COMMONWEALTH OF MASSACHUSETTS
BOARD OF BAR OVERSEERS
OF THE SUPREME JUDICIAL COURT

|  |  |
|---|---|
| BAR COUNSEL,                    )<br>                    Petitioner    )<br>                                            )<br>v.                                         )<br>                                            )<br>MATTHEW COBB, ESQ.,     )<br>                    Respondent )<br>                                            ) | BBO File Nos. C1-95-0510,<br>C1-97-0174 & C1-98-0209 |

## HEARING REPORT

On February 12, 2001, Bar Counsel filed a petition for discipline against the respondent, Matthew Cobb, charging professional misconduct in three separate counts. Count One, which arose from the respondent's representation of Dr. Omar Jaraki, alleged that the respondent filed a motion containing improbable and false accusations that he failed to corroborate and thereby exposed his client to sanctions. Count Two, which arose from the respondent's representation of Richard and Jean Nutile, alleged that the respondent filed a complaint against their adversaries' attorneys without grounds to support it, misrepresented to his clients that they had been sanctioned, persisted in a frivolous appeal, and converted settlement proceeds to pay sanctions properly assessed against him. Count Three, which arose from the respondent's representation of Marie Malave, alleged that the respondent settled a case without his client's authority, continued to represent a client when their interests were in conflict, disclosed client communications and made misrepresentations to a court and Bar Counsel. The respondent filed an answer on March 7, 2001.

Hearings were held on October 9, 11, 23 and 25, 2001, November 1, 2001, and March 21, 2002. Bar Counsel was represented by Assistant Bar Counsel Jane Rabe and

the respondent represented himself. The witnesses testifying at the hearing were: James H. Anderson, Esq.; Ellen Epstein Cohen, Esq.; Hon. Nancy Gertner; Robert L. Hernandez, Esq.; Marie Malave Duvivier; Richard J. Nutile; Alan Rose, Esq.; Conrad Meneide; and Michael Dolan, Esq. Bar Counsel introduced in evidence 109 exhibits.

## I. Findings of Fact

### Count One

1. The respondent, Matthew Cobb, was admitted to the Massachusetts bar on December 20, 1990 (Ans. ¶2).

2. In February 1993, Dr. Omar Jaraki worked as an emergency room doctor at Melrose/Wakefield Hospital, under contract with Gatewood Associates, P.C. (Gatewood) (Ans. ¶4). In February 1993, Jaraki was also employed as an emergency room physician at Quincy City Hospital (Ans. ¶4).

3. In February 1993, the Chief Executive Officer of Melrose/Wakefield Hospital instructed Gatewood not to schedule Jakari to work in the emergency room (Ex 3; Ex. 14). As a result, Gatewood terminated Jakari's contract to perform physician services as an independent contractor at Melrose/Wakefield Hospital (Ex. 5).

4. On or about March 4, 1993, the respondent was retained by Jaraki to represent him in his claims for damages arising from his termination as an emergency-room physician at Melrose/Wakefield Hospital (Ans. ¶6). Jaraki alleged, *inter alia*, that he had been denied medical staff privileges at Melrose/Wakefield Hospital because of his ethnic origins and that the hospital had fabricated charges of dereliction of duty and sexual harassment to conceal its ethnic bias (Ans. ¶6).

5. On or about June 11, 1993, the respondent filed suit in Middlesex Superior Court against Richard Quinlan; Melrose/Wakefield Hospital; Gatewood Associates, P.C.; Spectrum Emergency Care, Inc.; Joseph P. Gatewood, M.D.; and Richard Geist, M.D.

The matter was styled <u>Jaraki v. Quinlan, et al.</u>, Middlesex Superior Court No. 93-3406 (Jaraki I) (Ans. ¶7).

6. Attorney James Anderson of the firm of Taylor, Anderson & Travers appeared for Gatewood, Spectrum, Dr. Gatewood and Dr. Geist (Ans. ¶7).

7. In or about September 1993, Jaraki was hired temporarily for emergency-room work at the Lawrence General Hospital (Ans. ¶8).

8. In early 1994, Jaraki was offered a cardiology fellowship at St. Louis University in Missouri (Ans. ¶9).

9. On July 3, 1994, Jaraki left Quincy City Hospital to pursue a cardiology fellowship at St. Louis University in Missouri (Ans. ¶10).

