43.  On February 15, 1995, Blute filed a Motion for Entry of Separate and Final Judgment in the Superior Court seeking a dismissal against the defendants Nutter and Rose and an order that the respondent pay the sum of $7,244.50 previously ordered.

44.  On April 28, 1995, the Superior Court allowed the motion for entry of separate and final judgment dismissing the plaintiffs' complaints against Nutter and Rose and denied the plaintiffs' cross-motion for a stay pending resolution of the appeal (Tr. 3:132; Ex.49).  The Superior Court, Smith, J., ordered the respondent to pay $4,000 in sanctions and the Plaintiffs to pay $3,244.50 in sanctions (Tr. 3:132; Ex. 49)[2].

45.  On June 5, 1995, the respondent appealed the dismissal of the Plaintiffs' claims against Nutter and Rose and the award of attorneys fees to a three-member panel of the Appeals Court (Ans. ¶48).

46.  In June 1995, the respondent settled the complaint against Dr. Hayes for $45,000 (Ans. ¶49).   In his accounting of the settlement proceeds, the respondent credited the Nutiles with their $2,000 payment for the sanctions ordered by Judge Sosman.  (Tr. 2:201-202; Ex. 20).  The respondent deducted from the Nutiles' settlement $3,244.50 plus $277.11 in interest for the sanctions imposed by Judge Lawrence (Ex. 20).  The respondent told the Nutiles that he had lost in the Appeals Court and that additional sanctions were ordered (Tr. 2:202).  The respondent told the Nutiles that he would pay the first sanctions and they would pay the second sanction (Tr. 2:202).  The Nutiles agreed to this arrangement because they thought the sanctions were assessed against them on both occasions (Tr. 2:202).

47.  In September 1995, the respondent filed a brief on appeal from the entry of final judgment and interlocutory orders of dismissal and sanctions (Ex. 59).  The respondent charged the Nutiles for work done on this appeal (Tr. 2:203; Ex. 19e).

---

[2] This order for the plaintiffs to pay $3,244.50 was erroneous and was modified by the review and decision of the three-judge panel of the Appeals Court on August 16, 1996 (Ex. 61).  See below.

48. On August 16, 1996, a three-judge panel of the Appeals Court affirmed the Superior Court's finding that the respondent had acted in bad faith in commencing the litigation against Nutter and Rose, dismissed the complaint against Nutter and Rose, and awarded "double costs against [the respondent] based upon the frivolous nature of the appeal" (Tr. 3:134; Ex. 61). The Appeals Court panel held that Justice Laurence had not abused his discretion in sanctioning the respondent for his accusations of bias against Judge Sosman (Ex. 61). The order states, "We affirm the judgment dismissing the complaint and the orders of the motion judge and single justice assessing sanctions against plaintiffs' counsel. We also consider this appeal frivolous and award double costs against the plaintiffs'counsel" (Ex. 61) (emphasis added).

49. By August 1996, when the Appeals Court panel's order was issued, the respondent was on notice that the sanctions ordered by both Judge Sosman and Judge Laurence had been imposed against him individually under Rule 11 (Ex. 61). The respondent never informed the Nutiles of the decision of the panel or refunded to the Nutiles the $3,244.50 plus interest which he had deducted from their settlement funds (Tr. 2:204-205).

50. On or about September 5, 1996, the respondent filed an application for leave to obtain further appellate review (Ans. ¶52). On September 16, 1996, counsel for Nutter and Rose filed an opposition to the application (Ans. ¶52). On September 23, 1996, judgment after rescript entered, and the complaint of the plaintiffs against Nutter and Rose was dismissed (Ans. ¶52). On October 30, 1996, the Supreme Judicial Court declined to review the matter further (Ans. ¶52).

**Count Three**

51. Marie Malave (now Duvivier) worked as a nurse assistant at Carney Hospital from October 1985 through November 3, 1995 (Ans. ¶57). Malave is from Haiti and, during and since this time, has suffered from diabetes and hypertension (Ans. ¶57).

52. In May 1994, Malave was assigned a new supervisor, Carol Krzywda (Ans. ¶58). After that date Malave believed that she was the victim of discrimination due to her age and physical maladies (Tr. 5:30; Ex. 74).

