COMMONWEALTH OF MASSACHUSETTS
BOARD OF BAR OVERSEERS
OF THE SUPREME JUDICIAL COURT

| | |
|---|---|
| BAR COUNSEL,      Petitioner   )<br><br>v.   )<br>  )<br>MATTHEW COBB, ESQ.,   )<br>        Respondent ) | BBO File Nos. C1-95-0510,<br>C1-97-0174 & C1-98-0209 |

## APPEAL PANEL REPORT

### INTRODUCTION

Bar Counsel filed a petition for discipline against the respondent, Matthew Cobb, charging professional misconduct in three separate counts. Count One, which arose from the respondent's representation of Dr. Omar Jaraki, alleged that the respondent filed a motion containing improbable and false accusations that he failed to corroborate and thereby exposed his client to sanctions. Count Two, which arose from the respondent's representation of Richard and Jean Nutile, alleged that the respondent filed a complaint against their adversaries' attorneys without grounds to support it, misrepresented to his clients that they had been sanctioned, persisted in a frivolous appeal, and converted settlement proceeds to pay sanctions assessed against him. Count Three, which arose from the respondent's representation of Marie Malave, alleged that the respondent settled a case without his client's authority, continued to represent a client when their interests were in conflict, disclosed client communications and made misrepresentations to a court and Bar Counsel.

Following 6 days of hearings held before a hearing committee of the Board, in which Bar Counsel was represented by Assistant Bar Counsel Jane Rabe and the respondent represented himself, the committee issued its report, finding that the respondent had violated numerous Disciplinary Rules and recommending that the respondent be disbarred. The respondent appealed. Oral argument on his appeal was heard on June 6, 2003, pursuant to Rule 3.50 of the Rules of the Board of Bar Overseers, before Constance L. Rudnick, Chair, James B. Re, and Robert Guttentag, a panel of the Board. Bar Counsel was again represented by Assistant Bar Counsel Jane Rabe and the respondent again represented himself.

We adopt the findings of fact and conclusions of law of the hearing committee and reject the respondent's appeal. Because we conclude that the respondent converted client funds, engaged in conduct that grossly exceeded the bounds of acceptable advocacy, and otherwise violated the ethical rules governing lawyers' conduct, we adopt the hearing committee's conclusion that disbarment is the appropriate sanction in this case.

## FINDINGS OF THE HEARING COMMITTEE

As stated above, the petition for discipline consisted of allegations concerning the respondent's conduct in his representation of clients in three matters. Although we adopt the committee's findings in their entirety, we summarize here only those facts necessary to this appeal.

Count One, Dr. Omar Jaraki

On or about March 4, 1993, the respondent, who has been a member of the bar of the Commonwealth since December 20, 1990, was retained by Dr. Omar Jaraki to represent him in his claims for damages arising from his termination as an emergency-room physician at Melrose/Wakefield Hospital. Dr. Jaraki alleged, *inter alia*, that he had been denied medical staff privileges at Melrose/Wakefield Hospital because of his ethnic origins and that the hospital had fabricated charges of dereliction of duty and sexual

2

On March 16, 1995, the defendants filed an "Opposition to the Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction," a "Motion to Strike Dr. Jaraki's Affidavit of March 3, 1995," and a "Motion for Sanctions." The motions were supported by an affidavit from Attorney Anderson, in which, *inter alia*, Attorney Anderson swore that there was no attorney named "Diane Taylor" at Taylor, Anderson & Travers.

On March 17, 1995, there was a hearing before Superior Court Judge James F. McHugh, III, on Jaraki's motion for a temporary restraining order. Both Jaraki and Dr. Rozenbaum testified. At the hearing, the respondent asserted that Dr. Rozenbaum, Attorney Gertner and "Diane Taylor" were engaging in a criminal enterprise to prevent Dr. Rozenbaum from testifying.

After the hearing, the court denied the respondent's motion, ruling that the respondent had "filed the Motions for a Temporary Restraining Order in bad faith and without any reasonable inquiry..." in violation of Mass. R. Civ. P. 11. The court ordered both the respondent and Jaraki jointly to pay sanctions in the amount of $8,367 to Gatewood, Spectrum Emergency Care, Inc. and Joseph Gatewood; $3,167.49 to counsel for Dr. Rozenbaum; and $1,050 to Dr. Rozenbaum.

Count Two-The Nutiles

In December 1991, Richard and Jean Nutile retained the respondent to represent them in Jean Nutile's claims against Dr. Michael Hayes and South Shore Neurology Associates, Inc. (South Shore) that she had been sexually assaulted by Dr. Hayes during his physical examination of her in December 1990. On or about February 26, 1992, the respondent sent to South Shore and Dr. Hayes a thirty-day demand letter pursuant to G.L. c. 93A, in which he alleged that his client had been sexually assaulted during a physical examination by Dr. Hayes performed at South Shore's offices and that, if South Shore did not respond with a reasonable offer, an action would be filed.

On March 27, 1992, Attorney Alan D. Rose, then a partner at Nutter, McClennan & Fish (Nutter), responded to the demand letter on behalf of South Shore, in which Rose denied that an assault had occurred and stated that "[y]our February 1992 letter is defamatory. [The doctor] and South Shore have excellent reputations and both fully believe that your client's conduct in accusing [the doctor] of sexual and professional misconduct is actionable." Rose sent a copy of this letter to Jean Nutile.

