Board of Bar Examiners of New Mexico, 353 U.S. 232, 238-9 (1957).
There, the court held:


A State cannot exclude a person from the practice of law or from
any other occupation in a manner or for reasons that contravene
the Due Process or Equal Protection Clause of the Fourteenth
Amendment. n5 Dent v. West Virginia, 129 U.S. 114. Cf.  Slochower
v. Board of Education, 350 U.S. 551; Wieman v. Updegraff, 344
U.S. 183. And see Ex parte Secombe, 19 How. 9, 13. A State can
require high standards of qualification, such as good moral
character or proficiency in its law, before it admits an
applicant to the bar, but any qualification must have a rational
connection with the applicant's fitness or capacity to practice
law. Douglas v. Noble, 261 U.S. 165; Cummings v. Missouri, 4
Wall. 277, 319-320. Cf.  Nebbia v. New York, 291 U.S. 502.
Obviously an applicant could not be excluded merely because he
was a Republican or a Negro or a member of a particular church.
Even in applying permissible standards, officers of a State
cannot exclude an applicant when there is no basis for their
finding that he fails to meet these standards, or when their
action is invidiously discriminatory. Cf.  Yick Wo v. Hopkins,
118 U.S. 356. (bolding added).


     The bolded portion above really relates to the state
attempting to disbar without any basis, plain and simple. Schware
had nothing to do with procedural due process.
     The First Circuit has adopted a tough but fair standard
necessary to successfully raise a substantive due process claim.
In Amsden v. Moran, 904 F.2d 748, 753-54 (1st.Cir.1990), Judge
Selya held that:


[A] substantive due process claim implicates the essence of state
action rather than its modalities; such a claim rests not on
perceived procedural deficiencies but on the idea that the
government's conduct, regardless of procedural swaddling, was in
itself impermissible. Stating the proposition does not cabin it
very well. It has been said, for instance, that substantive due
process protects individuals against state actions which are

"arbitrary and capricious," Newman, 884 F.2d at 25, n5 or those which run counter to "the concept of ordered liberty," Palko v. Connecticut, 302 U.S. 319, 325, 82 L. Ed. 288, 58 S. Ct. 149 (1937), or those which, in context, appear "shocking or violative of universal standards of decency," Furtado v. Bishop, 604 F.2d 80, 95 (1st Cir. 1979) (footnote omitted), cert. denied, 444 U.S. 1035, 62 L. Ed. 2d 672, 100 S. Ct. 710 (1980). See Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)(in substantive terms, Due Process Clause condemns conduct "too close to the rack and the screw"); cf. Tenoco Oil Co. v. Department of Consumer Affairs, 876 F.2d 1013, 1020-24 (1st Cir. 1989) (discussing disfavored status of substantive due process claims).

We decline the invitation to sort out so wide a variety of labels. Wordplay aside, we agree with Judge Friendly that, in the circumscribed precincts patrolled by substantive due process, it is only when some basic and fundamental principle has been transgressed that "the constitutional line has been crossed." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d 324 (1973). As distinguished from its procedural cousin, then, a substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must in and of itself be egregiously unacceptable, outrageous, or conscience-shocking.

So the purely legal question here is, does the state's reputationally savaging disbarment of a lawyer for theft, when the state knows or reasonably should know if it bothered to look that no such evidence exists (i.e., no simple "humdrum legal error" here, as Judge Selya put it in Amsden, supra, at FN 5), particularly when the state conducts the disbarment process in a system whose sole contribution to injustice is to add but one more nail to the coffin of arbitrary conduct for safe keeping, constitute a deprivation of Liberty under the above standard? Of course it does. Given the legal theory as above, what might we

ask is the sum total of the so called "evidence" supporting the state's claim of theft by the notorious hardened criminal mastermind Matt Cobb? If this sum total is zero, then Cobb wins this claim. If the state presented anything COMPETENTLY evidencing even a prima facie theft, then the state wins this substantive due process claim. In analyzing below this state "evidence", we are really looking at issues of competency (is this evidence at all?) or relevance (does this information bear upon a charge that Cobb stole something?). So, here is the state's evidence of theft.

**ONE**

Accordingly, we affirm the judgment dismissing the complaint and the orders of the motion judge and single justice assessing sanctions against plaintiffs' counsel [Cobb] We also consider this appeal frivolous and award double costs against the plaintiff's counsel.

Exhibit 1.

**TWO**

The wholly incompetent AMOL testimony of the same man, Blute, that the said Judge allowed and encouraged to commit undisputed ethical misconduct before her on the record before rewarding him with sanctions against Cobb for suing his partner, and only after she accepted an out of session case any disclosure to Cobb and his clients, that he "believed" without stating any basis therefore when asked that Cobb was personally responsible for a certain sanction handed down by the Single Justice of the Mass. Appeals Court, even after he could not point to a single document nor word supporting the same, and, lastly,

**THREE**

A statement by Cobb's ex-client that Cobb "offered to split" court sanctions with them which per the above were supposedly put solely on Cobb.

That's it! Let's take them seriatim.

