However, in spite of the newfound, post "hearing" un-alleged recast "indictment", for lack of better terms, not one scintilla of competent evidence was ever put on to show that: (1) the Lawrence Order directed Cobb to do anything; (2) the Appeals Court's purported across the board "affirmance" was an "order" of any sort, let alone an "order" directing Cobb to do or pay something; (3) the Appeal's Court's purported "affirmance" was now somehow an unstated "modification" of Judge Smith's Order without using the word "modified", and (4) Judge Smith's specific Order was somehow "erred". That's zero.

As previously pointed out in the substantive due process argument, supra, the obligation for the Nutiles to pay their $3700.00 arose the instant Judge Lawrence gave his Order, the same Order that both Cobb, and, subsequently, Judge Smith correctly interpreted to inure to the Nutiles. But even if the obligation to the Nutiles arose as late as the Smith Order, the simple fact is that Cobb never received even one cent of any contribution by the Nutiles towards any sanction amount until after the Nutile's had the obligation to pay. The state has never shown how it is that the Nutiles, owing some $ 3700.00, yet only paying $2000., had given to Cobb for his disbursement anything whatsoever that they were not obligated to give. Unfortunately in the system we are analyzing, this sort of non-evidence and all too obvious prosecutorial misconduct does not ever affect the statistical certainty of guilt anyway.

The case of In Re Ruffalo, 390 U.S. 544 (1968) bars such moving target indictments in bar discipline cases on due process

grounds. In <u>Ruffalo</u>, the Court held that:

As noted, the charge (No. 13) for which petitioner stands
disbarred was not in the original charges made against him. It
was only after both he and Orlando had testified that this
additional charge was added. Thereafter, no additional evidence
against petitioner relating to charge No. 13 was taken. Rather,
counsel for the county bar association said:

"We will stipulate that as far as we are concerned, the only
facts that we will introduce in support of Specification No. 13
are the statements that Mr. Ruffalo has made here in open court
and the testimony of Mike Orlando from the witness stand. Those
are the only facts we have to support this Specification No. 13."

Id., at 549.

The Court then went on to hold:

Disbarment, designed to protect the public, is a punishment or
penalty imposed on the lawyer. Ex parte Garland, 4 Wall. 333,
380; Spevack v. Klein, 385 U.S. 511, 515. He is accordingly
entitled to procedural due process, which includes fair notice of
the charge. See In re Oliver, 333 U.S. 257, 273. It was said in
Randall v. Brigham, 7 Wall. 523, 540, that when proceedings for
disbarment are "not taken for matters occurring in open court, in
the presence of the judges, notice should be given to the
attorney of the charges made and opportunity afforded him for
explanation and defence." Therefore, one of the conditions this
Court considers in determining whether disbarment by a State
should be followed by disbarment here is whether "the state
procedure from want of notice or opportunity to be heard was
wanting in due process." Selling v. Radford, 243 U.S. 46, 51.

In the present case petitioner had no notice that his employment
of Orlando would be considered a disbarment offense until after
both he and Orlando had testified at length on all the material
facts pertaining to this phase of the case. As Judge Edwards,
dissenting below, said, "Such procedural violation of due process
would never pass muster in any normal civil or criminal
litigation." n3 370 F.2d, at 462.

Id., at 551.

These are adversary proceedings of a quasi_criminal nature. Cf.
In re Gault, 387 U.S. 1, 33. The charge must be known before the
proceedings commence. They become a trap when, after they are
underway, the charges are amended on the basis of testimony of

the accused. He can then be given no opportunity to expunge the earlier statements and start afresh. n4

n4 The Ohio State Bar Association and Mahoning County Bar Association, amici curiae in support of the order of the Court of Appeals, argue that there was no due process violation because the State Board gave petitioner several months to respond to charge No. 13. This argument overlooks the fact that serious prejudice to petitioner may well have occurred because of the content of the original 12 specifications of misconduct. He may well have been lulled "into a false sense of security" ( Bouie v. City of Columbia, 378 U.S. 347, 352) that he could rebut charges Nos. 4 and 5 by proof that Orlando was his investigator rather than a solicitor of clients. In that posture he had "no reason even to suspect" (ibid.) that in doing so he would be, by his own testimony, irrevocably assuring his disbarment under charges not yet made. (bolding added).

How the charge would have been met had it been originally included in those leveled against petitioner by the Ohio Board of Commissioners on Grievances and Discipline no one knows.

Id., at 552.

This absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process.

Reversed.


In Ruffalo, at least the lawyer *was able to see* the amended indictment and arguably prepare to defend against it. Even still, it was unconstitutional essentially because it was a trap for which he never expected to have to defend against. See Ruffalo FN 4 above. Here, there was no amended indictment, nor time to prepare for countering it (admittedly the state lacked evidence of theft anyway, but this conduct is highly relevant to its true motivation to retaliate for speech assertion). Moreover, the theory here as to the eleventh hour reconstituted charge of theft was shear lunacy as above, apart from its completely fraudulent

Page 58 of  77

contrived factual basis. Any lawyer making that sort of theoretically inept and intentionally misrepresentation premised argument in this federal court would surely be sanctioned and, we now ironically come full circle, potentially reported to the BBO.