10. On or about February 14, 1995, the respondent filed a First Amended Complaint in *Jakari v. Quinlan, et al*, Middlesex Superior Court No. 95-0210 (Ex. 5). Jaraki sought damages based on the difference between what he earned as a cardiology fellow and what he would have earned had he continued to work at both Lawrence General Hospital and Quincy City Hospital (Ex.5).

11. Dr. Leonid Rozenbaum was an emergency-room physician employed at Quincy City Hospital during the same period of time as Jaraki's employment there (Ans. ¶12).

12. In or about January 1995, the respondent filed answers to interrogatories propounded by Attorney Anderson on behalf of Gatewood, Spectrum, Dr. Gatewood, and Dr. Geist (Ans. ¶14). The respondent listed "Dr. Leo Rozenbaum" in response to an interrogatory asking for the names of Jaraki's witnesses (Ans. ¶14). Anderson recognized Dr. Rozenbaum's name as a client of his partner, Attorney Ellen Epstein Cohen (Tr. 1:79-80).

13. In 1994 and 1995, Dr. Rozenbaum was represented on unrelated matters by Ellen Epstein Cohen, a lawyer employed by Taylor, Anderson & Travers (Ans. ¶15). By letter dated January 19, 1995, Attorney Cohen notified Dr. Rozenbaum that he had been

3

listed as a witness in the Jeraki case and asked him to contact her so that the firm could determine whether there was a conflict of interest (Ex. 115; Tr. 1:136).

14. On March 3, 1995, the respondent filed an *ex parte* motion for a temporary order against the defendants; the firm of Taylor, Anderson & Travers; "Attorney Diane Taylor" (whom the respondent identified as a partner at Taylor, Anderson & Travers)[1]; and Attorney Nancy Gertner (now Judge) to restrain them from "communicating by any means with Leo Rozenbaum, M.D., a witness in [this] action" (Ans. ¶17). The motion also sought a short order of notice and, ultimately, a preliminary injunction restraining any of the defendants and their officers, agents, and attorneys from contacting Dr. Rozenbaum (Ans. ¶17).

15. The *ex parte* motion filed by the respondent made several false assertions concerning alleged conversations between Dr. Rozenbaum and "Attorney Diane Taylor" as well between Dr. Rozenbaum and his former attorney, Attorney Nancy Gertner (Ex. 6). The respondent alleged that Attorney Taylor and Attorney Gertner were urging Dr. Rozenbaum not to testify or were attempting to influence and alter his testimony in the Jeraki matter (Ex. 6). The respondent drafted and filed an affidavit of Jeraki to support the *ex parte* motion. The affidavit also contains several false assertions concerning alleged communications between Dr. Rozenbaum and his attorneys. In making the false allegations in the motion and affidavit the respondent relied entirely upon the representations of his client (Ans. ¶19; Ex. 14). The respondent made no attempt to corroborate his client's allegations and had no good grounds to support them. In fact, the respondent did not correctly identify Dr. Rozenbaum's attorney, who was never an individual by the name of Diane Taylor. There was no one by that name at the law firm used by Dr. Rozenbaum.

16. On March 3, 1995, the court declined to consider the respondent's motion *ex parte* (Ans. ¶22). The court issued a short order of notice to be served on Dr. Rozenbaum

---

[1] See paragraph 19, infra.

4

listed as a witness in the Jeraki case and asked him to contact her so that the firm could determine whether there was a conflict of interest (Ex. 115; Tr. 1:136).

14. On March 3, 1995, the respondent filed an *ex parte* motion for a temporary order against the defendants; the firm of Taylor, Anderson & Travers; "Attorney Diane Taylor" (whom the respondent identified as a partner at Taylor, Anderson & Travers)[1]; and Attorney Nancy Gertner (now Judge) to restrain them from "communicating by any means with Leo Rozenbaum, M.D., a witness in [this] action" (Ans. ¶17). The motion also sought a short order of notice and, ultimately, a preliminary injunction restraining any of the defendants and their officers, agents, and attorneys from contacting Dr. Rozenbaum (Ans. ¶17).