53. On or about October 23, 1995, Malave resigned from Carney Hospital (Ans. ¶59). She offered her resignation because of a work environment she perceived as hostile (Tr. 2:29; Ex. 68).

54. In 1995, Malave was a single parent and the sole support of her children (Tr. 2:131-132). She secured employment at New England Baptist Hospital as soon as she resigned from Carney Hospital (Tr. 2:132).

55. On or about November 1, 1995, Malave retained the respondent to represent her in an action against Carney Hospital for discrimination on the basis of disability, race and ethnicity (Ans. ¶60). The respondent agreed to file a complaint with the MCAD and EEOC against Carney Hospital (Ans. ¶60). Malave signed a contingent fee agreement (Tr. 2:126; Ex. 66).

56. On or about December 19, 1995, the respondent filed Malave's complaint with the MCAD and EEOC against Carney Hospital (Ans. ¶61). The respondent also drafted an affidavit to accompany Malave's complaints (Ans. ¶61). The respondent argued that Malave had been constructively discharged and suffered damages (Ans. ¶61).

57. The MCAD conducted an investigation and determined that the alleged discrimination occurred in April 1995, which was beyond the six-month filing deadline under federal and state anti-discrimination law (Exs. 70, 70A). On July 24, 1996, the MCAD dismissed Malave's charge because her complaint was "not timely filed with the Commission" and because the Commission was "unable to conclude that the information provided constituted a violation of the statutes" (Tr. 2:134; Ex. 70B). The respondent filed an administrative appeal. In October 1996, the MCAD affirmed the dismissal of Malave's complaint (Ex. 70C).

58. The respondent told Malave that MCAD had denied her claims, but that she had a strong case (Tr. 2:134). The respondent required Malave to pay $1,000 to cover the expense of litigation, and he modified the contingent fee agreement to reflect the payment in April 1997 (Tr. 2:126-128, 134-135; Ex.66).

59. On April 27, 1997, the respondent filed suit in U.S. District Court on Malave's behalf against Carney Hospital and Carol Krzywda for violations of 42 U.S.C. § 2112a (Americans with Disabilities Act) and 42 U.S.C. § 2000e (Title VII of the 1964 Civil Rights Act). The action was styled Malave v. Carney Hospital, et al., Civil Action No. 97-11950EFH (Ans. ¶63). Attorney Michael F.X. Dolan, Jr. of Murphy, Hesse, Toomey & Lehane, filed an appearance on behalf of the defendants (Ans. ¶63).

60. At a scheduling conference on February 9, 1998, the respondent told Dolan and the Court that Malave would accept $30,000 to settle all her claims against the defendants (Ex. 75A).

61. On March 11, 1998, the respondent and Malave appeared for a deposition at Dolan's office (Tr. 2:140; Ex. 74) During a break in the deposition, the respondent and Dolan discussed the possibility of settling the case (Tr. 55:28-29). Dolan told the respondent that Carney Hospital would not pay $30,000, but that he could recommend settling for $15,000. (Tr. 5:29). The deposition was suspended to accommodate the respondent's schedule (Tr. 5:25; Ex. 75A).

62. After the deposition was suspended, the respondent told Malave that the hospital had offered $15,000 (Tr. 2:142). The respondent told Malave that she would have $10,000 to put in her bank book (Tr.2:142).

63. On or about March 12, 1998, Malave called the respondent's office and left a message on the respondent's answering machine informing him that she would not accept anything less than $30,000 to settle her claim against Carney Hospital (Ans. ¶65). On or about March 16, 1998, the respondent spoke with Malave by telephone about settlement

(Ans. ¶65). Malave told the respondent that she would not agree to a settlement of less than $30,000 (Ans. ¶65).

64. On March 18, 1998, Dolan telephoned the respondent to schedule the conclusion of Malave's deposition and further discuss the possibility of settlement (Ex. 75A). During this conversation the respondent made a demand of $15,000 to settle Malave's case (Ex. 75A).

65. On March 18, 1998, the respondent called Malave to discuss a settlement offer of $15,000. The respondent and Malave had an extended phone conversation during which the respondent tried to convince Malave to accept the $15,000. (Tr. 2:144). The respondent urged Malave to come to his office to sign settlement papers (Tr. 2:144-145) and told Malave that Judge Harrington would not be happy with her if she refused to sign the settlement (Tr. 2:147). We credit Malave's testimony that she repeatedly told the respondent that she did not want to accept the $15,000 settlement (Tr. 2:144-148). Later in the day on March 18, 1998, the respondent called Dolan to confirm the settlement for $15,000 (Ex. 75A).