Over the next three months, the respondent filed three complaints for damages on behalf of Jean Nutile against Nutter, Rose, South Shore and Dr. Hayes in Suffolk Superior Court. In essence, the complaints against Nutter and Rose alleged that mailing a copy of South Shore's response directly to the plaintiff was a violation of the Disciplinary Rules, violated G.L. c. 93A and the Massachusetts Civil Rights Act, invaded the plaintiffs' privacy, and intentionally inflicted emotional distress on the plaintiffs. The respondent never served the first complaint on the defendants and that case was ultimately dismissed for lack of prosecution. In response to the second suit, which was served on all defendants, as well as to the amended complaint, Nutter and Rose filed a motion to dismiss on several grounds, including that the claims asserted were barred by absolute privilege as well as a motion for attorney's fees under Rule 11 and G.L. c. 231, § 6F.[1]

In the interim, the respondent communicated with his clients and with counsel for Nutter and Rose on numerous occasions as follows. On November 12, 1992, the respondent sent the Nutiles a copy of his correspondence to Nutter and Rose, telling the Nutiles that Nutter and Rose would become part of the lawsuit; there would be a conflict of interest between Nutter and its client; and by adding Rose and Nutter to the complaint would make their case stronger because Nutter was a "bigger law firm" and the lawyers

---

[1] Paragraph 31 of the hearing committee's report duplicates an apparent typographic error in the Petition for Discipline, which alleges that Nutter and Rose sought attorneys' fees under "G.L. c. 21, § 6F," as well as G.L. c. 231, § 6F. The reference to c. 21, § 6F appears to be a typographical error, as that statute deals with the enforcement of environmental laws.

there would no longer be able to represent the South Shore and the doctor in the Nutiles' lawsuit.

On December 1, 1992, the respondent served Nutter and Rose with an undated Chapter 93A demand letter, in which the respondent referred to South Shore and the doctor as "NMF and Rose's (former?) clients." By this letter the respondent was suggesting that Nutter and Rose could no longer represent their clients in light of the allegations against them in the same matter. The respondent's claims against Nutter and Rose had the purpose and effect of interfering with Nutter's and South Shore's attorney-client relationship.

On December 4, 1992, Attorney Joseph Blute wrote to the respondent on behalf of Nutter and Rose. In this letter Blute told the respondent that his claims against Nutter and Rose were barred on several grounds, including an absolute privilege relating to statements made by an attorney relative to proposed litigation. Blute cited relevant case law and suggested that the respondent refrain from filing a complaint against Nutter and Rose because it would violate his obligations under Rule 11 and the Disciplinary Rules and would constitute grounds for an award of costs and attorney's fees under G. L. c. 231, § 6F.

On December 23, 1992, Blute responded to the second 93A demand letter, again asserting that his clients were protected from civil liability. On January 7, 1993, the respondent replied to Blute's letter, stating that he did "not care whether it's Nutter, F. Lee Bailey or a kid right out of law school, NOBODY is going to do to my clients what NMF attempted and get away with [it]."

On January 8, 1993, Blute telephoned the respondent and attempted to persuade him to refrain from pursuing the complaint against Nutter and Rose. The respondent was angry and told Blute that he would not allow "large firms" to treat him this way and get away with it. Blute suggested that the Board of Bar Overseers and not a civil suit was the

7

appropriate forum for the respondent's complaint. The respondent never reported Rose or Nutter to the Board.

On February 2, 1994, Justice Sosman, then of the Superior Court, conducted a hearing on the motion to dismiss and dismissed the plaintiffs' complaint against Nutter and Rose, holding that Rose's actions were "clearly privileged" and the "mailing of the 93A reply directly to the plaintiff was not actionable." The court continued the case for a hearing on Nutter and Rose's request for Rule 11 sanctions and advised the parties that any sanction would be against the respondent personally and not the Nutiles.

The hearing on sanctions was conducted by then Superior Court Judge Sosman on or about August 12, 1994. The court found that the action filed against Nutter and Rose was "patently lacking in any even arguable merit," that [the respondent] had received the relevant legal research from Nutter and Rose's counsel "demonstrating that lack of any viable cause of action," and that the respondent had "pursued the action for the apparent purpose of depriving South Shore of its chosen counsel." The court found that the respondent had violated Rule 11 by filing the complaint against Nutter and Rose, and awarded Nutter and Rose attorneys' fees and directed that the fees "be paid by plaintiff's counsel and not, directly or indirectly, passed on to the plaintiff." The respondent did not provide a copy of Judge Sosman's decision to the Nutiles.

On September 29, 1994, the respondent filed a petition for interlocutory review and a motion for stay on behalf of the Nutiles. In his affidavit in support of review, the respondent alleged that Nutter "must have some particular power or influence with the trial court judge" for the judge to overlook Nutter's ethical breaches.

A Single Justice of the Appeals Court affirmed the decision and the sanctions imposed by the Superior Court upon the respondent. After a hearing, Judge Laurence also awarded the defendants additional attorneys' fees and double costs in the amount of $3,244.50 for the respondent's conduct in filing a frivolous petition that included "scandalous and impertinent" material accusing the motion judge of "bias, unethical

8

conduct and inappropriate susceptibility to unspecified illegitimate influence" by counsel for Nutter and Rose.

The respondent did not pay the sanctions to Nutter when ordered in 1994. Blute wrote to the respondent requesting the sanctions ordered by Judge Sosman and Judge Laurence totaling $7,244.50. When the respondent had not paid the sanctions by February 1995, Blute filed a Motion for Entry of Separate and Final Judgment in the Superior Court seeking a dismissal against the defendants Nutter and Rose and an order that the respondent pay the sum of $7,244.50 previously ordered.