Number **ONE** above -

First of all, whatever this language is, we can be certain as to what it is not. It is simply not an "order" of any sort. Not in fact, not in sprit, not implicitly, not in specificity, not in directive, and not in accordance with constitutional principals even if it were. It does not order anything whatsoever of or from anybody whatsoever, not of Cobb, not of the Pope, anybody. The state's entire basis of "theft" rests wholly on the above statement not only being an "order" for Cobb to do something which he supposedly disobeyed, but also that the above statement somehow "modified" without saying so *a real order* of the trial court (Smith, J.), Exhibit 2, which ordered, not Cobb, but, quote "Cobb's clients" to pay the subject sanction. It is uncontested that this was done, and the obligation for the Client to pay arose long before this misnomer of a quote from the Appeals Court came down. The issue of who was to pay these sanctions was never an issue, either in fact nor even on the Appeal. An Appeals Court cannot and does not "Affirm" something which never occurred

Secondly, even if the above passage were an "order" of any sort, which it was not, then it would have to be clear since its violation would be cause for contempt. So, cases explaining the

specificity requirements of "orders" and the state's ability to punish clear violations thereof are instructive. One of these cases is Judge Woodlock's recent Opinion in <u>Hoult v. Hoult</u>, 2003 U.S. Dist. LEXIS 5017, at p. 16-17, wherein he points out that:

In order to find [so and so] in civil contempt, there must be a showing that there was an unequivocal order that was "clear and unambiguous." Goya Foods, Inc., 290 F.3d at 76. See also Gemco v. Seiko, 61 F.3d 94, 98 (1st Cir. 1995). "The test is whether the putative contemnor is "able to ascertain from the four corners of the order precisely what acts are forbidden." Goya Foods, Inc., 290 F.3d at 76., quoting Gilday v. Dubois, 124 F.3d 277, 282 (1st Cir. 1997); See Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991); Cadle Company v. Schlictmann, Conway, Crowley & Hugo, 939 F. Supp. 90 (D. Mass. 1996)(O'Toole, J.). See also NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990). Where there is any ambiguity as to the terms or requirements of the order, the terms are construed to the benefit of [so and so], as the persons charged with contempt. See Gilday v. Dubois, 124 F.3d at 286; Project B.A.S.I.C. v. Kemp, 947 F.2d at 17. "This requirement of clarity derives from concepts of fairness and due process." Project B.A.S.I.C. v. Kemp, 947 F.2d at 17. Here, [the party claiming that the order was violated] bears the burden of proving, by clear and convincing evidence, that [so and so's] actions were contumacious in violation of a court order. Goya Foods, Inc., 290 F.3d at 77; Project B.A.S.I.C. v. Kemp, 947 F.2d at 16; Cadle Company, 939 F. Supp. at 91.

So as to ONE above, Cobb followed the order of Judge Smith, Exhibit 2, directing that his client pay. The Appeals court neither "reversed" this order nor "modified" it. The state has yet to explain how a court can modify or reverse without saying so, or can order something to be done without saying so.

No. **TWO** above -

   **Mr. Blute's testimony**. Let's say that Matt Cobb and the BBO

actually get along. Cobb "believes" that Blute committed bank fraud. He goes to the U.S. Attorney with this "evidence", and is there asked to state his basis for this belief, but he has none, it's just his belief. Could a U.S. Attorney then scheme with Cobb to prosecute Blute for bank fraud on this "evidence"? Why not?

We have a member of the bar that the BBO can vouch for stating that "I believe, therefore it is so", isn't that enough to deprive one of his Liberty? What more do we need? While I am at it, I might as well finger some other folks based on my beliefs. This certainly is an efficient form of justice, since it dispenses with all that costly and time consuming stuff we call "evidence". In reality, both Blute and the state have had a symbiotic relationship all the way back to Blute's unethical *ex parte* cherry picking of the trial Court Judge as above out of session years ago to summarily ditch Cobb's client's case and sanction Cobb. This cozy relationship continued at the BBO, where Blute then ostensibly provides the sole "evidence" that Cobb was somehow responsible for a payment which a Judge ordered his client to make. Amazing.

## No. **THREE** above

A statement by Cobb's ex-client that Cobb "offered to split" court sanctions with him. Truly this statement is irrelevant. It was also coached, but that is another matter (see prosecutorial misconduct section herein).

Now, years before the OBC / BBO got involved, Cobb and his client Nutile had closed out the case. By any measure it had been

Page 31 of  77

a resounding success. Nutile settled for $45,000.00 tax free for a one time incident of alleged, uncorroborated sexual harassment in a doctor's office. During the case in Suffolk Superior Court, Cobb was sanctioned $4,000.00 personally by the trial Judge (Sosman) because he had sued Nutter, McClennen & Fish and one of its partners, Rose, because they had directly threatened Cobb's client with a lawsuit they knew was baseless even though she was represented by Cobb at the time. Years later, it turns out that Cobb's arguments as to the theory of recovery against the unethical wrongdoers was 100% valid. See Magistrate Collings Ruling in Metzler v. Grant. After Judge Sosman ruled, in August 1994, Cobb took an appeal to a "single Justice" of the Mass. Appeals Court.

Judge Lawrence, while agreeing with Cobb that Rose had acted unethically in communicating with Cobb's client, nonetheless awarded, under Mass.R.A.P. 25 NMF a sanction roughly in the amount of $3,700.00 because Cobb had argued in the Appeal papers that Judge Sosman was biased, as evidenced by the undisputed fact that she willfully allowed NMF and Blute to practice before her in violation of several ethical rules, and that such deed indicated that she was influenced by NMF. What Cobb did not say to Judge Lawrence was the fact that Blute and Sosman had combined to have the session switched without the knowledge nor consent of Cobb's client. Judge Lawrence's Order though did not say who was to pay, only who was to be paid, and Rule 25 did not authorize any such sanction directly on the attorney.