The point in Ruffalo was that the specific factual allegations of misconduct  - the theory of the case if you will - had completely changed post hearing based on the results of the hearing, exactly as here, where the "hearing" served to completely debunk the alleged "theft" theory as above. Curative amendments did not alter the constitutional deprivation, as it was irrelevant whether the lawyer had been given additional time to defend. Moreover, in Ruffalo, it was irrelevant whether the same originally alleged generalized morality based ethical precept was said to be violated by both the indicted, but abandoned, charge, and by what was supposedly later proved in the amended indictment. Namely, the said ethical precept charged was a generalized deception and moral unfitness. The Court described the originally alleged factual underpinnings supporting such charge as "soliciting ... clients through an agent". Id., at 546. As to the "proved", through amended indictment, factual charge of essentially using another to obtain information from his employer, the Ohio Supreme Court also described the same as one of moral unfitness. Id., at 547.

One of the above discussed reasons why Younger Abstention was here inappropriate was because its third affirmative prong (i.e., presumption of "adequate opportunity" of state to resolve the accused's federal claims) was not supported by the SJC's record of

rejecting each and every due process argument ever made in the BBO context. This rejection included what at a minimum can easily be seen as complete disrespect for the indictment rule of <u>Ruffalo</u>, which requires that one may not be convicted of a factual charge not specified in the indictment.

Namely, the SJC has unfortunately misstates the Rule such that there is no due process violation so long as at least one broad, generalized ethical rule violation (for instance "prejudicial to administration of justice", which is found in virtually all indictments, including Cobb's) of state's original indictment is "proved" by whatever stealth the OBC can effect before its co-tenants at the BBO. See <u>Matter of Saab</u>, 406 Mass. 315, 323-24 (1989).

In <u>Saab</u>, to rationalize the fact that the lawyer was charged under an entirely different theory than the indictment in violation of <u>Ruffalo</u>, the SJC cited <u>Zauderer v. Office of Disciplinary Counsel</u>, 471 U.S. 626, 654 (1985), for the proposition that "the United States Supreme Court has held, however, that a disciplinary authority may find an attorney's conduct deficient on an entirely different theory from the one argued by the investigative or prosecuting agency". <u>Saab</u> at 324. <u>This is simply not accurate</u>, as the purported quote from <u>Zauderer</u>, part VI, was by the undersigned's research clearly a plurality opinion, which did nothing therefore to upset the rule of <u>Ruffalo</u>, which Part VI no less was severely criticized on essentially <u>Ruffalo</u> due process grounds by two members of the Court. Id, at 656.

We therefore need not wait to find out that which we already know, namely, that the SJC will continue to interpret Supreme Court case law to regarding due process protection in disciplinary proceedings such that no due process violation will ever be found by the faulty indictments as here by the OBC and BBO, as agents of the SJC.

In _Saab_, the SJC also incredibly rejects the notion that un-indicted "pattern" and "conduct as a whole" FINDINGS are improper since the multiple Counts themselves somehow indicate that they will be considered as a whole. That's like saying that a citizen ought to know that each and every traffic ticket one receives beyond his first carries with it a mystical recidivism charge that cannot be found anywhere in the statutes. The Court simply states THAT this indication exists, without providing a basis therefore. Id., at 323. This too violates the indictment rule of _Ruffalo_, in the most extreme sense imaginable.

Nowhere is it alleged in Cobb's indictment that he will be subjected to new substantive charges of "pattern" or "conduct as a whole", and these clearly substantive charges cannot themselves be found in the disciplinary rules. But this is what happened. Saying that "prejudicial to the administration of Justice" somehow puts all Defendants on notice that aged and stacked Counts against him will be separately considered on some totality basis really shows the depth of fundamental due process concerns that the SJC unfortunately ignores in this area. These un-indicted, prosecution by ambush charges and the free license therefore only serve to shore up the argument that anything goes due process wise before

this system in bar discipline cases.

Under RICO for instance, a federal prosecuter at least has to charge "pattern" of racketeering activity, and separately prove each and every predicate act therefore, among other things which must be alleged to be found. The Defendant knows from the outset that he must disprove "pattern", since the same is an element of te substantive RICO charge. Even with this procedural protection, RICO remains extremely potent prosecutorial tool simply because of it's Blakey devised "pattern" which serves at time to gain convictions where conventional tools have failed. In Cobb's case, "conduct as a whole" as above and "theft", both symbiotically combined into the recommendation for disbarment.