15. The *ex parte* motion filed by the respondent made several false assertions concerning alleged conversations between Dr. Rozenbaum and "Attorney Diane Taylor" as well between Dr. Rozenbaum and his former attorney, Attorney Nancy Gertner (Ex. 6). The respondent alleged that Attorney Taylor and Attorney Gertner were urging Dr. Rozenbaum not to testify or were attempting to influence and alter his testimony in the Jeraki matter (Ex. 6). The respondent drafted and filed an affidavit of Jeraki to support the *ex parte* motion. The affidavit also contains several false assertions concerning alleged communications between Dr. Rozenbaum and his attorneys. In making the false allegations in the motion and affidavit the respondent relied entirely upon the representations of his client (Ans. ¶19; Ex. 14). The respondent made no attempt to corroborate his client's allegations and had no good grounds to support them. In fact, the respondent did not correctly identify Dr. Rozenbaum's attorney, who was never an individual by the name of Diane Taylor. There was no one by that name at the law firm used by Dr. Rozenbaum.

16. On March 3, 1995, the court declined to consider the respondent's motion *ex parte* (Ans. ¶22). The court issued a short order of notice to be served on Dr. Rozenbaum

---

[1] See paragraph 19, infra.

4

at his place of employment and on Attorney (now Judge) Gertner, as well as the parties (Ans. ¶22). A hearing on the motion was continued until March 17, 1995 (Ans. ¶22).

17. On March 4, 1995, the respondent caused a *subpoena duces tecum* to be served on Dr. Rozenbaum at Quincy City Hospital (Ans. ¶23). The subpoena required Dr. Rozenbaum to bring a "letter from "Attorney Diane Taylor" " (Ans. ¶23; Ex. 9A).

18. On March 6, 1995, the court impounded the respondent's motion and the affidavit (Ans. ¶24).

19. On March 7, 1995, Attorney Cohen filed on behalf of Dr. Rozenbaum an emergency motion to quash the *subpoena duces tecum* (Ans. ¶25). In a supporting affidavit, Dr. Rozenbaum denied the allegations set forth in the respondent's motion, stated that he had no information regarding the Jeraki case, and attested that he did not know an "Attorney Diane Taylor," had never discussed the case with Attorney Gertner, had never met with his personal counsel, Attorney Cohen, to discuss Jeraki, and did not have a letter from "Diane Taylor, Esq." (Ex. 9A). Dr. Rozenbaum sought costs, attorney's fees and other sanctions (Tr. 1:147, 154-155; Ex. 11-11A).

20. On March 16, 1995, the defendants filed an "Opposition to the Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction," a "Motion to Strike Dr. Jeraki's Affidavit of March 3, 1995," and a "Motion for Sanctions" (Ans. ¶27). The motions were supported by an affidavit from Attorney Anderson, in which, *inter alia*, Attorney Anderson swore that there was no attorney named "Diane Taylor" at Taylor, Anderson & Travers (Ans. ¶27).

21. On March 17, 1995, there was a hearing before Superior Court Judge James F. McHugh, III, on Jeraki's motion for a temporary restraining order (Ans. ¶29). Both Jeraki and Dr. Rozenbaum testified (Ans. ¶29). At the hearing, the respondent asserted that Dr. Rozenbaum, Attorney Gertner and "Diane Taylor" were engaging in a criminal enterprise to prevent Dr. Rozenbaum from testifying (Tr. 1:126-127; Ex. 14).

5

22. After the hearing, the court denied the respondent's motion, ruling that the respondent had "filed the Motions for a Temporary Restraining Order in bad faith and without any reasonable inquiry..." in violation of Mass. R. Civ. P. 11 (Ans. ¶31). The court ordered both the respondent and Jaraki jointly to pay sanctions in the amount of $8,367 to Gatewood, Spectrum Emergency Care, Inc. and Joseph Gatewood; $3,167.49 to counsel for Dr. Rozenbaum; and $1,050 to Dr. Rozenbaum (Ans. ¶31).

**Count Two**

23. On or about December 10, 1991, Richard and Jean Nutile retained the respondent to represent them in Jean Nutile's claims against Dr. Michael Hayes and South Shore Neurology Associates, Inc. (South Shore) that she had been sexually assaulted by Dr. Hayes during his physical examination of her on or about December 22, 1990 (Ans. ¶36).

24. On or about February 26, 1992, the respondent sent to South Shore and Dr. Hayes a thirty-day demand letter pursuant to G.L. c. 93A (Ans. ¶37). In the letter, the respondent alleged that his client had been sexually assaulted during a physical examination by Dr. Hayes performed at South Shore's offices and that, if South Shore did not respond with a reasonable offer, an action would be filed (Ans. ¶37).