66. On March 18, 1998, Dolan sent the respondent a fax accepting the respondent's settlement demand in the amount of $15,000 and requiring Malave to sign a settlement agreement, a general release and a stipulation of dismissal with prejudice (Tr. 5:68-69; Ex. 90).

67. After speaking with the respondent on March 18, 1998, Malave telephoned her son, Conrad Meneide, an engineer in Atlanta, Georgia (Tr. 2:148). Malave asked her son to call the respondent and make him stop trying to force her to settle for $15,000 (Tr. 2:148).

68. Meneide called the respondent's office twice and left one message on an answering machine and one message with a woman who answered the phone. (Tr. 4:7). Meneide told the respondent to stop the settlement because his mother did not agree to it

and wanted a minimum of $30,000 to settle her case (Tr. 4:7). The respondent never

returned Meneide's calls (Tr. 4:7).

69.  In March 1998 Meneide located Attorney Robert Hernandez, a French-

speaking employment and civil rights lawyer for his mother (Tr.4:8).

70.  On or about  March 24, 1998, Malave engaged Hernandez concerning

settlement of her claims against Carney Hospital (Tr. 2:152; Tr. 2:80-81). Malave told

Hernandez that she didn't want to settle her case for $15,000 and that the respondent was

trying to make her settle (Tr. 2:152).

71.  By letter faxed to the respondent on March 24, 1998, Hernandez requested a

complete copy of  Malave's file (Tr. 2:11; Ex. 93B).  On March 25, 1998, Hernandez

spoke to the respondent on the telephone.  The respondent told Hernandez that it would

not be necessary for him to forward the file, that as far as he was concerned the case was

settled, and that Malave had authorized him to settle for $15,000 (Tr. 2:12-13).

72.  Attorney Hernandez repeatedly requested a copy of Malave's deposition

transcript or the name of the court reporter who took the deposition.[3]  The respondent

failed to respond to these requests (Tr. 2:16-17; Ex. 93C).

73.  On or about April 1, 1998, the respondent advised Dolan that Malave was

refusing to honor the settlement agreement (Tr. 5:69-7; Ex. 75A).

74.  On or about April 13, 1998, Dolan filed a motion to enforce the settlement

agreement and dismiss with prejudice plaintiff's complaint and requested a hearing (Ans.

¶80).  Dolan asked the court to enforce the agreement based upon a theory of apparent

authority (Ans. ¶80).  Dolan also requested attorney's fees for the costs and expenses of

filing and arguing the motion (Ans. ¶80).

---

[3] The respondent told Hernandez that in the deposition Malave had disclosed that she had failed to notify
the hospital of her discrimination claim (Tr. 2:12-13). In fact, the deposition reveals the contrary (Ex.
93B). Thus, not only was the respondent misrepresenting his former client's statements, but also he was
doing so in order to buttress his decision to settle the case for $15,000.

16

75. On or about April 17, 1998, the respondent filed a pleading entitled "Plaintiff's Verified Response to Defendant's Motion to Enforce Settlement and General Release" (Ans. ¶82). The respondent did not notify Malave that he planned to file this response and he did not have authority to file any response on her behalf. (Tr. 2:19). The plaintiff's verified response contained at least one incorrect statement concerning Hernandez (Tr. 2:19-2). The plaintiff's verified response was verified only by the respondent (Tr. 2:21).

76. The plaintiff's verified response represented that Malave had authorized the settlement and that the respondent was "ready to submit to the Court in camera currently privileged documents and testimony indicating that a settlement was reached with Malave's full consent and authority" (Ans. ¶83). The respondent had no authority to disclose to the Court or to opposing counsel his communications with Malave (Tr. 2:22). The respondent had no authority from Malave to pursue enforcement of the putative settlement (Tr. 2:22). Malave never signed any documents that would indicate she had authorized the respondent to settle her case for $15,000 (Tr. 2:156-157; Ex. 86).

77. The respondent served Attorney Hernandez with a copy of the plaintiff's verified response, but he did not provide to Hernandez the defendant's motion or the proposed settlement agreement (Ans. ¶84).