The Superior Court (Smith, J.) allowed the motion for entry of separate and final judgment dismissing the plaintiffs' complaints against Nutter and Rose, denied the plaintiffs' cross-motion for a stay pending resolution of the appeal and ordered the respondent to pay $4,000 in sanctions and the plaintiffs to pay $3,244.50, the sanction ordered by Judge Laurence.[2] The committee obviously credited Mr. Nutile's testimony that the respondent intentionally misrepresented to the Nutiles that they had been sanctioned in the amount of $4000. When Mr. Nutile told the respondent that he could not afford to pay the $4,000 in sanctions, the respondent offered to "split" the sanctions with the Nutiles, and asked them for $2,000 toward the sanctions. He also said that he intended to appeal Judge Sosman's decision. Mr. Nutile agreed to pay and, on April 28, 1995, did pay the respondent $2,000 for the sanctions because he believed the respondent's claim that he was paying the other $2,000 on their behalf. The respondent also asked the Nutiles to pay the expenses for filing an appeal from the sanctions, and Mr. Nutile paid $150 for filing an appeal of the sanctions.

On June 5, 1995, the respondent appealed the dismissal of the plaintiffs' claims against Nutter and Rose and the award of attorneys fees to a three-member panel of the

---

[2] The portion of Judge Smith's Order that directed the plaintiffs to pay the sanction ordered by Judge Laurence might more accurately be called, at most, an interpretation by Judge Smith of Judge Laurence's Order. A panel of the Appeals Court later modified the part of Judge Smith's Order that plaintiffs pay the sanction ordered by Judge Laurence, and ordered that the respondent pay that sanction, too.

Appeals Court. At about that same time, the respondent settled the complaint against Dr. Hayes for $45,000. In his accounting of the settlement proceeds, the respondent credited the Nutiles with their $2,000 payment for the sanctions ordered by Judge Sosman. The respondent deducted from the Nutiles' settlement $3,244.50 plus $277.11 in interest for the sanctions imposed by Judge Lawrence. The respondent told the Nutiles that he had lost in the Appeals Court and that additional sanctions were ordered. The respondent told the Nutiles that he would pay the first sanction and they would pay the second sanction. The Nutiles agreed to this arrangement because they incorrectly thought the sanctions were assessed against them on both occasions.

In September 1995, the respondent filed a brief on appeal from the entry of final judgment and interlocutory orders of dismissal and sanctions, charging the Nutiles for work done on this appeal. On August 16, 1996, a three-judge panel of the Appeals Court affirmed the Superior Court's dismissal of the complaint against Nutter and Rose and its finding that the respondent had acted in bad faith in commencing the litigation against them. The Appeals Court panel held that Justice Laurence had not abused his discretion in sanctioning the respondent for his accusations of bias against Judge Sosman. In addition, the Appeals Court awarded double costs. The order stated that, "We affirm the judgment dismissing the complaint and the orders of the motion judge and single justice assessing sanctions against plaintiffs' counsel. We also consider this appeal frivolous and award double costs against the plaintiffs' counsel" (emphasis added).

Thus, by virtue of the order of the Appeals Court panel in August 1996, the respondent was placed on unmistakeable notice that the sanctions ordered by both Judge Sosman and Judge Laurence had been imposed against him individually under Rule 11.[3]

---

[3] As of the time of the Appeal Panel's hearing on June 6, 2003, the respondent still had not made restitution to the Nutiles. Despite the order of the Appeals Court panel in August 1996, the respondent's stated justification to the Appeal Panel for his failure to repay the Nutiles was Judge Smith's erroneous order that they pay the $3,244.50 sanction.

The respondent never informed the Nutiles of the decision of the panel, however, or refunded to the Nutiles the $3,244.50 plus interest that he had deducted from their settlement funds. Respondent's Motion for leave for further appellate review was denied in October, 1996.    On September 23, 1996, judgment after rescript entered, and the complaint of the plaintiffs against Nutter and Rose was dismissed.

Count Three-Malave

In November 1995, Marie Malave (now Duvivier) retained the respondent to represent her in a discrimination case in which Malave alleged that she had been discriminated against in her employment as a nurse assistant at Carney Hospital on account of her age and physical maladies from which she suffered. Malave ultimately resigned from Carney because of a work environment she perceived as hostile. Malave signed a contingent fee agreement.

The respondent filed a complaint with the MCAD and EEOC against Carney Hospital.   The MCAD conducted an investigation and ultimately dismissed Marlave's complaint on the grounds that the alleged discrimination occurred beyond the six-month filing deadline under federal and state anti-discrimination law and because the Commission was "unable to conclude that the information provided constituted a violation of the statutes." The decision was affirmed on administrative appeal.

The respondent told Malave that MCAD had denied her claims, but that she had a strong case.  The respondent required Malave to pay $1,000 to cover the expense of litigation, and he modified the contingent fee agreement to reflect the payment in April 1997.

In April 1997, the respondent filed suit in U.S. District Court on Malave's behalf against Carney Hospital and her supervisor under the Americans with Disabilities Act and Title VII of the Civil Rights Act.  Attorney Michael F.X. Dolan, Jr. of Murphy, Hesse, Toomey & Lehane, filed an appearance on behalf of the defendants.

11

At a scheduling conference in February 1998, the respondent told Dolan and the Court that Malave would accept $30,000 to settle all her claims against the defendants. During a break in the plaintiff's deposition in March 1998, the respondent and Dolan discussed the possibility of settling the case. Dolan told the respondent that Carney Hospital would not pay $30,000, but that he could recommend settling for $15,000. The deposition was suspended to accommodate the respondent's schedule.