Even the BC / BBO have backed away from their Indictment

Page 32 of 77

charge that this order somehow inured to Cobb personally. Cobb thus interpreted the order to mean that his clients were responsible for this payment, and so made that communication to his client. Nutter and Rose, meanwhile, wanted out of the case, so they filed for separate and final judgment, which was opposed with a motion to stay all sanction payments ordered in the case. Good Judge Herman Smith then ruled on the Motions, and specifically directed exactly what Cobb had already told Nutile, namely, that Cobb was to pay the $4,000 sanction as ordered by Judge Sosman, and "Cobb's client" was to pay the Lawrence sanction (aprox. $3,700.00), and that they had to do so by such and such a date. Exhibit 2.

So, from the Lawrence order forward, Cobb owed $4,000 and the Nutiles $3,700. None of that changed by dent of the Smith order, except that a time for payment was then ordered. But the Nutiles only sent Cobb $2,000 of the $3,700 that they had to pay. So, Cobb, being the kind of guy that he is, dug into his own pocket for not only the $4,000 he was slammed personally with, but for the difference between what the Nutiles owed ($3,700) and what they sent ($2,000.). Cobb was only re-payed this amount at the final closeout after settlement. The state's case depends on the notion that Cobb took sanction money from the Nutiles that they did not owe. The state never introduced any evidence that Cobb even for one second had possession of even one red cent of the Nutile's money which they sent in for sanctions prior to the Nutile's own obligation to pay sanctions themselves.

Page 33 of  77

So, that's it. That's the sum total evidence of theft for which the undersigned gets disbarred. What a system! You know, the OBC and BBO apparently had trouble understanding what the appeals court panel did or said, since they first alleged it in the Indictment to be an "Affirmance" of an order which never existed, then they abandoned that notion once they were enlightened by the Smith order, at which point they argued that the said appeal's court speak was a "modification" of the "obviously erred" Smith order they never even knew about when they accused Cobb in public of being a thief. It is truly amusing how they can't even get their story straight as to what the non-"order" of the appeals court said, yet want to disbar Cobb since the exact same order is apparently so clear.

These charges are pressed against a guy who was never accused of taking a single dime from the millions of dollars which passed through his hands that he was legally required to properly distribute save this railroading? The state tags him a crook because he exposed graft? This case has never been about protecting the public from Matthew Cobb, rather it is about protecting these actors herein from the public.

### Imagine this system:

The SJC declares that all lawyers indicted by the BC/BBO will be deemed guilty as charged. That it will adjudicate only the penalty therefore, but will do so after a full hearing on damages / mitigation before to a truly independent agency (say, the Mass Div. of Administrative Appeals) within a reasonably

Page 34 of  77

short time period. So the first question becomes whether the above system "shocks the conscience". Well, it dispenses with the bother of evidence affecting liability when important property and Liberty rights may be at stake. It certainly violates procedural due process by striping away these rights without notice and opportunity to be heard. But does it not also violate substantive due process because it simply takes away a citizen's rights without rationale therefore which is related to some state interest? There could be no such interest, the "fair administration of Justice" notwithstanding which could justify such deprivation.

Yet that system would be **leaps and bounds MORE FAIR** than the present system presided over by the SJC. Why? Because it would eliminate upwards of ten years of mental torture, it would de-legitimize the credibility of their findings, and it would have no substantial effect on the conviction rate as it stands. In other words, it would show the BBO for what it is. As it stands, when Daddy tells daughter he is disbarred, daughter assumed that a credible, responsible, upstanding, trustworthy entity made such determination. All of which of course is untrue on these facts. But when a known sham did the rigging, nobody would give it credit, and all would call it sham. That's far easier to take, and it's no less then what the entire OBC / BBO system deserves.

This lawsuit is not a case where the federal Plaintiff all too predictably claims in misty eyed self pity that he was somehow framed through the unmitigated zeal of a state

prosecutor's parading of false witnesses against him. Rather, here, the state's own "evidence" - whatever its predetermined "credibility" assessment by the state's structurally biased "hearing" committee, see below - is legally incompetent to support any charge of theft, which "theft" is the state's admittedly sole disbarable offense. This faux "theft" driven deprivation of substantive Liberty then goes from bad to worse, procedurally. That is to say the state then hedges its otherwise assured statistical chance of conviction generally (see below discussion on structural defects) by here utilizing the long forbidden stealth infused trap of convicting (re: "theft") on an admittedly un-indicted (never cured by amendment, not even a post "hearing" amendment, <u>Ruffalo</u>, supra) "theft" charge. The said un-indicted "theft" charge still lacking of any support was dreamt up by the state prosecutor post "hearing" because evidence at the hearing had shown the indicted "theft" charge lacked any evidentiary basis.

**Second Substantive Due Process Argument -**

The state lawyer governance system is broken down, completely, assuming that it ever fairly worked at all during the now thirty year existence of the BBO. The fact that many lawyers are criminals is not justification for wholesale and arbitrary guilt findings for all lawyers simply upon indictment, and this de facto presumption of guilt unconstitutionally shifts the burden of proof from the state to the accused. To a statistical certainty, the system guarantees guilt for each and every lawyer

indicted which, as a practical matter, means that the results of the "hearings" are pre-determined, and only serve to humiliate and torture the accused while creating a self-serving trail of purely ostensible justice, which is not justice at all. The public is unaware of these outrageous statistics, due in no small measure to the BBO / OBC's keeping them from public view since about 1993. For those lawyers against whom formal disciplinary proceedings are brought, acquittals are so rare in the system that they are wholly arbitrary under the still rock solid guidance of <u>Furman v. Georgia</u>, 408 U.S. 238 (1972).