In <u>Zauderer</u> at 669, one of the two Justices who sharply criticized the plurality portion of <u>Zauderer</u>, which plurality Opinion was quoted without such obviously limiting qualification by the SJC in <u>Saab</u> so as to defeat the Rule of <u>Ruffalo</u> with stare decisis therefore, said:

The Court appears to concede these serious problems, noting that "it may well be that for Ohio actually to disbar an attorney on the basis of its disclosure requirements as they have been worked out to this point would raise significant due process concerns." Ibid. (emphasis added). The Court "[sees] no infirmity" in this case, however, because the Supreme Court of Ohio publicly reprimanded Zauderer rather than disbarring him. Ante, at 654, n. 15. This distinction is thoroughly unconvincing. When an attorney's constitutional rights have been violated, we have not hesitated in the past to reverse disciplinary sanctions that were even less severe than a public reprimand. n14 Moreover, a public reprimand in Ohio exacts a potentially severe deprivation of liberty and property interests that are fully protected by the Due Process Clause. The reprimand brands Zauderer as an unethical attorney who has violated his solemn oath of office and committed a "willful breach" of the Code of Professional Responsibility, and

it has been published in statewide professional journals and the
official reports of the Ohio Supreme Court. n15 This Court's
casual indifference to the gravity of this injury inflicted on an
attorney's good name demeans the entire legal profession. n16 In
addition, under Ohio law "[a] person who has been . . . publicly
reprimanded for misconduct, upon being found guilty of subsequent
misconduct, shall be suspended for an indefinite period from the
practice of law or permanently disbarred . . . ." Govt. Bar Rule
V(7). In light of Ohio's vague rules, the governing authorities'
refusal to provide clarification and guidance to Zauderer, and the
Ohio Supreme Court's "failure to specify precisely what
disclosures [are] required," ante, at 653, n. 15, Zauderer will
hereafter publish advertisements mentioning contingent fees only
at his peril. No matter what disclaimers he includes, Ohio may
decide after the fact that further information should have been
included and might, under the force of its rules, attempt to
suspend him indefinitely from his livelihood. Such a potential
trap for an unwary attorney acting in good faith not only works a
significant due process deprivation, but also imposes an
intolerable chill upon the exercise of First Amendment rights. See
supra, at 665_666, and n. 8. n17


n16 "Where a person's good name, reputation, honor, or integrity
is at stake because of what the government is doing to him," due
process guarantees must scrupulously be observed. Wisconsin v.
Constantineau, 400 U.S. 433, 437 (1971). See also Board of Regents
v. Roth, 408 U.S. 564, 573 (1972) (same with respect to "any
charge . . . that might seriously damage [a person's] standing and
associations in his community"); Paul v. Davis, 424 U.S. 693,
722_723 (1976) (BRENNAN, J., dissenting) ("[The] enjoyment of
one's good name and reputation has been recognized repeatedly in
our cases as being among the most cherished of rights enjoyed by a
free people, and therefore as falling within the concept of
personal 'liberty'").(bolding added).


The Office of Disciplinary Counsel charged that Zauderer's drunken
driving advertisement was deceptive because it proposed a
contingent fee in a criminal case - an unlawful arrangement under
Ohio law. Amended Complaint paras. 3_7, App. 22_23. Zauderer
defended on the ground that the offer of a refund did not
constitute a proposed contingent fee. This was the sole issue
concerning the drunken driving advertisement that the Office
complained of, and the evidence and arguments presented to the
Board of Commissioners were limited to this question. The Board,
however, did not even mention the contingent_fee issue in its
certified report. Instead, it found the advertisement "misleading

and deceptive" on the basis of a completely new theory - that as a
matter of "general knowledge" as discerned from certain "Municipal
Court reports," drunken driving charges are "in many cases . . .
reduced and a plea of guilty or no contest to a lesser included
offense is entered and received by the court," so that in such
circumstances "the legal fee would not be refundable." App. to
Juris. Statement 11a. Although Zauderer argued before the Supreme
Court of Ohio that this theory had never been advanced by the
Office of Disciplinary Counsel, that he had never had any
opportunity to object to the propriety of judicial notice or to
present opposing evidence, and that there was no evidence
connecting him to the alleged practice, the court adopted the
Board's findings without even acknowledging his objections. 10
Ohio St. 3d, at 48, 461 N. E. 2d, at 886. Id., at 670-71.

Zauderer of course might not ultimately be able to disprove the
Board's theory. The question before the Court, however, is not one
of prediction but one of process. "A person's right to reasonable
notice of a charge against him, and an opportunity to be heard in
his defense - a right to his day in court - are basic in our
system of jurisprudence." In re Oliver, 333 U.S. 257, 273 (1948).
Under the Due Process Clause, "reasonable notice" must include
disclosure of "the specific issues [the party] must meet," In re
Gault, 387 U.S. 1, 33_34 (1967) (emphasis added), and appraisal of
"the factual material on which the agency relies for decision so
that he may rebut it," Bowman Transportation, Inc. v.
Arkansas_Best Freight System, Inc., 419 U.S. 281, 288, n. 4
(1974). These guarantees apply fully to attorney disciplinary
proceedings because, obviously, "lawyers also enjoy first_class
citizenship." Spevack v. Klein, 385 U.S. 511, 516 (1967). Where
there is an "absence of fair notice as to the reach of the
grievance procedure and the precise nature of the charges," so
that the attorney is not given a meaningful opportunity to present
evidence in his defense, the proceedings  violate due process. In
re Ruffalo, 390 U.S., at 552 (emphasis added). n18 . Id., at 672.

n18 The Court attempts to distinguish Ruffalo by explaining that
the absence of fair notice in that case caused the attorney to
give exculpatory testimony that, after it prompted the inclusion
of additional charges, became inculpatory. Ante, at 655, n. 18. In
the instant case, the Court assures, the absence of fair notice
was not "particularly offensive" because it simply led Zauderer to
refrain from presenting evidence that might have been exculpatory
rather than to present evidence having an inculpatory effect.
Ibid. This constricted interpretation of due process guarantees
flies in the face of what I had thought was an "immutable"
principle of our constitutional jurisprudence - that "the evidence

used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Greene v. McElroy, 360 U.S. 474, 496 (1959).