25. On March 27, 1992, Attorney Alan D. Rose, then a partner at Nutter, McClennan & Fish (Nutter), responded to the demand letter on behalf of South Shore (Ans. ¶38). In his response, Rose denied that an assault had occurred and stated that "[y]our February 1992 letter is defamatory. [The doctor] and South Shore have excellent reputations and both fully believe that your client's conduct in accusing [the doctor] of sexual and professional misconduct is actionable" (Ans. ¶38). Rose sent a copy of this letter to Jean Nutile (Ans. ¶38).

26. On November 12, 1992, the respondent filed a complaint for damages on behalf of Jean Nutile against Nutter, Rose, South Shore and Dr. Hayes in Suffolk Superior Court Docket No. 93-6804 (Tr. 3:21, 84,86; Ex. 30, Ex. 31). The complaint

against Nutter and Rose alleged that the mailing of South Shore's response directly to the plaintiff was a violation of the Disciplinary Rules and subjected Nutter and Rose to civil liability (Ex. 31).

27. By letter dated November 12, 1992, the respondent sent a copy of the Nutile complaint to Rose and invited him to discuss settlement of the matter prior to service of the complaint (Tr. 3:20,86-87; Exs, 21, 31, 34). The respondent never served the complaint on the defendants and the case was dismissed for lack of prosecution (Tr. 3:21; Exs. 30, 31).

28. On November 12, 1992, the respondent also sent the Nutiles a copy of his correspondence to Nutter and Rose with enclosures (Ex. 19A). The respondent told the Nutiles that Nutter and Rose would become part of the lawsuit and there would be a conflict of interest between Nutter and its client, South Shore. (Tr. 2:192-193). The respondent also told the Nutiles that adding Rose and Nutter to the complaint would make their case stronger because Nutter was a "bigger law firm" and the lawyers there would no longer be able to represent the South Shore and the doctor in the Nutiles' lawsuit. (Tr.2:193-194).

29. On December 1, 1992, the respondent served Nutter and Rose with an undated Chapter 93A demand letter (Tr. 3:22-23; Ex.22). In this letter the respondent referred to South Shore and the doctor as "NMF and Rose's (former?) clients" (Ex. 22). By this letter the respondent was suggesting that Nutter and Rose could no longer represent their clients in light of the allegations against them in the same matter (Tr. 2:193-194). The respondent's claims against Nutter and Rose had the purpose and effect of interfering with Nutter's and South Shore's attorney-client relationship (Tr. 2:193-194; Tr. 3: 89-92).

30. On December 4, 1992, Attorney Joseph Blute wrote to the respondent on behalf of Nutter and Rose (Tr. 3:88-89; Ex. 36c). In this letter Blute told the respondent that his claims against Nutter and Rose were barred on several grounds, including an

7

absolute privilege relating to statements made by an attorney relative to proposed litigation (Tr. 3:88-89; Ex. 36C). Blute cited relevant case law and suggested that the respondent refrain from filing a complaint against Nutter and Rose because it would violate his obligations under Rule 11 and the Disciplinary Rules and would constitute grounds for costs and attorney's fees under G. L. c. 231, § 6F (Ex. 36C).

31. In December 1993, the respondent filed another complaint on the Nutiles' behalf against Nutter, Attorney Rose, South Shore, and Dr. Hayes in Suffolk Superior Court, Docket No. 93-07134. The complaint against Nutter and Rose alleged that the mailing of a copy of South Shore's response directly to the plaintiff violated G.L. c. 93A and the Massachusetts Civil Rights Act, invaded the plaintiffs' privacy, and intentionally inflicted emotional distress on the plaintiffs (Ans. ¶39). NFM and Rose filed a motion to dismiss on several grounds, including that the claims asserted were barred by absolute privilege (Ans. ¶41). On the same date, they also filed a motion for attorney's fees under G.L. c. 21, § 6F; Rule 11; and G.L. c. 231, § 6F (Ans. ¶41).

32. On December 23, 1992, Blute responded to the second 93A demand letter, again asserting that his clients were protected from civil liability (Ex. 23).

33. On January 7, 1993, the respondent wrote to Blute that he does "not care whether it's Nutter, F. Lee Bailey or a kid right out of law school, NOBODY is going to do to my clients what NMF attempted and get away with" (Tr. 3:96; Ex. 36g).

34. On January 8, 1993, Blute telephoned the respondent and attempted to persuade him to refrain from pursuing the complaint against Nutter and Rose. The respondent was angry and told Blute that he would not allow "large firms" to treat him this way and get away with it (Tr. 3:94). Blute suggested that the Board of Bar Overseers and not a civil suit was the appropriate forum for the respondent's complaint (Tr. 3:107). The respondent did not report Rose or Nutter to the Board (Ex. 41).