78. By April 20, 1998, Hernandez had assumed responsibility for representing Malave (Ans. ¶85). On April 20, 1998, Attorney Hernandez provided to the respondent Ms. Malave's affidavit and his own affidavit for filing with the court (Ans. ¶85). Malave swore in her affidavit that she had refused to settle with Carney Hospital for $15,000 and that she had never authorized the respondent to settle for that amount (Ans. ¶85). Among other things, Attorney Hernandez attested that the respondent had told him that neither the demand for settlement nor Malave's authorization were in writing and that the respondent's "Verified Response" contained misstatements (Ans. ¶85). The respondent never filed either of these affidavits with the court (Ans. ¶85).

79. On April 20, 1998, Attorney Hernandez filed a request for investigation of the respondent's conduct with the Office of Bar Counsel (Ans. ¶86). On the same date, Attorney Hernandez provided to the respondent a copy of his request for investigation (Ans. ¶86).

80. On May 14, 1998, the U.S. District Court, without an evidentiary hearing, allowed the defendants' motion to enforce the settlement (Ans. ¶89). The court entered an order requiring the defendants to deliver to the respondent, as attorney for Malave, a check in the amount of $15,000 (Ans. ¶89). The respondent was ordered to disburse the settlement amount according to his fee agreement with Malave (Ans. ¶89). The court entered an order dismissing Malave's case with prejudice (Ans. ¶89).

81. On June 28, 1998, Attorney Hernandez appealed on Malave's behalf to the U.S. Court of Appeals for the First Circuit from the District Court's decision ordering enforcement of the settlement and dismissing Malave's case with prejudice (Ans. ¶90).

82. By letter dated July 7, 1998, the respondent sent a settlement check to Malave in the amount of $10,815 (Ans. ¶91). Malave refused to cash the check and gave it to Hernandez (Tr.2:158-160).

83. On March 9, 1999, the First Circuit Court of Appeals in Malave v. Carney Hospital, 170 F.3d 217 (1st Cir., 1999), vacated the District Court's decision and remanded the case to the District Court for an evidentiary hearing on whether the respondent had actual authority from Malave to settle her case (Ans. ¶92).

84. On or about September 14, 1999, the District Court conducted an evidentiary hearing to determine whether the respondent had actual authority to settle Malave's claim against Carney Hospital (Ans. ¶93). The court found that although the respondent had purported to hold documents which would indicate he had authority to settle on Malave's behalf, "he never produced any such documents during the evidentiary hearing" (Ex. 86). The court found that there was nothing in the record to affirmatively indicate that Malave had given the respondent the authority to settle her case, and concluded that the

18

respondent did not have actual authority to do so (Exs. 86, 89). The court reinstated Malave's case (Ex. 89).

85. Although not a party, the respondent filed an "Objection to December 13, 1999 Findings and Recommendations" (Ex. 87). The respondent falsely claimed that he had documentation that Malave had given him authority to settle in the form of hand-drafted answers to interrogatories (Ex. 87; Ex. 102). The answers to interrogatories handwritten by Malave's son do not provide any authority to settle (Ex. 73A). The respondent's objection was dismissed because he had no standing (Ex. 89).

86. Hernandez ultimately settled the case on behalf of Malave for $22,500 (Tr. 2:161, 175-176).

## II. Conclusions of Law

### Count One

87. The respondent's conduct in filing pleadings with the court that contained scandalous or improbable allegations without conducting an investigation into those allegations violated Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice), and Canon Six, DR 6-101(A)(2) (inadequate preparation) and (3) (neglect). His further pursuit of these claims after he received evidence that they could not be true also violated these rules.

88. The respondent's conduct in representing to the court that Dr. Rozenbaum, Attorney Gertner and "Attorney Diane Taylor" were engaged in a criminal conspiracy when he had no admissible evidence to support that claim violated Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice), and Canon Seven, DR 7-106(C)(1) (before a tribunal a lawyer shall not state or allude to any matter that he had no reasonable basis to believe is relevant or that will not be supported by admissible evidence).

19

89. The respondent's conduct in exposing and subjecting Jaraki to sanctions for violations of Mass. R. Civ. P. 11 was a violation of Canon Seven, DR 7-101(A)(3) (prejudice or damage to client during professional relationship).