The respondent communicated this offer of settlement to Malave, who subsequently left a message on the respondent's answering machine informing him that she would not accept anything less than $30,000 to settle her claim against Carney Hospital. Malave reiterated this position in a telephone conversation with the respondent on or about March 16, 1998.

On March 18, 1998, Dolan telephoned the respondent to schedule the conclusion of Malave's deposition and further discuss the possibility of settlement. Notwithstanding the client's clear expression of intent NOT to settle the case for less than $30,000, in the conversation, the respondent made a demand of $15,000 to settle Malave's case.

That same day, the respondent called Malave to discuss a settlement offer of $15,000, and the respondent and Malave had an extended phone conversation during which the respondent tried to convince Malave to accept the $15,000. The respondent urged Malave to come to his office to sign settlement papers and told Malave that Judge Harrington would not be happy with her if she refused to sign the settlement. We credit Malave's testimony that she repeatedly told the respondent that she did not want to accept the $15,000 settlement. Nonetheless, later in that day, the respondent called Dolan to confirm the settlement for $15,000, an amount which the client had expressly rejected.

After speaking with the respondent on March 18, 1998, Malave telephoned her son, Conrad Meneide, an engineer in Atlanta, Georgia. Malave asked her son to call the respondent and make him stop trying to force her to settle for $15,000.

12

Meneide called the respondent's office  twice and left one message on an answering machine and one message with a woman who answered the phone. Meneide told the respondent to stop the settlement because his mother did not agree to it and wanted a minimum of $30,000 to settle her case.  The respondent never returned Meneide's calls.

On or about  March 24, 1998, Malave engaged Attorney Hernandez to represent her mother with respect to the settlement of her claims against Carney Hospital. Malave repeated to Hernandez the instructions she had given the respondent: she didn't want to settle her case for $15,000. She also told Hernandez the respondent was trying to make her settle.

Hernandez faxed a letter to the respondent on that same day, requesting a complete copy of Malave's file.  On the following day, March 25, 1998, Hernandez spoke to the respondent on the telephone.  The respondent told Hernandez that it would not be necessary for him to forward the file, that as far as he was concerned the case was settled, and that Malave had authorized him to settle for $15,000.[4]

On or about April 1, 1998, the respondent advised Dolan that Malave was refusing to honor the settlement agreement. On or about April 13, 1998, Dolan filed a motion to enforce the settlement agreement based upon a theory of apparent authority, to dismiss with prejudice plaintiff's complaint, to hold a hearing, and for attorney's fees for the costs and expenses of filing and arguing the motion. In response, the respondent filed a pleading entitled "Plaintiff's Verified Response to Defendant's Motion to Enforce Settlement and General Release." The respondent did not notify Malave that he planned to file this response and he did not have authority to file any response on her behalf. The plaintiff's verified response contained at least one incorrect statement concerning Hernandez, and was verified only by the respondent. The plaintiff's verified response

---

[4] Attorney Hernandez repeatedly requested a copy of Malave's deposition transcript or the name of the court reporter who took the deposition. The respondent failed to respond to these requests.

represented that Malave had authorized the settlement and that the respondent was "ready to submit to the Court in camera currently privileged documents and testimony indicating that a settlement was reached with Malave's full consent and authority." The respondent had no authority to disclose to the Court or to opposing counsel his communications with Malave, nor did he have any authority from Malave to pursue enforcement of the putative settlement, which she had expressly refused and rejected. Although Dolan had forwarded to the respondent settlement documents, Malave never signed any documents that would indicate she had authorized the respondent to settle her case for $15,000.

The respondent served Attorney Hernandez with a copy of the plaintiff's verified response, but he did not provide to Hernandez the defendant's motion or the proposed settlement agreement.

On April 20, 1998, Attorney Hernandez, who, by this time, had assumed full responsibility for representing the plaintiff, provided to the respondent Ms. Malave's and his own affidavits, which the respondent was supposed to file with the court. In her affidavit, Malave swore that she had refused to settle with Carney Hospital for $15,000 and that she had never authorized the respondent to settle for that amount. Among other things, Attorney Hernandez attested (1) that the respondent had told him that neither the demand for settlement nor Malave's authorization was in writing, and (2) that the respondent's "Verified Response" contained misstatements. The respondent never filed either of these affidavits with the court.

On May 14, 1998, the U.S. District Court, without an evidentiary hearing, allowed the defendants' motion to enforce the settlement. The court entered an order requiring the defendants to deliver to the respondent, as attorney for Malave, a check in the amount of $15,000, dismissing Malave's case with prejudice, and requiring the respondent to disburse the settlement amount according to his fee agreement with Malave.

On June 28, 1998, Attorney Hernandez appealed on Malave's behalf to the U.S. Court of Appeals for the First Circuit from the District Court's decision ordering

14

enforcement of the settlement and dismissing Malave's case with prejudice. On or about July 7, 1998, the respondent sent a letter to Malave, enclosing a settlement check in the amount of $10,815, which Malave refused to cash. She gave the check to Hernandez.