When thousands of prosecutions where death is available result in only 50 or so death sentences, the result is arbitrary. <u>Furman</u>, at 293.

This is the same as saying when 1750 lawyers are prosecuted, and innocence is a possibility in each case, yet only 15 or so survive, same thing.

So, these two above seemingly unrelated substantive due process problems of arbitrariness and caprice, one specific to Cobb, the other generally as to the long inept system itself, mesh together like a fine machine gears in a grinder in which innocence and guilt both go in, but only guilt comes out. These two wrongs will form a unique and constitutionally shameful synergy whenever the alleged substantive due process deprivation itself grows out of certain but baseless judicial punishment by the state in the state's own forum.

Cobb's situation here is much like walking up to the plate

with two strikes before you even swing. Here is the thought,

counter-thought process involved:

One rightly surmises that the state has no evidence to disbar on
theft, and their other charges relative, unbelievably, to
exposing unethical acts by judges are also baseless because the
law allows and / or requires me to do what I did so long as it
was truth based. Strike One! Wake up and smell the coffee Cobb,
you angered the wrong people and you had better dig in and wind
down.

Oh well, says Cobb, at least I can easily show at the state
"hearing" that the charges are baseless. Strike Two! Cobb, go and
research the numbers, you have no statistical chance here at the
BBO anyway.

Fine says me, I'll make federal constitutional arguments to the
SJC, and they will not simply as they always do by footnote alone
accept the so called  - in this case completely fabricated -
factual "summary" handed to it by the BBO. Strike three, your
out! Cobb, you of all people ought to know when to bail from a
bad system, you should have sued them in federal court where at
least your chances are above zero.

So, that's what I'm doing. I have no chance whatsoever of

either the truth nor the federal constitution bearing any

rational relation to my fate in the Massachusetts system. At

least here, there is a fair chance of Justice. The Massachusetts

system, for lack of better terms, truly is and has been a federal

constitutional dead zone for years. The state of Massachusetts **in**

**the area of lawyer governance** does this simply because it can

still get away with it. It is clearly a system of men, that's

privileged men, or men who are intimidated by the totalitarian

rule of the BBO into standing mute when manifest judicial

misconduct detrimentally affects their clients, and not of Laws.

One would surmise that the BBO's job was to protect the public,

not nail those lawyers who served the public interest by

Page 38 of   77

attempting to weed out corruption in the courts.

The said system here desires total, arbitrary, and unfettered control over who it "allows" to practice law and who it wants out on the street because they laid the crosshairs of truth and public scrutiny on a judge(s) who, at a bare minimum, had a serious ethical lapse at the time, both as to her appearance and in fact. Under Middlesex v. Garden State, supra, every stitch of conduct at the OBC and BBO is attributable to the SJC. This profession needs a real spine when it comes to the all too utopian notion of self policing, not more hoards of the intimidation induced spineless. We cannot constitutionally and should not morally torture then disbar those who simply do their job by reporting unethical acts by judges.

Argument Three Re: Substantive Due Process - The state, by attempting to punish as an ethical violation a particular legal stance taken in a case, which stance one judge (Sosman, J.) found  sanctionable, and, another (Collings, U.S.M.J.), meritorious, is arbitrary and capricious because reasonable people, like, for instance, these judges, differed over whether the exact same legal position was or was not valid, and, therefore, the state's punishment of the loser for ethical misconduct no less is irrational, and otherwise arbitrary and capricious.

In re Ruffalo, 390 U.S. 544 (1968), White and Marshall concurring, the Court said:
The conduct for which the Court of Appeals disbarred petitioner

Page 39 of   77

cannot, however, be so characterized. Some responsible attorneys, like the judge who refused to order petitioner disbarred from practice in the Northern District of Ohio, 249 F.Supp. 432 (1965), would undoubtedly find no impropriety at all in hiring a railroad worker, a man with the knowledge and experience to select relevant information and appraise relevant facts, to "moonlight" __ work on his own time __ collecting data. On the other hand some, like the officials of the Mahoning County and Ohio State Bar Associations, would believe that encouraging a man to do work arguably at odds with his chief employer's interests is unethical. The appraisal of petitioner's conduct is one about which reasonable men differ, not one immediately apparent to any scrupulous citizen who confronts the question. n3 I would hold that a federal court may not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct. I express no opinion about whether the Court of Appeals, as part of a code of specific rules for the members of its bar, could proscribe the conduct for which petitioner was disbarred.

**Forth Substantive Due Process Argument** - Cobb reported the misconduct or appearance of misconduct of two judicial officers some ten years ago. Cobb made at least one of these reports under the mandatory state regulations requiring him to report **prima facie** fraud on the Court. That said, a state may not, with the right hand, command such report independent of how offensive to some its content may be, yet, with the left, fatally back slap the messenger because the content was injurious to the reputation of a public official. Simultaneously compelling then punishing the exact same speech is not only completely irrational as adverse to the public interests, not only arbitrary and capricious, but the same otherwise makes mock of the notion of equal justice under the law and such intimidation keeps honest

lawyers from doing their jobs for fear of receiving a fate
similar to Cobb's as their reward. Moreover, you cannot command
on report based on prima facie evidence, yet re-determine in
hindsight that the event did not occur on preponderance basis
consistent with substantive due process since the same is
arbitrary.