The Court acknowledges these guarantees, but argues that the Board's change of theories after the close of evidence was "of little moment" because Zauderer had an opportunity to object to the Board's certified report before the Supreme Court of Ohio. Ante, at 654. This reasoning is untenable. Although the Supreme Court of Ohio made the ultimate determination concerning discipline, it held no de novo hearing and afforded Zauderer no opportunity to present evidence opposing the Board's surprise exercise of judicial notice. Under Ohio procedure, the court's role was instead limited to a record review of the Board's certified findings to determine whether they were "against the weight of the evidence" or made in violation of legal and procedural guarantees. Cincinnati Bar Assn. v. Fennell, 63 Ohio St. 2d 113, 119, 406 N. E. 2d 1129, 1133 (1980). n19 All that Zauderer could do was to argue that the Board's report was grounded on a theory that he had never been notified of and that he never had an opportunity to challenge with evidence of his own, and to request that proper procedures be followed. n20

Here, Cobb defeated the charged claim of theft, hands down, only to be shocked at the closing upon hearing the words "disbarment". "Affirmance" and "modification" cannot be reconciled.

## Procedural Due Process Theory THREE –

The government's undue pre-indictment delays in this matter, stretching an average of 6 1/2 years on the only two claims which here even merit any serious discussion, were effected with a manifest intent to gain unfair advantage, and the same caused severe prejudice to Cobb's rights.

Let us begin generally. In order to even plausibly postulate that the OBC / BBO do not systematically and intentionally combine, as a matter of course, to use their free unfettered

license to affect severe, completely unregulated, undue delays to gain unconstitutional advantage in Bar proceedings, one would, among other things discussed below, have to assume that they cannot even read. Because if they could, they would surely derive much solace, encouragement, and safe harbor enablement for such practices from their Supervisor's (the SJC) Opinions which clearly encourage and enable the following conduct:

**ONE** - Undue delay, pre-indictment especially. No time limitations (read: Statute of Limitations) of any sort whatsoever as to any aspect of any case which OBC decides to bring no matter how much time has elapsed, will ever be enforced, under any circumstances, even in cases wherein the lawyer was punished 16 years after the act, or 10 years after as here, and even after the Bar has complained of this untoward practice in the Local Lawyer's Weekly. The state cannot show that it allows such aberrations in any other field, apart from its regulation of the practice of law. The manifest legal presumption of undue prejudice and deliberate indifference to constitutional rights logically and practically attached to this disgrace is clearly shifted from the state to the accused to show prejudice. If the state waited 50 years to indict a lawyer on his death bed, would he still have to show prejudice under this system? All indications thus far are "yes". The lack of Limitations in these regards is *per se* unconstitutional.

**TWO** - No prohibition against the "stacking" of multifarious Counts upon one another. By routine undue delay of one-half decade or so, it takes not a rocket scientist to deduce that more charges may

trickle in, which can then be combined into a multiple indictment, in which the standard bearer argument, below, of "pattern" and "conduct as a whole" can then be made, despite lack of indictment as to these terms and despite any ethical rule remotely even addressing them. This routinely allows for a RICO like "pattern" substantive charge to be used to ambush the unwitting lawyer who naively believes he actually has anything other than an arbitrary chance in the system. Any relatively short statute of limitations commanding swift action from the BBO would eliminate this unfair advantage since cases would be resolved before some other otherwise unrelated and perhaps otherwise frivolous charge drifted in 4 1/2 years later, as here, preventing the "pattern" ambush. Bar opinions in Massachusetts wherein the BBO did not "credit" the validity of other Counts of the indictment based on completely separate charges in time, place, and manner in order to argue "pattern" are not that common according t the undersigned's research.

**THREE** - No limitations at all about convicting on unindicted "pattern" and "conduct as a whole" charges, which of course are never set forth in the indictment, because the SJC says they do not have to be.

It's only common sense that a parent who gives cigarettes, matches, and a smoking room to his child cannot credibly deny that the child is not encouraged thereby to smoke. Enabling as such on the one hand, while preaching against the ills of smoking on the other, can hardly be said to discourage smoking.

**Why Cobb suffered actual and substantial prejudice on account of these unconstitutional practices.**

First, the most important witness in the so called "Jaraki" matter, Dr. Jaraki himself, who could testify as to what he heard about the judge speaking with her ex-client who thereafter "forgot" what he knew since others had told him that it "would be unethical" for him to testify, had long since moved out of state and perhaps Country. While the event giving rise to the so called ethical breach occurred in March 1995, and while the litigation itself continued through Spring of 1998 meaning Jaraki was then available to testify, the indictment came down in February, 2001, some three years after contact between Jaraki and Cobb was lost. Given the structural deficiencies in the system as above, it truly is hard to imagine that the delay was not intentional, particularly when the state then called a witness, the Judge no less, to *voluntarily* testify as to the absence of that very conversation over Cobb's Objection.