8

35. On January 18, 1993, the respondent filed a first amended complaint on the Nutiles' behalf against Nutter, Rose, South Shore, and Dr. Hayes in Suffolk Superior Court, Docket No. 93-07134 (Ex. 34).

36. On February 1, 1994, Nutter and Rose filed a motion to dismiss on several grounds (Tr. 3:100; Ex. 37; Ex. 41). On the same date, Nutter and Rose also filed a motion for sanctions including attorneys' fees and Blute's supporting affidavit (Tr. 3:100; Exs. 36 and 36A).

37. On February 2, 1994, the court (Sosman, J.) conducted a hearing on the motion to dismiss and dismissed the plaintiffs' complaint against Nutter and Rose (Ans. ¶42). The court held that Rose's actions were "clearly privileged" and the "mailing of the 93A reply directly to the plaintiff was not actionable" (Ex. 40). The court continued the case for a hearing on Nutter and Rose's request for Rule 11 sanctions and advised the parties that any sanction would be against the respondent personally and not the Nutiles (Ex. 41).

38. On or about August 12, 1994, the court (Sosman, J.) conducted a hearing on sanctions (Ex. 39). The court found that the action filed against Nutter and Rose was "patently lacking in any even argueable merit," that [the respondent] had received the relevant legal research from Nutter and Rose's counsel "demonstrating that lack of any viable cause of action," and that the respondent had "pursued the action for the apparent purpose of depriving South Shore of its chosen counsel" (Tr. 3:117-118; Ex. 39). The court found that the respondent had violated Rule 11 by filing the complaint against Nutter and Rose. The judge awarded Nutter and Rose attorneys' fees and directed that the fees "be paid by plaintiff's counsel and not, directly or indirectly, passed on to the plaintiff" (Ex. 39; Tr. 3:118). The respondent did not provide a copy of Judge Sosman's decision to the Nutiles (Tr. 2:197).

39. After receiving the August 12, 1994 order, the respondent intentionally misrepresented to the Nutiles that they had been sanctioned in the amount of $4000 (Tr.

2:197-198, 215). Mr. Nutile told the respondent that he could not afford to pay the $4,000 in sanctions (Tr.2:198). The respondent then offered to "split" the sanctions with the Nutiles and asked them for $2,000 because he intended to appeal Judge Sosman's decision (Tr. 2:198). The respondent told Mr. Nutile that he would win the appeal and they would get their money back because Judge Sosman was in error (Tr. 2:198). Mr. Nutile agreed to pay the respondent $2,000 for the sanctions because he thought the respondent was paying the other $2,000 on their behalf (Tr. 2:198). Mr. Nutile paid the respondent $2,000 towards the sanctions on April 28, 1995 (Tr. 2: 198, 219; Ex. 19C). The respondent also asked the Nutiles to pay the expenses for filing an appeal from the sanctions (Tr.2:199; Ex. 19D). Mr. Nutile paid $150 for filing an appeal of the sanctions (Tr.2:199; Ex. 19D).

40. On September 29, 1994, the respondent filed a petition for interlocutory review and a motion for stay on behalf of the Nutiles (Ans. ¶45). In his affidavit in support of review, the respondent alleged that Nutter "must have some particular power or influence with the trial court judge" for the judge to overlook Nutter's ethical breaches (Ans. ¶45).

41. On October 20, 1994, Justice Laurence, sitting as Single Justice of the Appeals Court, affirmed the decision and the sanctions imposed by the Superior Court upon the respondent (Tr. 3:128; Ex. 55). Judge Laurence also awarded the defendants additional attorneys' fees and double costs for the respondent's conduct in filing a frivolous petition that included "scandalous and impertinent" material accusing the motion judge of "bias, unethical conduct and inappropriate susceptibility to unspecified illegitimate influence" by counsel for Nutter and Rose (Tr. 3:120-121, 128; Tr. 4:40-41; Ex.55).

42. The respondent did not pay the sanctions to Nutter when ordered in 1994 (Tr. 3:119-120; Ex. 28; Ex. 47; Ex. 49). Blute wrote to the respondent requesting the sanctions ordered by Judge Sosman and Judge Laurence totaling $7,244.50 (Tr. 3:121).