## Count Two

90. The respondent's conduct in violating Rule 11 by filing suit against Nutter and Rose when he knew that the claim was unwarranted under existing law and when there was no good faith argument to support it was a violation of Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice), and Canon Seven, DR 7-102(A)(2) (knowingly advancing a claim or defense that is unwarranted under existing law). While we acknowledge that the ethical propriety under DR 7-104(A)(1) of sending a Chapter 93A demand letter directly to a represented party was not clearly established when the respondent filed the claim, it was clear that a violation of a disciplinary rule does not establish a basis for civil liability. See Fishman v. Brooks, 396 Mass. 643, 649 (1986).

91. The respondent's conduct in alleging in pleadings filed in the Appeals Court that the trial judge had to have been improperly influenced in dismissing the complaint and in assessing costs against him when he had no good ground to support such accusations was a further violation of Rule 11 and Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice) and Canon Seven, DR 7-102(A)(1) (lawyer shall not take action on behalf of client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another).

92. The respondent's conduct in persisting in a frivolous appeal from the dismissal and sanctions imposed against him by the motion judge, the single justice and the Appeals Court violated Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice) and

Canon Seven, DR 7-102(A)(2) (knowingly advancing a claim or defense that is unwarranted under existing law).

93.  The respondent's conduct in misrepresenting to his clients that the court had assessed sanctions against them instead of telling them that he had been sanctioned personally violated Canon One, DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice); and Canon Seven, DR 7-101(A)(1) (intentional failure to seek the lawful objectives of the client), (2) (intentional failure to carry out a contract of employment) and (3) (prejudice or damage client during professional relationship).

94.  The respondent's conduct in converting $3,471.61 of the client's share of the settlement proceeds to pay sanctions that had been assessed against him personally violated Canon One, DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice); and Canon Nine, DR 9-102(B)(3) (failing to maintain complete records of the handling, maintenance and disposition of all trust funds and render appropriate accounts) and (4) (failing promptly to pay funds to client as requested by client or otherwise due).

**Count Three**

95.  The respondent's conduct in failing promptly to advise opposing counsel that his client did not wish to settle for $15,000 violated Mass. R. Prof. C. 1.2 (lawyer shall seek the lawful objectives of the client).

96.  The respondent's conduct in continuing to represent Malave when his personal and professional interests were in conflict with her interests, in failing to withdraw when he knew or it was apparent that his interests conflicted with hers, and in purporting to represent the client in filing the plaintiff's verified response in opposition to his client's interests, violated Mass. R. Prof. C. 1.2 (lawyer shall seek the lawful

21

objectives of the client), 1.7(b) (lawyer shall not represent a client if the representation may be materially limited by lawyer's responsibilities to another or by the lawyer's own interests), 1.8(b) (lawyer shall not use confidential information to the disadvantage of the client or for the lawyer's advantage unless the client consents after consultation), and 1.16(a)(1) (lawyer shall withdraw if the representation will result in violation of the rules of professional conduct).

97. The respondent's conduct in disclosing client communications to the court and opposing counsel without his client's authorization and against his client's interests violated Mass. R. Prof. C. 1.6(a) and 1.8(b). The respondent's conduct in falsely representing in pleadings filed with the court that he had documents and testimony demonstrating that his client had authorized settlement for $15,000 violated Mass. R. Prof. C. 3.3(a)(1) (knowingly making a false statement of material fact or law to a tribunal) and 8.4(c) (dishonesty, fraud, deceit or misrepresentation), (d) (conduct prejudicial to the administration of justice), and (h) (conduct adversely reflecting on fitness to practice).

98. The respondent's misrepresentation to Bar Counsel that he had provided to Attorney Hernandez in March 1998 the name of the court reporter who recorded Malave's deposition violated Mass. R. Prof. C. 8.4(c) (dishonesty, fraud, deceit or misrepresentation), (d) (conduct prejudicial to the administration of justice) and (h) (conduct adversely reflecting on fitness to practice).

### III. Factors in Mitigation and Aggravation

99. At the time of his misconduct, the respondent had substantial experience in the practice of law (Tr. 7:108-109; Tr. 8:93-94). See Matter of Luongo, 416 Mass. 308, 312, 9 Mass. Att'y Disc. R. 199, 203 (1993).