In March 1999, the Court of Appeals vacated the District Court's decision and remanded the case to the District Court for an evidentiary hearing on whether the respondent had actual authority from Malave to settle her case. The District Court conducted a hearing on this issue on or about September 14, 1999. In December, 1999, the court issued its decision, finding that although the respondent had purported to hold documents that would indicate he had authority to settle on Malave's behalf, "he never produced any such documents during the evidentiary hearing." The court found that there was nothing in the record to affirmatively indicate that Malave had given the respondent the authority to settle her case, and concluded that the respondent did not have actual authority to do so. The Court reinstated Malave's case.

The respondent filed an objection to the court's decision in which he falsely claimed that he had documentation that Malave had given him authority to settle in the form of hand-drafted answers to interrogatories. The answers to interrogatories handwritten by Malave's son do not provide any authority to settle. The respondent's objection was dismissed because he had no standing.

Hernandez ultimately settled the case on behalf of Malave for $22,500.

## HEARING COMMITTEE'S CONCLUSIONS OF LAW

### Count One

The committee found that the respondent's conduct in filing pleadings with the court that contained scandalous or improbable allegations without conducting an investigation into those allegations violated Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice), and Canon Six, DR 6-101(A)(2) (inadequate preparation) and (3)

(neglect). His further pursuit of these claims after he received evidence that they could not be true also violated the above-stated rules.

The committee found the respondent's conduct in representing to the court that Dr. Rozenbaum, Attorney Gertner and "Attorney Diane Taylor" were engaged in a criminal conspiracy when he had no grounds to support that claim violated Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice), and Canon Seven, DR 7-106(C)(1) (before a tribunal a lawyer shall not state or allude to any matter that he had no reasonable basis to believe is relevant or that will not be supported by admissible evidence).

The committee found the respondent's conduct in exposing and subjecting Jaraki to sanctions for violations of Mass. R. Civ. P. 11 was a violation of Canon Seven, DR 7-101(A)(3) (prejudice or damage to client during professional relationship).

Count Two

The committee found the respondent's conduct in violating Rule 11 by filing suit against Nutter and Rose when he knew that the claim was unwarranted under existing law and when there was no good faith argument to support it was a violation of Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice), and Canon Seven, DR 7-102(A)(2)(knowingly advancing a claim or defense that is unwarranted under existing law). The committee concluded that although the ethical propriety under DR 7-104(A)(1) of sending a Chapter 93A demand letter directly to a represented party was not clearly established when the respondent filed the claim, it was clear at that time that a violation of a disciplinary rule does not establish a basis for civil liability. Fishman v. Brooks, 396 Mass. 643, 649 (1986).

The committee found the respondent's conduct in alleging in pleadings filed in the Appeals Court that the trial judge had to have been improperly influenced in dismissing the complaint and in assessing costs against him when he had no good ground

16

to support such accusations was a further violation of Rule 11 and Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice) and Canon Seven, DR 7-102(A)(1) (lawyer shall not take action on behalf of client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another).

The committee found the respondent's conduct in persisting in a frivolous appeal from the dismissal and sanctions imposed against him by the motion judge, the single justice and the Appeals Court, violated Canon One, DR 1-102(A)(5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice) and Canon Seven, DR 7-102(A)(2) (knowingly advancing a claim or defense that is unwarranted under existing law).

Additionally, the committee determined the respondent's conduct in misrepresenting to his clients that the court had assessed sanctions against them instead of telling them that he had been sanctioned personally violated Canon One, DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice); and Canon Seven, DR 7-101(A)(1) (intentional failure to seek the lawful objectives of the client), (2) (intentional failure to carry out a contract of employment) and (3) (prejudice or damage client during professional relationship).

Further, the committee found the respondent's conduct in converting $3,471.61 of the client's share of the settlement proceeds to pay sanctions that had been assessed against him personally violated Canon One, DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (conduct prejudicial to the administration of justice) and (6) (conduct adversely reflecting on fitness to practice); and Canon Nine, DR 9-102(B)(3) (failing to maintain complete records of the handling, maintenance and disposition of all trust funds and render appropriate accounts) and (4) (failing promptly to pay funds to client as requested by client or otherwise due).

Count Three

The committee found the respondent's conduct in failing promptly to advise opposing counsel that his client did not wish to settle for $15,000 violated Mass. R. Prof. C. 1.2 (lawyer shall seek the lawful objectives of the client), and his conduct in continuing to represent Malave when his personal and professional interests were in conflict with her interests, in failing to withdraw when he knew or it was apparent that his interests conflicted with hers, and in purporting to represent the client in filing the plaintiff's verified response in opposition to his client's interests, violated Mass. R. Prof. C. 1.2 (lawyer shall seek the lawful objectives of the client), 1.7(b) (lawyer shall not represent a client if the representation may be materially limited by lawyer's responsibilities to another or by the lawyer's own interests), 1.8(b) (lawyer shall not use confidential information to the disadvantage of the client or for the lawyer's advantage unless the client consents after consultation), and 1.16(a)(1) (lawyer shall withdraw if the representation will result in violation of the rules of professional conduct).