## Abridgment of Free Speech

**Overview** - Under any legal test from strict scrutiny to rational
relationship, and wholly independent of motive, the government
cannot rationally justify punishment for the protected speech in
question and, though we can certainly guess, it is impossible to
tell just how much the proceeding was poisoned once this illegal
punishment is factored out, and, therefore, the entire proceeding
is void. It is here uncontested that no insubstantial protion of
the prosecution is overtly based on Cobb's speak as t these
judges.

    The Supreme Court of the United States has said time and
again that - opinion aside - speech factually critical of the
judiciary is of the utmost core public concern and remains the
sole check on judicial authority run rampant. Landmark, supra.


    We start with the basic tenant that in our great Union, a
lawyer is an officer of the court, state and federal. This does
not mean he is ipso facto a "state actor" under section 1983. He
could be, but there would have to be more. What being an officer

Page 41 of  77

of the court means is that you have sworn to uphold the law in our dual governments' most basic forums for truth, the public courthouses. To be meaningful, "upholding the law" precludes a knowing subversion of the truth, particularly when someone is disadvantaged thereby. In court, the law is then applied to the truth in order to reach a judgment. Thus, it's not so much a jury or other fact finder's mission to simply sort out facts, but, rather, to determine truth. That great mission fails if what we have determined as "truth" was a result of lies perpetrated on the court system.

Frankly, no even minimally competent lawyer should need a written rule codifying the above paragraph. It's common sense that the oath means that you do not lie, cheat, nor steal in this business. Such an oath however must likewise mean that you must report or otherwise expose those who do, or who were credibly reported to have done so, no matter who they are or what they did. You either understand what you are here for, or you don't, law school, bar exam, ethics exams, apprenticeships, and C.L.E. notwithstanding. Neither blurry words on coffee stained papers at midnight nor long winded sermons by supervisors in the law adequately inform such inherent conscience driven judgment.

It sometimes though takes courage to follow the above precepts. As history has shown in this matter and as will be seen below and at the trial of this matter, if you say in the Massachusetts state courts that an extremely popular up and coming judge acted unethically, then power will crush truth, indeed, the truth bearer, every time. The risk of this court not

acting here is that this case against Cobb will have the very effect the state wants, namely, to chill, or, rather, to freeze solid, the speech of lawyers who dare to do their job.

Apart from the above duty to speak out, we have in this Union the Liberty of free speech. This most particularly includes the right to be openly critical of the government. Landmark, supra, essentially states that, AMOL, the public interests are critically served by exposing wrongdoing in the courts and are critically disserved by allowing the courts a club like atmosphere ruled by "self anointed priests".

As we will see below, Cobb's two statements critical of the judges in question were both made in now ancient court proceedings, one in 1994, another in 1995. And while Cobb's political beliefs certainly informed his decision to make those statements at the time, as set forth below, he certainly recognizes that courtrooms are not generally deemed proper forums for free political expression. However, courtrooms remain forums for the truth by definition, and that's really what we are looking for here.

A state cannot constitutionally compel lawyers under fear of the whip to report fraud on the court once **prima facie** (read: sufficient) evidence of such fraud has been uncovered on the one hand, yet then, on the other, punish that same messenger years later on an ancient hindsight weight or credibility based re-assessment, let alone because the person mentioned was a judge. And for this obvious point we need no "interpretation" of the regulation at hand, other than to simply determine that the

Page 43 of  77

obligation truly springs forth on sufficiency. As we speak, the record at the BBO is **prima facie** that such a fraud was attempted, and that ends the issue on this particular alleged wrongdoing of Cobb which has been the driving force of the entire prosecution.

As to the other speak regarding Judge Sosman as seen above, what she did is undisputed, and the same unequivocally permits a reasonable inference of bias, because under both common sense and First Circuit law a judge is absolutely required to act when she is made aware of unethical conduct, as she was point blank on the transcript in open court by Cobb, rather than to urge it on then later appear to reward it as she did. As to the influence allegation, Cobb was flatly prevented contrary to First Amendment law of the Supreme Court from even creating a record establishing the same at the BBO by the BBO Chair himself.

We can all agree that every court has an obligation to prevent, and an extremely broad power to punish, including disbarment, any clear and present danger to the administration of justice. As seen below, in both instances of Cobb's speak relating to judicial officers, what was said was material to the issue then pending for the court's determination. In neither case was there any issue of prior restraint by, for instance, court order preventing anticipatorily any of the statements. So, the state's burden here will be to show factually just how it was that such a clear and present danger was created by Cobb's speak. This it can never do. Prior restraints aside, one cannot possibly create a clear and present danger to the administration of justice (meaning the pursuit of the truth) by speaking a **prima**

Page 44 of  77

*facie* truth bearing upon a material issue pending before the
court for its determination. It is truly incredible that the
entire lawyer governance system in Massachusetts has to be put
before a federal court to understand this.