**Second,** the state had charged Cobb with not telling the Nutiles that Sosman had sanctioned him personally, but the Nutiles were in the Courtroom when Judge Sosman said this and this is undisputed on the Court transcript!!! Undeterred, Rabe then economically coerced as above Nutile *seven years later when the money was all gone* to what to say about the "hearing". He basically knew nothing but what he was coerced to say by Rabe, such as "[he] was in the back and could not hear" words that both he and his wife had come all the way to Boston to hear!!! He said

"Cobb called us and said that he, I mean we, had been sanctioned".
Moreover, **THIRD** prejudice wise is the immense psychological and
emotional distress which the undersigned endured and can easily
attest to while trying to continue to be successful at his
practice with actual pre-indictment open "investigations" pending
and unresolved for at least 5 1/2 years.

In U.S. v. Marion, 404 U.S. 307 (1971), the U.S. Supreme
Court discussed delays of constitutional import in criminal
matters. The Fourteenth Amendment due process concerns embodied
therein come to the fore in a quasi-criminal bar discipline
matter. Marion primarily concerned itself with speedy trial issues
invoked post indictment, which issues are not here claimed as a
right that Cobb enjoys in a bar discipline proceeding. However, as
to pre-indictment delay, controlled as it is by Statutes of
Limitation and the due process clause of the Fourteenth Amendment,
the Court stated, at 315, FN8, that:


Most courts of appeals have recognized the Sixth Amendment right
to a speedy trial only after a prosecution has been formally
initiated or have held that the sole safeguard against
pre-indictment delay is the relevant statute of limitations. ...
(bolding added and long string citation omitted) ... . Some courts
of appeals have stated that pre-indictment delay may be cause for
dismissal but they have seemed to treat the question primarily as
one of due process (although the Sixth Amendment is occasionally
mentioned) and have required a showing of actual prejudice:
(bolding added and long string citation omitted) ... . Although
Petition of Provoo, 17 F.R.D. 183 (Md.), aff'd sub nom. United
States v. Provoo, 350 U.S. 857 (1955), is sometimes cited for the
proposition that pre-indictment delay will justify dismissal, the
District Court explicitly stated that it considered this delay to
be relevant only on the issue of whether the defendant had been
denied a fair trial. 17 F.R.D., at 202. In Taylor v. United
States, 99 U. S. App. D. C. 183, 238 F.2d 259 (1956), a conviction

was vacated where there had been a six_year delay between the
crime (housebreaking) and trial, 3 1/2 years of which was a delay
between crime and indictment; the defendant had been in prison on
another charge during this time, and the defendant was
substantially prejudiced in his ability to defend against the
housebreaking charge. The Court of Appeals stated: "We do not rely
on the mere lapse of time between the commission of the offenses
and the date of indictment, considered by itself, for that is
governed by the statute of limitations. It is the combination of
the factors set forth above [post-indictment delay, prejudice]
which motivates our decision." Id., at 186, 238 F.2d, at 262.


The Marion Court, at 322-23, went on to discuss how it is that the

due process clause itself protects pre-indictment delays:


The law has provided other mechanisms to guard against possible as
distinguished from actual prejudice resulting from the passage of
time between crime and arrest or charge. As we said in United
States v. Ewell, supra, at 122, "the applicable statute of
limitations . . . is . . . the primary guarantee against bringing
overly stale criminal charges." (bolding added) Such statutes
represent legislative assessments of relative interests of the
State and the defendant in administering and receiving justice;
they "are made for the repose of society and the protection of
those who may [during the limitation] . . . have lost their means
of defence." Public Schools v. Walker, 9 Wall. 282, 288 (1870).
These statutes provide predictability by specifying a limit beyond
which there is an irrebuttable presumption that a defendant's
right to a fair trial would be prejudiced. n14 As this Court
observed in Toussie v. United States, 397 U.S. 112, 114_115
(1970):

"The purpose of a statute of limitations is to limit exposure to
criminal prosecution to a certain fixed period of time following
the occurrence of those acts the legislature has decided to punish
by criminal sanctions. Such a limitation is designed to protect
individuals from having to defend themselves against charges when
the basic facts may have become obscured by the passage of time
and to minimize the danger of official punishment because of acts
in the far-distant past. Such a time limit may also have the
salutary effect of encouraging law enforcement officials promptly
to investigate suspected criminal activity."