100. The respondent has failed to acknowledge the nature, effects, and implications of his misconduct. See Matter of Clooney, 403 Mass. 654, 657-658, 5 Mass. Att'y Disc. R. 59, 63-64 (1988). He continues to lack insight into his behavior and persists in blaming everyone except himself. He has made unfounded allegations in these proceedings against the Hearing Committee for failing to provide subpoenas and for engaging in *ex parte* communications with Bar Counsel; the allegations resemble closely the conduct alleged in the petition for discipline and found in this proceeding.

101. Ms. Malave was a vulnerable client, an immigrant of limited means whose first language was not English and who was the sole source of support for her children. See ABA Standards for Imposing Lawyer Sanctions § 9.22(h) (1992).

## MATTERS IN MITIGATION

102. The respondent has proffered no facts in mitigation other than circumstances the Court has characterized as "typical" mitigating factors that would not alter the sanction. See Matter of Alter, 389 Mass. 153, 157, 3 Mass. Att'y Disc. R. 3, 7 (1983).

## RECOMMENDATION FOR DISCIPLINE

We recommend that the respondent be disbarred. His misconduct under the second count alone warrants disbarment: in direct violation of Judge Sosman's order that the $4,000 sanction be paid by him alone and not be passed on to his clients, the respondent deliberately concealed that fact from his clients and intentionally misrepresented that they had personally been sanctioned in the amount of $4,000. His actions constituted a fraud on his own clients, and by taking their money he intentionally misappropriated client funds. See Matter of Leo, BD-2001-024 (September 12, 2001). Far from making restitution for that misconduct, he persists in the indefensible position

that his actions were proper. Disbarment is the appropriate sanction for such misconduct. See Matter of Schoepfer, 426 Mass. 183, 13 Mass. Att'y Disc. R. 679 (1997) (presumptive sanction for intentional misappropriation with intent to deprive or with actual deprivation resulting is disbarment or indefinite suspension); Matter of Bryan, 411 Mass. 288, 7 Mass. Att'y Disc. R. 24 (1992) (absence of restitution a major consideration in choosing between disbarment or indefinite suspension).

The respondent's other misconduct, while also serious and itself warranting suspension, serves only to strengthen our conclusion that he is unfit to practice law. He has made groundless and scandalous accusations of misconduct against opposing counsel and sitting judges. See Matter of Cohen, 435 Mass. 7 (2001); Matter of Kurker, BD-2002-052 (October 24, 2002). He filed other baseless and inappropriate pleadings. See Matter of Tobin, 417 Mass. 92, 96, 10 Mass. Att'y Disc. R. 256, 266-267 (1994) (18-month suspension). He made misrepresentations to the court about his authority to settle Malave's case and about documents he claimed would establish his authority. See Matter of Neitlich, 413 Mass. 416, 8 Mass. Att'y Disc. R. 167 (1992) (one-year suspension). He betrayed Malave by seeking to enforce a "settlement" she had consistently refused to enter into, and by revealing confidential matters to buttress the settlement; even after the court found there had been no settlement, he arrogated to himself the authority to object to the findings. Compare Matter of Dolan, 10 Mass. Att'y Disc. R. 59 (1994) (public reprimand where unauthorized settlement undertaken in misguided effort to serve client's interest).

Finally, we must take into account the cumulative nature of the respondent's misconduct. See Matter of Saab, 406 Mass. 315, 327, 6 Mass. Att'y Disc. R. 278, 291

24

(1989).  Here it is plain that the respondent's conduct—toward adversaries, judges, the

disciplinary process, and even his own clients—evinces "'a persistent and extended

pattern of improper and unethical behavior,' without even a rudimentary understanding or

acknowledgement of the ethical behavior expected of a member of the bar."  Matter of

Clooney, 403 Mass. 654, 657, 5 Mass. Att'y Disc. R. 59, 63-64 (1988), quoting Matter of

McInerney, 3 Mass. Att'y Disc. R. 143, 146 (1983).  Under these circumstances,

disbarment is the only appropriate sanction.


                                        Respectfully submitted,
                                        By the Hearing Committee,


                                        Joan E. Kolligian, Chair


                                        Richard L. Levine


                                        Joan G. Paino