Further, the committee found the respondent's conduct in disclosing (or purporting to disclose) client communications to the court and opposing counsel without his client's authorization and against his client's interests violated Mass. R. Prof. C. 1.6(a) and 1.8(b). The respondent's conduct in falsely representing in pleadings filed with the court that he had documents and testimony demonstrating that his client had authorized settlement for $15,000 violated Mass. R. Prof. C. 3.3(a)(1) (knowingly making a false statement of material fact or law to a tribunal) and 8.4(c) (dishonesty,

fraud, deceit or misrepresentation), (d) (conduct prejudicial to the administration of justice), and (h) (conduct adversely reflecting on fitness to practice).[5]

In aggravation, the committee found that at the time of his misconduct, the respondent had substantial experience in the practice of law, Matter of Luongo, 416 Mass. 308, 312, 9 Mass. Att'y Disc. R. 199, 203 (1993), and he has failed to acknowledge the nature, effects, and implications of his misconduct. Matter of Clooney, 403 Mass. 654, 657-658, 5 Mass. Att'y Disc. R. 59, 63-64 (1988). In fact, the committee remarked that the respondent continued to lack insight into his behavior and persisted in blaming everyone except himself. He made unfounded allegations against the Hearing Committee in these proceedings for failing to provide subpoenas and for engaging in *ex parte* communications with Bar Counsel; the allegations resemble closely the conduct alleged in the petition for discipline and found in this proceeding.

The committee also found that Ms. Malave was a vulnerable client, an immigrant of limited means whose first language was not English and who was the sole source of support for her children. ABA Standards for Imposing Lawyer Sanctions § 9.22(h) (1992).

The committee found no facts in mitigation other than circumstances the Court has characterized as "typical" mitigating factors that would not affect the sanction. Matter of Alter, 389 Mass. 153, 157, 3 Mass. Att'y Disc. R. 3, 7 (1983).

The committee recommended that the respondent be disbarred.

---

[5] The committee also concluded that the respondent's misrepresentation to Bar Counsel that he had provided to Attorney Hernandez in March 1998 the name of the court reporter who recorded Malave's deposition violated Mass. R. Prof. C. 8.4(c) (dishonesty, fraud, deceit or misrepresentation), (d) (conduct prejudicial to the administration of justice) and (h) (conduct adversely reflecting on fitness to practice). We note that there was no factual finding that the respondent made any representation on this subject to Bar Counsel. Therefore, we do not adopt the Hearing Committee's conclusion of law based upon the alleged misrepresentation to Bar Counsel because it was not supported by any factual finding. We note however, that in light of the plethora of other violations which we affirm, reversal on this point has no bearing on our recommendation.

ISSUES ON APPEAL

Except for an opening paragraph in which the respondent briefly mentions numerous constitutional issues, his brief fails to clearly articulate the bases for his appeal.[6] He does not challenge particular, identified findings of fact or conclusions of law. Rather, as to each count he offers confusing, rambling, broad attacks on some factual assertions and/or conclusions, liberally punctuated with invectives and diatribes calling into question the integrity of the hearing committee, a Justice of the Superior Court, the Appeals Court and Bar Counsel. It appears that the respondent is challenging the evidentiary basis of some of the committee's factual conclusions, as well as the committee's legal conclusions. We reject the respondent's appeal in its entirety for the following reasons.

To the extent that the respondent's appeal rests essentially on a disagreement with the hearing committee's finding and interpretation of certain facts, we note that while the Board of Bar Overseers has plenary power to review a hearing committee's findings of fact and conclusions of law, we are mindful that the Board must "pay[] due respect to the role of the hearing committee as the sole judge of the credibility of the testimony

---

[6] We note that the section of his brief entitled "Grounds upon which Appeal Rests" alleges a variety of constitutional issues: (1) the "stacking" of these cases is unconstitutional, (2) the lack of a limitations period is unconstitutional, (3) punishment for protected or compelled speech is unconstitutional, (4) the fact that every lawyer "indicted" by the board is "always found guilty" is unconstitutional, (5) the attempt to regulate speech with vague and overbroad statutes is unconstitutional, (6) the bad faith prosecution is unconstitutional and Younger abstention is inapplicable because "it cannot be shown that the BBO hearing process can produce objective results." Because none of these issues is argued in the brief, we reject all of these grounds. Even if we were to consider these contentions, we would reject the respondent's appeal on each of these grounds, since none have legal merit. See Matter of Saab, 406 Mass. 315 (1989)(Simultaneous consideration of separate, even factually unrelated violations is an established part of the disciplinary system of the Commonwealth); In re Gross, 435 Mass. 445 (2001)(Delay in bringing a disciplinary action is not grounds for dismissal of the complaint except under limited circumstances which the respondent did not allege existed in this case); Matter of Eisenhauer, 426 Mass. 448 (1998) (Due process satisfied where there was no evidence of bias or misconduct by bar counsel or any member of reviewing bodies, and attorney was afforded notice and opportunity to be heard, to present evidence, to challenge evidence against him). With respect to the respondent's accusations that the First Amendment protects his right to speak in some way, we note that more than a decade ago the Supreme Court of the United States decided that an attorney's right to speak in a proceeding is not unlimited. See Gentile v. Bar of Nevada, 501 U.S. 1030 (1991). Finally, the respondent's claims that all attorneys "indicted" by the board [presumably the BBO] are "found guilty" does not even merit a response.

presented at the hearing." Matter of Saab, 406 Mass. at 328. Based on our own review, we conclude that the evidence before the hearing committee amply supports its factual findings, inferences drawn from the facts, and conclusions of law with the exception of the conclusion noted in footnote 5, supra.