Quite telling here is the fact that the state has never
put forth even one solitary fact as to how anything Cobb said
about these judges was in any way a clear and present danger to
the administration of justice. It probably would have if it could
have, the upshot being that one cannot credibly articulate facts
which do not exist. Instead, and comfortably insulated in its own
cozy system which, save the odd IOLTA challenge, has never had to
answer to outside authority, the apparent BBO theory here is that
categorically a Massachusetts lawyer must never, ever say that a
judge did anything unethical.

The BBO's theory here is apparently that judges, simply by
their position, are somehow immune from allegations of
misconduct, even when such misconduct in and of itself then
presented a clear and present danger to the administration of
justice because it either prejudiced or reasonably could have
prejudiced a material, genuinely contested issue in the case. The
state system has the right issue pegged, granted, but it has it
exactly backwards, again having confused or transposed protecting
the judiciary with protecting the public. Only the later has any
constitutional merit.

No government official, most particularly a judge, has any
such preferred status, or is otherwise immune from such
criticism. It is truly beyond the constitutional pale to punish a

Page 45 of  77

lawyer simply because the acts he reported  - which themselves presented a clear and present danger as such - related to judges. This notion, besides being absolutely absurd when the mission is truth, ignores the core of the Supreme Court's First Amendment law in this lawyer governance field, discussed immediately below.

The very best wager to make in Boston for years will be that the state's attorney in this matter will not be able to substantively discuss this case with the court without, within the first one hundred words, making the statements that Cobb "accused a judge of bias and of being influenced" or "accused a sitting federal judge of criminal conspiracy". The funny thing is that neither of these statements, as unpleasant and as unfortunate as they were for having to have been publicly made in the first place, are in and of themselves without more in any way unethical or otherwise improper for a lawyer to have made (the last statement being somewhat of a mischaracterization of what Cobb did or said, but why quibble). The issue here is whether these statements when made had any basis in the truth. So it's not content begetting content, rather, whether whatever content was stated had any truthful basis underlying it.

Hindsight is 20-20, but it would have been far better to have jailed Cobb then on criminal contempt. At least that way, Cobb, after first trimming up on bread and water while exhausting a futile run through the Massachusetts courts on this apparently sacred issue, could have put this federal constitutional issue in a federal court through a habeas corpus proceeding, and killed it dead then before its then young roots had time to grow into the

Page 46 of   77

terminal legal cancer it has now become.


    In <u>Landmark Communications, Inc. v. Virginia</u>, 435 U.S.
829, 838 (1978), the Court held:


Landmark urges as the dispositive answer to the question
presented  that truthful reporting about public officials in
connection with their public duties is always insulated from the
imposition of criminal sanctions by the First Amendment. It
points to the solicitude accorded even untruthful speech when
public officials are its subjects, see, e. g., New York Times Co.
v. Sullivan, 376 U.S. 254 (1964), and the extension of First
Amendment protection to the dissemination of truthful commercial
information, see, e. g., Virginia State Board of Pharmacy v.
Virginia Citizens Consumer Council, 425 U.S. 748 (1976); Linmark
Associates, Inc. v. Willingboro, 431 U.S. 85 (1977), to support
its contention. We find it unnecessary to adopt this categorical
approach to resolve the issue before us. We conclude that the
publication Virginia seeks to punish under its statute lies near
the core of the First Amendment, and the Commonwealth's interests
advanced by the imposition of criminal sanctions are insufficient
to justify the actual and potential encroachments on freedom of
speech and of the press which follow therefrom. See, e. g.,
Buckley v. Valeo, 424 U.S. 1, 64_65 (1976).


In Mills v. Alabama, 384 U.S. 214, 218 (1966), this Court
observed: "Whatever differences may exist about interpretations
of the First Amendment, there is practically universal agreement
that a major purpose of that Amendment was to protect the free
discussion of governmental affairs." n11 Although  [*839]  it is
assumed that judges will ignore the public clamor or media
reports and editorials in reaching their decisions and by
tradition will not respond to public commentary, the law gives
"[judges] as persons, or courts as institutions . . . no greater
immunity from criticism than other persons or institutions."
Bridges v. California, 314 U.S. 252, 289 (1941) (Frankfurter, J.,
dissenting). The operations of the courts and the judicial
conduct of judges are matters of utmost public concern.


    . . .

Moreover, neither the Commonwealth's interest in protecting the reputation of its judges, nor its interest in maintaining the institutional integrity of its courts is sufficient to justify the subsequent punishment of speech at issue here, even on the assumption that criminal sanctions do in fact enhance the guarantee of confidentiality. Admittedly, the Commonwealth has an interest in protecting the good repute of its judges, like that of all other public officials. Our prior cases have firmly established, however, that injury to official reputation is an insufficient [*842] reason "for repressing speech that would otherwise be free." New York Times Co. v. Sullivan, 376 U.S., at 272_273. See also Garrison v. Louisiana, 379 U.S. 64, 67 (1964). The remaining interest sought to be protected, the institutional reputation of the courts, is entitled to no greater weight in the constitutional scales. See New York Times Co. v. Sullivan, supra. As Mr. Justice Black observed in Bridges v. California, 314 U.S., at 270_271:


"The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. . . . [An] enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."

    Mr. Justice Frankfurter, in his dissent in Bridges, agreed that speech cannot be punished when the purpose is simply "to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed." Id., at 291_292.


Properly [*843] applied, the [clear and present danger] test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.