There is thus no need to press the Sixth Amendment into service to
guard against the mere possibility that pre-accusation delays will

prejudice the defense in a criminal case since statutes of
limitation already perform that function.

n14 The Court has indicated that criminal statutes of limitation
are to be liberally interpreted in favor of repose. United States
v. Habig, 390 U.S. 222, 227 (1968). The policies behind civil
statutes of limitation are in many ways similar. They "represent a
public policy about the privilege to litigate," Chase Securities
Corp. v. Donaldson, 325 U.S. 304, 314 (1945), and their underlying
rationale is "to encourage promptness in the bringing of actions,
that the parties shall not suffer by loss of evidence from death
or disappearance of witnesses, destruction of documents or failure
of memory." Missouri, Kansas & Texas R. Co. v. Harriman, 227 U.S.
657, 672 (1913). Such statutes "are founded upon the general
experience of mankind that claims, which are valid, are not
usually allowed to remain neglected," Riddlesbarger v. Hartford
Insurance Co., 7 Wall. 386, 390 (1869), they "promote justice by
preventing surprises through the revival of claims that have been
allowed to slumber until evidence has been lost, memories have
faded, and witnesses have disappeared," Order of Railroad
Telegraphers v. Railway Express Agency, 321 U.S. 342, 348_349
(1944), and they "are primarily designed to assure fairness to
defendants. . . . Courts ought to be relieved of the burden of
trying stale claims when a plaintiff has slept on his rights."
Burnett v. New York Central R. Co., 380 U.S. 424, 428 (1965). As
in the criminal law area, such statutes represent a legislative
judgment about the balance of equities in a situation involving
the tardy assertion of otherwise valid rights: "The theory is that
even if one has a just claim it is unjust not to put the adversary
on notice to defend within the period of limitation and that the
right to be free of stale claims in time comes to prevail over the
right to prosecute them." Order of Railroad Telegraphers v.
Railway Express Agency, supra, at 349.

At page 324-25 immediately below, the Marion Court went on to set

forth the operable **due process** test regarding when it is, if ever,

that an indictment ought to be dismissed on account of the

government's undue delay, keeping in mind that the Court had

already determined that the applicable limitations period - wholly

absent here, but, in federal parlance being five years, see 18

U.S.C. s. 3282 - gives rise to an irrebutable presumption of

prejudice once the time line is exceeded. Clearly therefore, the

below deals then with pre-indictment delay which does not exceed the applicable limitations period. In other words, while the United States Supreme Court has ruled out speedy trial protections for pre-indictment delay - here not applicable, at least not yet - in Bar Discipline cases, it has done so only because of the existence of the applicable Statute of Limitations as above. However, the Court goes on to hold as below that due process may still inform that the indictment itself was unconstitutional if certain conditions are met, namely:

Since appellees rely only on potential prejudice and the passage of time between the alleged crime and the indictment, see Part IV, infra, we perhaps need go no further to dispose of this case, for the indictment was the first official act designating appellees as accused individuals and that event occurred within the statute of limitations. n15 Nevertheless, since a criminal trial is the likely consequence of our judgment and since appellees may claim actual prejudice to their defense, it is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. **Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.** [bolding added] n16 Cf. Brady v. Maryland, 373 U.S. 83 (1963); Napue v. Illinois, 360 U.S. 264 (1959). However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. n17 Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. n18 To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases.

At 325-26, the Court stated:

The 38-month delay between the end of the scheme charged in the indictment and the date the defendants were indicted did not extend beyond the period of the applicable statute of limitations here. Appellees have not, of course, been able to claim undue delay pending trial, since the indictment was brought on April 21, 1970, and dismissed on June 8, 1970. Nor have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely [*326]  on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature.

Barker v. Wingo, 407 U.S. 514 (1972).

    Although Barker was a sixth amendment speedy trial case, the

Court discussed some of the issues which overlap between sixth

amendment and fourteenth amendment, Marion, supra, type due process

delay concerns, those issues being the government's intentional

delay for either delay or harassment, and the prejudice which may

attach to any such delay. Namely at 531 the Court held that:

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. n32 A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

Page 73 of 77

n32 We have indicated on previous occasions that it is improper for the prosecution intentionally to delay "to gain some tactical advantage over [defendants] or to harass them." United States v. Marion, 404 U.S. 307, 325 (1971). See Pollard v. United States, 352 U.S. 354, 361 (1957).

The Barker Court at 532-33, also discussed some of the speedy trial prejudice factors, which logically at least overlap some of the same practical prejudice concerns found in the due process pre-indictment delay test above note in Marion. Namely:

A fourth factor is prejudice to the defendant. ... Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility. See cases cited in n. 33, supra.

Here, the very two cases (Nutile and Jaraki) which are really at issue here were both publicized. Nutile in the Massachusetts Appeals Court reports and Jaraki in the then new Reports of Superior Court decisions. In it, Cobb's ethical mores were questioned as it was stated that the case had been referred to the BBO. Now, that was in Fall, 1995. A full five and one-half years then went by before the indictment came down. During this period, Cobb was time and again tagged as "having accused a sitting federal judge of criminal conspiracy" without any way whatsoever of forcing closure of the issue to clear his name and to point out the obvious, that the First Amendment protected that statement - like it or not - to the extent that it was **prima facie** and relevant, which it was. Judging how others think of you is very difficult,

Page 74 of 77

and perhaps it's one of those situations wherein you know how it feels when you are the one ridiculed.

Every day for those five and one-half years that the Jaraki Opinion had been published as such with it being known that the BBO was to have its mitts involved, Cobb suffered the following and similar thoughts and worries: "Well, they have never timely dismissed this matter as they have all other routine matters concerning me before the BBO, so maybe they are going to file charges **verses** "Well, if they have not done something by now, it must not be too terribly important".