Count One

The respondent appears to contend that his referring to Attorney Ellen Cohen as Diane Taylor was merely a "misnomer," and the evidence supported the conclusion that the respondent was correct in his accusation that certain attorneys were attempting to dissuade a witness from testifying. We conclude that the committee's findings were amply supported by the evidence, and the inferences it drew were equally well-founded. The respondent's misstatement as to the attorney's name may have been an "error," but, as the committee found, it was an error which should not have been made. The respondent could easily have ascertained whether or not "Diane Taylor" had ever been a member of the firm, as he had received a letter from Attorney Anderson before he made the accusations.[7] More tellingly, the overwhelming credible evidence contravenes the respondent's assertion that he was justified in accusing the attorneys of attempting to persuade a witness not to testify. Not one of the individuals involved testified that such conversations took place, and the respondent offered no credible evidence to the contrary.[8] The respondent conveniently ignores the fact that he was sanctioned by a

---

[7] The committee obviously did not agree with the respondent's characterization that the misnomer occurred "in the excitement of the moment." We agree with the committee's conclusion that there were ample occasions at which the attorney's name could have been verified.

[8] The respondent's contention that he did not accuse the attorneys of participating in a "conspiracy" is belied by the evidence before the committee. At the hearing before Judge McHugh, a major part of the colloquy centered around the fact that the respondent was alleging a "criminal enterprise." Any legal or factual distinction between a "conspiracy" and a "criminal enterprise" is trivial and immaterial to the allegations in this case.

judge who heard the evidence and argument and concluded that the allegations were baseless and brought in bad faith, in violation of Rule 11.

Count Two

The respondent's assertions here are that he did not misrepresent to the Nutiles whose responsibility it was to pay the fees and costs assessed by the Superior Court for filing a frivolous action, and by the Single Justice and later a panel of the Appeals Court for filing legally and factually groundless appeals. The respondent maintains that the Nutiles were, in fact, obligated to make some payment. The respondent rests his appeal as to this count on the contentions that (1) since the Nutiles were present in court when Justice Sosman ordered the respondent to pay costs and fees, the committee could not have concluded that he misrepresented anything to them, and (2) because Superior Court Judge Herman Smith "ordered" that the plaintiffs pay the $3,244.50 sanction ordered by the Single Justice, the committee could not have found that he wrongfully assessed that sanction to the clients.

The fact that his clients, who are not lawyers, may have been present at a hearing[9] did not preclude the committee from finding the respondent made misrepresentations to them. The Nutiles testified to that effect, and clearly, the committee chose to credit their testimony. Further, the Nutiles testified they were seated in the back of the courtroom and did not hear much of Justice Sosman's order. Finally, the fact that the Nutiles testified they never received a copy of the written decision, which would have clearly stated the court's position vis-à-vis payment of fees and costs, raises the clear inference that the

---

[9] We note that there were two hearings before Justice Sosman at which the issues of fees was raised, one on February 2, 1994 and another on August 12, 1994. The respondent fails to identify at which of these hearings the evidence showed the Nutiles were present, although we assume, in light of the testimony, that it was the first hearing, which concerned primarily whether there was a violation of Rule 11. Although the judge made mention of imposing sanctions on COUNSEL, the issue of sanctions was not comprehensively addressed until August.

22

respondent chose to take advantage of his clients' ignorance and/or uncertainty as to their responsibility in extracting a portion of the sanctions from them.

The obviously erroneous allocation of costs and fees to the plaintiffs found in Judge Smith's order gives the respondent's arguments on appeal only slightly more credibility. Although Justice Sosman made it clear that she was imposing attorneys' fees on counsel, not on the parties, Justice Laurence of the Appeals Court did not. Neither his October 20, 1994 decision,[10] nor his November 21, 1994 order assessing $3,244.50 in sanctions for the frivolous appeal specified on whom the sanctions were imposed. The Superior Court's Order of April 28, 1995, sent on May 2, 1995, did state that the fees assessed on appeal were to be paid by the plaintiffs.[11] Thus, it might not have been unreasonable for the respondent to have passed on the $3,244.50 sanction to the plaintiffs until the matter was clarified later, as it was.

However, the matter is not as simple as that. The hearing committee credited the Nutiles' testimony that the $2,000 check they remitted to the respondent on April 28, 1995 was for one-half the $4,000 sanction thatclearly was assessed against the respondent alone.Furthermore, once the respondent received the Appeals Court panel opinion on August 16, 1996 clearly ordering ALL costs assessed against the respondent, not the plaintiffs, he should have returned the $3,244.50 plus interest that he had deducted from their share of the settlement amount. Therefore, we conclude (1) that Bar Counsel proved that the respondent misrepresented to the Nutiles that they had been sanctioned by Justice

---

[10] We do note in passing that the single justice agreed with the respondent that sending the 93A reply to the plaintiff was improper. However, as the committee found, even if the conduct were a violation of a disciplinary rule, the violation standing alone does not give rise to a civil cause of action. The respondent's remedy would have been to file a complaint with this Board, which he did not do.

[11] Although respondent argues in his brief on appeal that "[a]ny competent litigator knows that unless a Court specifically directs COUNSEL to pay a sanction" then it is the party's responsibility to do so, he fails to cite any authority to support that assertion, and this panel has been unable to locate any either. However, the legal resolution of this issue has no bearing on our decision on appeal.

Sosman, and caused Mr. Nutile to pay one-half of the fees and costs for which he was not responsible, thereby converting $2,000 of the Nutiles' funds, at least temporarily; and (2) that Bar Counsel proved that the respondent converted $3,244.50 plus interest from the Nutiles' settlement funds. Even accepting, without deciding, that the respondent acted in good faith when he deducted $3,244.50 plus interest from the Nutiles' money, once the Appeals Court's panel decision was rendered, the respondent was on notice that the Laurence sanction also had been imposed on him rather than the clients. At that point, he owed the Nutiles a refund, which he did not pay, and thus, the conversion occurred as of that date. See Matter of Leo, BD-2001-024 (September 12, 2001).