In Pennekamp v. Florida, supra, at 335, Mr. Justice Reed observed that this Court is

"compelled to examine for [itself] the statements in issue and

Page 48 of  77

the circumstances under which they were made to see whether or
not they do carry a threat of clear and present danger to the
impartiality and good order of the courts or whether they are of
a character which the principles of the First Amendment, as
adopted by the Due Process Clause of the Fourteenth Amendment,
protect."

Mr. Justice Brandeis was even more pointed in his concurrence in
Whitney v. California, 274 U.S. 357, 378_379 (1927):


"[A legislative declaration] does not preclude enquiry into the
question whether, at the time and under the circumstances,
[*844]  the conditions existed which are essential to validity
under the Federal Constitution. . . . Whenever the fundamental
rights of free speech and assembly are alleged to have been
invaded, it must remain open to a defendant to present the issue
whether there actually did exist at the time a clear danger;
whether the danger, if any, was imminent; and whether the evil
apprehended was one so substantial as to justify the stringent
restriction interposed by the legislature."


It was thus incumbent upon the Supreme Court of Virginia to go
behind the legislative determination and examine for itself "the
particular [utterance] here in question and the circumstances of
[its] publication to determine to what extent the substantive
evil of unfair administration of justice was a likely
consequence, and whether the degree of likelihood was sufficient
to justify [subsequent] punishment." Bridges v. California, 314
U.S., at 271. Our precedents leave little doubt as to the proper
outcome of such an inquiry.

 [***HR13]   [13]
In a series of cases raising the question of whether the contempt
power could be used to punish out_of_court comments concerning
pending cases or grand jury investigations, this Court has
consistently rejected the argument that such commentary
constituted a clear and present danger to the administration of
justice. See Bridges v. California, supra; Pennekamp  [*845]   v.
Florida, supra; Craig v. Harney, 331 U.S. 367 (1947); Wood v.
Georgia, 370 U.S. 375 (1962). What emerges from these cases is
the "working principle that the substantive evil must be
extremely serious and the degree of imminence extremely high
before utterances can be punished," Bridges v. California, supra,
at 263, and that a "solidity of evidence," Pennekamp v. Florida,
supra, at 347, is necessary to make the requisite showing of
imminence. "The danger must not be remote or even probable; it

must immediately imperil." Craig v. Harney, supra, at 376.

[***HR14]   [14]
The efforts of the Supreme Court of Virginia to distinguish those
cases from this case are unpersuasive. The threat to the
administration of justice posed by the speech and publications in
Bridges, Pennekamp, Craig, and Wood was, if anything, more direct
and substantial than the threat   [**1545]   posed by Landmark's
article. If the clear_and_present_danger test could not be
satisfied in the more extreme circumstances of those cases, it
would seem to follow that the test cannot be met here. It is true
that some risk of injury to the judge under inquiry, to the
system of justice, or to the operation of the Judicial Inquiry
and Review Commission may be posed by premature disclosure, but
the test requires that the danger be "clear and present" and in
our view the risk here falls far short of that requirement.
Moreover, much of the risk can be eliminated through careful
internal procedures to protect the confidentiality of Commission
proceedings. n13 Cf. Nebraska Press Assn. v. Stuart, 427 U.S., at
564; id., at 601 n. 27 (BRENNAN, J., concurring in judgment). In
any event, we must conclude as we did in Wood v. Georgia, that
"[the] type of 'danger' evidenced by the record is precisely one
of the types of activity envisioned by the Founders in presenting
the First Amendment for ratification." 370 U.S., at 388.


    It is true that Landmark dealt factually with an out of

court statement, but the principals above are braod based, and

applicable to speaking the truth in a non-contempt setting in a

courtroom or legal paper.

In Wood v. Georgia, 370 U.S. 375, 391 (1962), the Court held

that:


[the] effort by the petitioner to prove the truth of his
allegations was rejected, the court holding irrelevant the truth
or falsity of the facts and opinions expressed in the
publications. 103 Ga. App. 305, 321, 119 S. E. 2d 261, 273. If
the petitioner could be silenced in this manner, the problem to
the people in the State of Georgia and indeed in all the States
becomes evident.

**Second Free Speech Deprivation here -**

There exists a fair preponderance of the evidence, some direct by admission and some circumstantial via the government(s patently false and pretextual "theft" and "public protection" articulations,  establishing that Cobb's protected speech on matters of public concern was a substantial factor motivating the government's prosecution / retaliation and  punishment of him, and such illegal motivation has poisoned the entire prosecution. This is simply a pretext analysis. It gfo like so: Since the state articulated bases are somewhat incredible for the punishment, we are allowed to infer an illegal unstated reason. Here, the state admits in part that it came after Cobb for this speech anyway.

This issue will be more fully developed as time allows, but is fairly straightforward on these facts.

**Procedural Due Process**


Argument ONE - Prosecutorial Misconduct -

About six  years after the events at hand, in October 2000, and while Cobb was still suffering daily for almost that entire time under a cloud of suspicion regarding the case(s) giving rise to this matter which had been parked at the BBO to his detriment, OBC prosecutor, Rabe, in her so called "investigative" role, went to Cobb's ex-clients, Nutiles, and intentionally tricked and otherwise economically coerced them into going along in part with

Page 51 of  77

Rabe'(s manufactured story of "theft" on her promise to them that she would "get their money back" from Cobb (there was no such money to get back). In the process, Rabe - notwithstanding the BBO's own privacy rules which flatly prohibited the same - further coerced the Nutiles by telling them that "we  [meaning the BBO, not the OBC with whom she was employed. Yet both the OBC and BBO claim total independence, autonomy, and privacy from each other entity]  have a big case" pending against Cobb (meaning another case), and that Cobb was "going to be suspended", among other things.