Of course, both of these positions are logical, yet they are irreconcilable and nerve racking. In at least a handful of cases I was involved in this statement was thrown in my face to discredit me and derivatively, my then clients. So its was highly prejudicial for the BBO to well know for 5 1/2 years the public suspicion created by Judge McHugh's "report" to the BBO and by the Sosman matter also published, yet it stood pat ostensibly "due to the press of other business". No constitutionally competent adjudicatory system could ever allow for this excuse less delay to occur.

Lastly, as to the OBC / BBO's intent to delay for advantage, Rabe, who is involved in the present case has continued to pocket a case brought by a disgruntled ex-client of Cobb's, for acts occurring **in late 1992.** <u>The case still remains a threat to Cobb's Liberty and property rights now some twelve years later</u>. The Client made some unintelligible claim in 1998 to the BBO, which simply was a paragraph or so long letter to Cobb asking for Cobb's payment of

Page 75 of  77

a One Dollar settlement in a so called "malpractice" case. The letter was "cc'ed" to the BBO, which commanded that Cobb respond, which he did. The facts supporting the claim occurred at least six years prior **to that point** in time, when the client had fired Cobb for his protestations regarding the client's continuing refusal to stop filing stealth like **pro se** papers in the federal court while Cobb was attempting at least to represent her.

The pendency of this claim was actually discussed between Cobb and Rabe in or around 1998, Rabe then telling Cobb that a formal charge might still be brought on the claim. That's been six more years now, and the claim is still pending. Essentially, it was an ex-client, one Pakezigi, who sued Cobb in Middlesex Superior Court for "malpractice". Cobb immediately propounded discovery to her asking the basis of her claims, together with an "Offer of Judgment" for One Dollar, which Offer was promptly accepted. Beyond that, Cobb had no clue then as now what supposed negligence the claim was premised upon.

On these facts, it cannot plausibly be denied that OBC / BBO have not intentionally delayed the case. Bar Counsel certainly admitted as much six years ago, and time does not lie in any event. There is nothing whatsoever presently, or three years from now for that matter, preventing Bar Counsel from again indicting on this case whenever it wants to, **the case clearly being saved as a back up to this prosecution.** It is of a huge advantage to the OBC to use FRE 404(a) barred evidence routinely to attain convictions, and this is why thay stack cases for years until enough of them pile up so it can then charge an un-indicted "pattern".

**Last Procedural Due Process Argument –**

**Vindictiveness** in sentencing is the reward for those lawyers who have the guts – or, rather, the misfortune, to have no choice but to vigorously defend false and defamatory charges at the BBO, particularly when, like Cobb, they accurately point out just how absurd the state's "theft" charge was, and the same is unconstitutional under <u>Alabama v. Smith</u>, 490 U.S. 794 (1989) and <u>North Carolina v. Pearce</u> , 395 U.S. 711 (1969). Cobb was said to have "not appreciated" his conduct as evidenced by his agressive stance at the BBO.

When you do this to a man, he will fight for what is his, if he is truly a man.

Respectfully submitted,

Matthew Cobb
Law Office of Matthew Cobb
101 Tremont Street
Boston, Massachusetts  02108
(617) 357-7300

Verification – I, Matthew Cobb, under pains and penalties swear that the Facts set forth above are true to the best of my knowledge and personal observation. I cannot attest to the above Opinions, nor some of the stated inferences or arguments. But the facts described I stand by so help me God. This last day of April, 2004.

_____
Matthew Cobb

UNITED STATES COURT
DISTRICT OF MASSACHUSETTS

Matthew Cobb,                              )
                                           )      CIVIL ACTION
     Plaintiff,                            )
                                           )      04 - 10390  MLW
vs.                                        )
                                           )
Supreme Judicial Court of the Commonwealth of)
 Massachusetts by and through its          )
 individual members in their respective    )
 Official capacities, Honorable Margaret H. )
 Marshall, C.J., John M. Greaney, J., Francis)
 X. Spina, J., Martha B. Sosman, J., Roderick)
 L. Ireland, J., Judith A. Cowin, J., and  )
 Robert J. Cordy, J.                        )

## VERIFIED SECOND AMENDED
## AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE RELIEF

Now comes the Plaintiff, Matthew Cobb, and for his Verified
Second Amended and Supplemental Complaint for Injunctive Relief,
respectfully alleges that:


### Jurisdiction

1)   This action arises exclusively under the Laws and Constitution
     of the United States of America,  jurisdiction being conferred
     by 29 U.S.C. 1331.

### Parties

2)   The Plaintiff is Matthew Cobb, a citizen of the United States
     of America and of Massachusetts.

3)   The  above  captioned  Defendant(s)  are  all  the  individual
     members  of  the  Honorable  Supreme  Judicial  Court  of  the
     Commonwealth of Massachusetts (sometimes collectively referred
     to herein as the "SJC"), acting in their official capacities.