Count Three

The respondent appears to rest his appeal as to this count on the principal of res judicata, that is, that Judge Alexander ruled, in the Motion to Enforce Settlement, that he and counsel for the defendant "believed they had a deal" to settle the case. The respondent's position not only misconstrues the doctrine of res judicata but ignores significant facts. "The term 'res judicata' describes doctrines by which a judgment has a binding effect in future actions. It comprises both claim preclusion (also known as 'merger' and 'bar') and issue preclusion (also known as 'collateral estoppel'). Claim preclusion 'makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been litigated in the action." (Citations omitted.) (Emphasis added.) Jarosz v. Palmer, 436 Mass. 526, 530 n.3 (2002).

Thus, the doctrine of res judicata does not apply here for several reasons. First, Bar Counsel, against whom the respondent purports to use Judge Alexander's ruling,

24

was not a party to that case. Thus, no decision, whether styled as res judicata or collateral estoppel, could be binding on Bar Counsel, since Bar Counsel, against whom the finding is being asserted, was not in privity with the defendant in the civil case. Further, the respondent's position omits the fact that Judge Alexander's ruling was reversed on appeal, and the case was remanded for a further hearing at which the trial court found that the respondent DID NOT have actual authority to settle the case.

To the extent that other arguments on appeal turn on finding facts or deriving inferences different from those made by the committee, we reject them as well.

## RECOMMENDATION FOR DISCIPLINE

We recommend that the respondent be disbarred. His overall conduct, which we are entitled to take into account as a whole, see Matter of Saab, supra, demonstrates an egregious disregard for the ethics of the practice of law. The respondent was sanctioned several times under Rule 11 for filing frivolous pleadings or suits. He was sanctioned by the Appeals Court for filing a frivolous appeal which was also "scandalous and impertinent."[12] His misconduct under the second count alone warrants disbarment: in direct violation of Judge Sosman's order that the $4,000 sanction be paid by him alone and not be passed on to his clients, the respondent deliberately concealed that fact from his clients and intentionally misrepresented that they had personally been sanctioned in the amount of $4,000. His actions constituted a fraud on his own clients, by which he deprived them, albeit temporarily, of $2,000. Moreover, by failing to repay the Nutiles

---

[12] We cannot help but comment that the respondent does not seem to have learned his lesson from Justice Laurence's sanctions and the reasons therefor. His appeal brief is replete with unnecessary invectives, from calling the Appeals Court's opinion "loose lipped and careless," to charging that the Appeals Court did not thoroughly read his brief, to calling one of Bar Counsel's "accusations" "idiotic," and her persistence as to a position "gross incompetence." He has also characterized Justice Sosman's conduct as having "ethical lapses."

the $3,244.50 plus interest when the decision of the panel of the Appeals Court made clear that he alone was responsible to pay all of the sanctions, he intentionally misappropriated client funds. See Matter of Leo, supra, Matter of Schoepfer, 426 Mass. 183, 13 Mass. Att'y Disc. R. 679 (1997) (presumptive sanction for intentional misappropriation with intent to deprive or with actual deprivation resulting is disbarment or indefinite suspension); Matter of Bryan, 411 Mass. 288, 7 Mass. Att'y Disc. R. 24 (1992) (absence of restitution a major consideration in choosing between disbarment or indefinite suspension).

As the committee found, the respondent's other misconduct, while also serious and itself warranting suspension, serves only to strengthen our conclusion that he is unfit to practice law. He has made groundless and scandalous accusations of misconduct against opposing counsel and sitting judges. See Matter of Cohen, 435 Mass. 7 (2001); Matter of Kurker, BD-2002-052 (October 24, 2002). He filed other baseless and inappropriate pleadings. See Matter of Tobin, 417 Mass. 92, 96, 10 Mass. Att'y Disc. R. 256, 266-267 (1994) (18-month suspension). He made misrepresentations to the court about documents he claimed would establish his authority. See Matter of Neitlich, 413 Mass. 416, 8 Mass. Att'y Disc. R. 167 (1992) (one-year suspension). He betrayed Malave by seeking to enforce a "settlement" she had consistently refused to enter into; even after the court found there had been no settlement, he arrogated to himself the authority to object to the findings. Compare Matter of Dolan, 10 Mass. Att'y Disc. R. 59 (1994) (public reprimand where unauthorized settlement undertaken in misguided effort to serve client's interest).

Finally, we must take into account the cumulative nature of the respondent's misconduct. See <u>Matter of Saab</u>, 406 Mass. 315, 327, 6 Mass. Att'y Disc. R. 278, 291 (1989). Here it is plain that the respondent's conduct—toward adversaries, judges, the disciplinary process, and even his own clients—evinces "'a persistent and extended pattern of improper and unethical behavior,' without even a rudimentary understanding or acknowledgement of the ethical behavior expected of a member of the bar." <u>Matter of Clooney</u>, 403 Mass. 654, 657, 5 Mass. Att'y Disc. R. 59, 63-64 (1988), quoting <u>Matter of McInerney</u>, 3 Mass. Att'y Disc. R. 143, 146 (1983). Under these circumstances, disbarment is the only appropriate sanction.

## CONCLUSION

For all of the foregoing reasons, we adopt and incorporate by reference the Hearing Committee's findings of fact, conclusions of law, and recommendation that the respondent, Matthew Cobb, be disbarred.

Constance L. Rudnick, Panel Chair

Robert J. Guttentag, Panel Member

James B. Re, Panel Member

Dated:  December 1, 2003

27