Now, this "information" given by Rabe curiously was possessed roughly one year before the "hearing" was even to begin and was also four months **pre-indictment**. Rabe then went on to continue to misrepresent "evidence" throughout the so called "proceedings" - including the Comstock Lode itself of maintaining the "theft" claim after it was exposed for what it was, frivolous. Moreover, she in the end colluded with a state witness, Blute, to have him state his baseless "belief" that Cobb had taken money from the Nutiles, a "belief" contradicted by that own witness's prior words, and which "belief" as above was wholly incompetent AMOL as "evidence", and which "evidence" was the only such thing in "support" as above of the state's "theft" charge.


In Figueroa Ruiz v. Delgado, 359 F.2d 718 (1st.Cir.1966), the Court held:

n6 The Commonwealth's brief, perhaps to build up its position, overstates the duties of HN2a public prosecutor. It fails to recognize that he, too, has a duty not to convict an innocent

person even though he might be able to make a case against him.
Cf., e.g., Alcorta v. State of Texas, 1957, 355 U.S. 28, 78 S.
Ct. 103, 2 L. Ed. 2d 9. Id., at 720.

**Procedural Due Process Argument TWO - Lack of Fair Trial - Judicial Bias -**

There was no fair trial at the BBO as against Cobb.
Admittedly as above, the outcome was decided long before the
"hearing" started. One of the "hearing" officers entrusted to
decide the facts had long known the state's judge key witness on
one charge and the BBO would not force her to step down over
Cobb's Objections. The "theft" charge by Rabe design became a
moving target *after the evidence had closed* because she knew the
SJC consistently allowed - in violation of the Supreme Court's
Ruffalo case, infra, - these procedural shenanigans at the BBO.
Manifestly Overt Bias was otherwise exhibited at the BBO
"hearings" through prohiiting / harassing Cobb for his attempts
to introduce the exact same evidence which BC was freely allowed
to do without so much as a whisper from the BBO.

There' s far more to here say on this point, but this Brief
is way too long already.

**Procudural Due Process Argument THREE - Bad Indictment - Ruffalo**

As to the "theft", which is admittedly the sole determining
factor tipping the scales to disbarment (permanent deprivation of
Cobb's reputational liberty interest), the government's
indictment cannot be reconciled with its findings within the
constraints of procedural due process. Due process requires that

the government cannot convict in a criminal nor (as is this) a
"quasi-criminal" case on an un-indicted finding of "theft". This
"theft" conclusion against Cobb is one for which no indictment of
any sort was ever made, not originally, not by amendment. The
government waited to announce its complete abandonment of its
"theft" theory/ facts charged in the original Indictment only
after the evidence was completely closed. Secondly, apart from
such transparent bait and switch, the government here
simultaneously invoked and deprived Cobb's Liberty interest in
this matter through its RICO like clearly substantive "findings"
of so called "[pattern]" or "[conduct as a whole]", neither of
which were specified in any remote fashion in the Indictment nor
were reasonably anticipated as substantive charges to have to be
even defended against.

   **What was actually charged** - the original indictment charged
that the Massachusetts Appeals Court had "affirmed" an order of a
single Appeal's Court Justice (Lawrence,J.) which  - according to
the indictment - supposedly directed Cobb to personally pay a
sanction of about $3,700. Cobb, so the theory went, then lied,
cheated, or otherwise ripped off his client by having her pay his
bill for him.

   Upon reading these false charges in the Indictment in
February 2001, Cobb responded by way of Answer, to which he
attached a trial court order, Exhibit 2 hereto, which completely
debunked the government's entire "theft" theory based as it was
upon the "affirmance" of an Order which never existed. Cobb there
pointed out that the particular sanction above mentioned, to the

penny, was not only never directed specifically at him by Judge
Lawrence as recklessly charged, but, moreover, the trial court
Judge (Smith) had specifically ordered that Cobb's client pay the
sanction, Exhibit 2, and that the said Smith order was complied
with in every regard.

After receiving Cobb's Answer, the state prosecutor then
admitted in an Affidavit filed in Suffolk Superior Court no less
that she "was not aware" - despite the same information having
been provided to her previously by Cobb - of the Smith Order
directing Cobb's client, not Cobb, to pay the sanction.  So much
for the "theft" charge, or so one would think.

Undeterred by such utter nonsense as facts, law, and orders
of the court, the government prosecutor simply recast its theory
to the government sponsored tribunal immediately after the
evidence closed. Its new post evidence position was that the
above said Appeals Court "affirmance" as alleged initially was
now not an "affirmance" at all. Rather, it had magically become
an: (1) "order"; (2) "directing Cobb" to do something (we still
do not know what); (3) which now "modified", (4) an "obviously
erred" Smith Order. Moreover, the entire indicted allegation that
Single Justice Lawrence's Opinion had Ordered Cobb to do anything
was completely and forever abandoned without one word's
explanation since it was proven to be non-existent and was
irreconcilable with Judge Smith's specific Order as above. The
state prosecutor, now stuck with the reality of Smith's order and
no reversal nor modification of the same, ever, simply did what
it did in the original indictment, namely, continue to lie.