4)   Though non-parties, the Massachusetts Office of Bar Counsel by
     and through its agents (hereinafter OBC) and the Massachusetts
     Board of Bar Overseers by and through its agents (hereinafter
     BBO), each deem themselves "official bodies subject to the
     supervision of the Court", meaning the SJC, and they are
     otherwise legally indistinguishable from the SJC in the area
     of lawyer governance and licensing in that they act as an
     administrative Division(s) of the State Judiciary. *Middlesex
     County Ethics Committee v. Garden State Bar Association*, 457
     U.S. 423 (1982).

5)   The said SJC Single Justice, on August 2, 2004, has wholly
     adopted and ratified the complete holdings and doings of the
     above said BBO / OBC, making these above entities further
     indistinguishable as a matter of Fact and Law, and making it
     both necessary and proper under this notion and the below
     paragraphs 6-8 to refer to the doings of the BBO / OBC as the
     doings of the Single Justice and therefore at least in part
     the SJC.

                                Facts

6)   The Supreme Judicial Court of Massachusetts (SJC) together
     with all the trappings of its Judiciary generally, including
     its lawyer discipline and disability system, is itself the
     Government of Massachusetts.

7)   The United States Supreme Court has held exactly that the
     ultimate and exclusive responsibility within Massachusetts for
     the structure and administration of its lawyer discipline and
     disability system and for the disposition of individual cases
     within the same falls under the inherent power of the SJC.

                                  2

*Middlesex County Ethics Commission v. Garden State Bar Association*, 457 U.S. 423, 433 (1982).

8) The responsibility for the conscious shocking conduct as alleged herein committed as against Cobb by the Massachusetts Lawyer Discipline and Disability System (lawyer governance system or system hereinafter) is held as a matter of Law by the SJC under *Middlesex, supra*, which holding of responsibility provides the basis for all acts of the said System being deemed judicial in nature. *Id.*

9) Cobb, a Massachusetts lawyer, proximately on account of his exercise roughly one decade ago of his fundamental substantive Liberty interest of freedom of speech on matters of the utmost public concern under the First Amendment to the U.S. Constitution respecting the fair administration of Justice in a State Judiciary, and on account of his then exercise of his safe harbor lawyer's Oath to not participate in the doing of any falsity upon the Court, was proximately and systematically punished / retaliated against by the Defendants as set forth below. *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978); *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991); *Butterworth v. Smith*, 494 U.S. 624 (1990).

10) The said retaliation commenced forthwith and has never ceased immediately after Cobb's public exposure in 1994 and 1995 as an Officer of the Court of *prima facie* misconduct on the part of two separate judges (detailed below), which retaliation has now manifested itself in the form of near decade long and counting State sanctioned judicial disciplinary proceedings as against Cobb for which Cobb stands disbarred effective September 1, 2004.

11) For vigorously defending his rights as above against baseless "theft" charges used to disguise Defendant's motivation to punish him for his protected speech, Cobb has been additionally systematically retaliated against by Defendant by its use of his defense as a substantive charge against him, essentially merging the actual BBO proceedings themselves into the substantive verdict, thereby improperly importing vindictiveness into his sentencing. *Alabama v. Smith*, 490 U.S. 794 (1989) and *North Carolina v. Pearce* , 395 U.S. 711 (1969).

12) Massachusetts has engaged in longstanding and repeated public publications regarding the nature and specifics of the proceedings as against Cobb.

13) Such publications have emphasized both his reporting of these judicial officers and also a fabricated and outrageous pretextual charge of "theft" for which there is no competent evidence in support thereof.

14) Defendant through these publications – and through the public disbarment of Cobb who is generally known within the Boston legal community to have had these judge critical charges pending against him for many years – has sought to chill and intimidate other members of the Massachusetts Bar from similarly reporting judicial misconduct.

15) Generally, such reporting as a matter of Law manifestly serves public interests of the highest order, *Landmark, supra,* and, specifically, is in strict conformance with the Massachusetts Lawyer's Oath of Office, which mandates that Cobb will at all times act with the utmost fidelity and that he will unqualifiedly never consent to the doing of any falsehood in the court.

16) Defendant has deprived Cobb of the equal protection of the Laws as guaranteed by the Fourteenth Amendment, by and through the SJC's politically motivated grant of an illegal reputational preference to the above said judges whilst subordinating Cobb's legal interests in relation thereto without rational basis therefore. *Landmark, supra.*

17) The false "theft" charge was invented out of thin air by the system prosecutor falsely disguise Defendant's disbarment of Cobb, which "theft" charge the State has long since admitted was the only disbarable offense as against Cobb.

18) Cobb has been permanently injured in terms of his reputational Liberty interests in his good name without procedural due process of Law as guaranteed by the Fourteenth Amendment, generally, through a near decade long forced participation in a structurally deficient lawyer governance system (described below), which system is incapable to a mathematical statistical certainty of producing any result other than guilt.

19) The several below described as applied violations of historic indicia of constitutional procedural due process, each of which is determinative herein in its own right and all of which exist to insure the fair trial which he never received, proximately caused the said Liberty deprivation.

20) Cobb's property right under State Law relative to his license to practice Law has been similarly permanently injured without procedural due process of Law as guaranteed by the Fourteenth Amendment through the constitutionally deficient "proceedings" as detailed herein.

21) Cobb has otherwise been deprived of his fundamental

5