substantive due process rights under the Fourteenth Amendment by the conscious shocking conduct of Massachusetts of disbarring him without evidence of the sole disbarment charge, and this position has been now adopted by its Defendant Judiciary through its recent ratification and adoption of the BBO ruling.

22) The said BBO disbarment ruling was the proximate result of a "theft" accusation which was undisputedly and admittedly shown to be wholly without evidentiary basis (credibility assessments are irrelevant when there is no evidence to even weigh) shortly after the indictment came down in February 2001 but before the "hearings" commenced in Fall, 2001, and which accusation was maliciously maintained nonetheless in order to not only publically tarnish Cobb's reputation in the public eye, but also so that such "theft" could be used as a guise in part for the State's motivation to punish / retaliate against Cobb for his protected speech as respects the said judges.

23) For an Officer of the Court as was Cobb, his right to report judicial misconduct became a solemn duty since he was a participant in the state court litigation in which these untoward acts were *prima facie* observed.

24) In 1994 and 1995, Cobb engaged in speech which, as a matter of law, was of the utmost and highest public concern relating to the fair administration of Justice in the Courts of Massachusetts through his public identification and exposure of two improper acts *prima facie* done, or competently and sufficiently reported to have been done, by two public officials (judges), which acts were either unethical, exhibited a manifest appearance of impropriety, were violative

of Judicial Codes, and/or were otherwise improper as an affront to Justice in the Courts.

25) Specifically, in 1994, a State trial Court Judge, one Sosman, had sanctioned Cobb personally in the amount of $4,000.00 for bringing a so called "frivolous" lawsuit against one Rose, a lawyer, who had on information and belief, only a year or so prior and then unbeknownst to Cobb, vice-chaired the very committee who had approved the said Judge's application to the Bench.

26) During the hearing on "sanctions" held February 2, 1994, before the said Judge, Rose made a point to abruptly enter the hearing midship and sit just behind counsel table to be seen by the Bench.

27) The specific legal argument as against Rose for which Cobb was summarily sanctioned was that his threatening to sue Cobb's client for defamation of character when he knew that there was no colorable right to bring such an action was extortionate and actionable, and that Rose, as a lawyer, *potentially* possessed only a qualified, and not an absolute, privilege to engage in such illegal activity, which qualified privilege he lost on account of his knowingly illegal conduct.

28) Cobb's argument as against Rose under Massachusetts Law as above had additionally included the undisputed fact (a "weight" of the evidence consideration, not the theory of the case) that Rose's threat of legal action as against Cobb's frail minded client (via a direct written communication to her at a time in which he undisputedly knew that she was represented by Cobb) was a violation of a specific Massachusetts disciplinary rule mandating discipline.

7

29) Rose knew that at the time he made the written threat of a defamation lawsuit against the said client, Nutile, that the same was barred under Massachusetts Law holding that no legal action could be grounded on her defamatory words since they were part and parcel to her good faith contemplation of a lawsuit.

30) Not only was this argument good law then, when it was made, and not only did the Massachusetts Court's systematically ignore its own clear precedent in this regard uniquely as against Cobb throughout the proceedings against Cobb which gave rise to this lawsuit, but a virtually indistinguishable argument under the exact same statute was later confirmed as actionable by a United States Magistrate Judge, the Honorable Robert B. Collings, of the United States District Court for the District of Massachusetts, *Meltzer v. Grant*, 193 F. Supp. 2d 373 (2002), and, therefore, Cobb's conduct was protected as no lawyer can be disciplined for taking a "frivolous" legal position that reasonable minded judges cannot agree on. *In re Ruffalo*, 390 U.S. 544 (concurrence); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048-49 (1991)(Majority Opinion by Mr. Chief Justice Rehnquist).

31) Cobb brought the *Meltzer* Ruling to the attention of the said governance "hearing" committee but it cut no ice, as he was still disciplined for having brought a "frivolous" proceeding the committee - and hence now the Defendant - wholly ignoring the Ruling.

32) Cobb had argued in August 1994 - in Court papers filed before a Single Judge of the Massachusetts Appeals Court (interlocutory appeal) seeking a reversal of the trial Judge's

rulings - that the said trial judge was biased and apparently influenced by defense counsel, Rose's, law firm.

33) Such allegation was made however only after the said judge had:

A)      allowed and encouraged an *ex parte* communication with a lawyer, one Blute who belonged to the said defense counsel's (Rose's) law firm, by agreeing to take another judge's (mandatorily assigned to a specific court session) case without such judge's then knowledge nor the knowledge nor participation of Cobb nor his client;

B)      never disclosed (as was ethically required) the same to either Cobb or his then present client, and had openly allowed and encouraged a member of Rose's firm, Blute, to knowingly commit at least one additional (never disputed to this date) unethical act (then DR 5-103) in open court on February 2, 1994 with her full knowledge, on the record, which record is preserved for all to see but for its having been sealed from the Public view for the last decade by the said Judge's own Court Order.

34) The said allowance by the Judge of unethical conduct as above, together with her not having mandatorily reported the same was the stated basis for the above said Appeal argument that the said judge was either biased or influenced, this basis being wholly separate from the substantive appeal argument that the judge simply was wrong on the Law.

35) The Relator did not then report to the Single Appeals Court Judge the *ex parte* doings as above, as he then figured that

9

the unethical acts condoned, encouraged, then rewarded via sanctions by the judge on the record and in open court was a sufficient basis from which to infer bias and potential influence.

36) For filing the Single Judge Appeal with the above argument, Cobb's client, and not Cobb, was then sanctioned by the Single Appeal Court Judge in an amount of $3244.50.

37) Later in the same case, a trial court Judge specifically enforced and otherwise then Ordered that payment of these two sanctions be made therein Ordering "Cobb" to pay the $4,000.00 and "Cobb's Client" to pay the $3244.50.

38) It remains undisputed to this date that the said Order was fully complied with.

39) The then Judge, now Justice, Sosman, is now a member of the SJC.

40) Cobb went on to achieve an exceptional monetary settlement in the case for his client nonetheless.

41) As to the second report, in 1995, Cobb and his Plaintiff client (Jaraki, an emergency room physician) had both interviewed a witness (an ER colleague of Jaraki) who had material information respecting a material damage issue in a pending civil case in state court.

42) The said witness at that time had been more than eager to corroborate under oath that which Jaraki already knew, the essence of which being that due to an upcoming re-credentialing process at a certain hospital, Cobb's client had made a reasonable (mitigation) decision to leave the said hospital for another job.

43) However, when the said witness's name then showed up on a

mandatory witness list in the Jaraki matter (according to the witness himself) he was promptly contacted by one Cohen (his personal lawyer), after which they had several discussions about the matter.

44) Cohen was then representing the said witness in unrelated medical malpractice litigation in which he was the Defendant. Cohen's law firm coincidentally however was also defending the very case being prosecuted by Cobb and Client in which the said witness had previously willingly and enthusiastically volunteered to testify in as above.

45) According to the above said witness who reported this information to Jaraki, he was told by Cohen that it "would be unethical" for him to testify in the Jaraki case, that she had strongly urged him not to so testify, and that he had promised her in response that if called to testify in the Jaraki matter that he would lie claiming that he knew nothing thereby averting the need to be cross examined by her firm.

46) In point of fact attorney Cohen had been presented with a situation wherein her firm would have had to bail out of one or the other of these hourly billable cases due to the certainty of her law firm then being forced to have to cross-examine its own client.

47) The witness also reported to Jaraki that he had also consulted with his personal ex-attorney about the situation, a then newly appointed federal judge, Gertner.

48) The witness reported to Jaraki that after he consulted with Gertner about the situation that she too strongly urged him to not testify in the matter despite his knowledge.

49) After these several conversations, the witness finally

11

reported to Jaraki that he still would feign ignorance if called to the stand.

50) Unfortunately, what the witness was planning on the advice of these consultations was an obstruction of justice. Whether it was convenient or not, this was a witness who one day knew much, the next day, "nothing".

51) Based on this potential obstruction, Cobb alerted the State Court in papers seeking an order to prevent any further such obstruction.

52) In these papers Cobb had admittedly unintentionally misnamed a lawyer, one Cohen, and that mistake has been honestly and freely admitted to by Cobb from the very outset.

53) When the presiding State court judge heard that a federal judge was purportedly involved in such obstruction, he literally lost control for upwards of several minutes and screamed at Cobb. The resulting intimidation at that time was such that the then testifying had spontaneous control problems in the witness chair.

54) Afterwards, the judge leveled monetary sanctions in the form of attorney's fees, basing them primarily on the misnomer, though he certainly did not believe and so stated that a judge (Gertner) could be so involved in any such obstruction.

55) Cobb has never criticized this judge in the least, as he was a fine and honest man trying to do his job who simply could not fathom that any judge could do such a thing.

56) And to his credit, in his written Opinion, the said Judge specifically stated the obvious, namely, that another fact finder (this was a pretrial proceeding) may well find these facts different than he did. This Opinion was part of the BBO

12

record.

57) The above notation as such by the judge is conclusive evidence that the said report itself was *prima facie*, which was all that was required either under the First Amendment or Cobb's lawyer's Oath to so legally report this information to the Court.

58) The above described Single Justice Ruling of August 2, 2004 also in and of itself concluded that the said report was prima facie.

59) This is why it did not matter whether Gertner, or Cohen, or both, as they were allowed to do by the BBO/BC tribunal deciding the Cobb matter, came in and said that they did not do it.

60) Such testimony was irrelevant to the prima facie reporting standard, since trials do not evaporate the instant the defendant claims innocense.

61) When the BBO indictment against Cobb came down in February, 2001, there were four primary charges which could possibly warrant suspension for a first time offense: (a) accusing judge Sosman "without basis" as above; (b) accusing judge Gertner /lawyer Cohen "without basis" as above; (c) filing a "frivolous" case against Rose then taking an appeal thereon; and (d) being a "thief" (see below). Although there were other charges, they were trivial in comparison and not even worthy of a suspension under the systems' own decisions, let alone disbarment.

62) The "theft" allegation related to the Single Appeals Judge's above mentioned sanction directive in the Sosman matter, which directive had occurred seven years prior.

63) The "theft" charge as indicted being that it was Cobb, and not his client, who had been ordered by the trial court to pay the above said $3244.50 sanction.

64) Once so indicted as above, Cobb immediately brought to the attention of the governance system the fact that it was his client, and not once but twice, who was by written court order directed to pay the said sanction.

65) The governance system's prosecutor, one Rabe, who had drafted the indictment with the "theft" charge, then averred under oath in state court that she "had not been aware of" nor previously seen the said court order specifically directing the payments as such, yet she thereafter steadfastly refused for still undisclosed reasons to withdraw the faux essentially capital "theft" charge from the indictment.

66) Under *Landmark, Butterworth,* and *Gentile, supra,* public interests of the utmost concern in our free society are served by exposing wrongdoing in the Courts in any way short of contempt (not here relevant) as Cobb did, and such public interests are disserved as a matter of Law by hiding the same and by irreparably and intentionally destroying the Liberty, speech, and property rights of those who expose such wrongdoing.

67) Massachusetts cannot as a matter of law therefore "protect the public" (its sole rationale for punishing any lawyer) by hiding from the public, through character assassination and fatal punishment of the messenger, the wrongdoing of reputationally preferred public officials.

68) At the BBO / BC the government failed to produce any evidence rationally relating its doings as against Cobb to its sole

reason for being regarding lawyer governance relative to these two reports, namely, the protection of the public.

69) The punishment for these reports cannot be shown a decade after the occurrences to rationally serve any public interest, and Cobb has already suffered sever and agonizing distress the whole time with this impending cloud over his law practice.

70) He is a first time "offender", and is being disbarred without a scintilla of evidence to support the admittedly only disbarable charge of "theft".

### Clear and Present Danger

71) The "hearing" record created at the subject lawyer governance system contains not one scintilla of evidence remotely suggesting that Cobb's reports as such then presented any clear and present danger to the fair administration of justice. *Bridges v. California*, 314 U.S. 252  (1941); *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034-35 (1991) (MR. JUSTICE KENNEDY'S plurality Opinion).

72) The government's entire argument as to these reports was simply that Cobb said what he said about the judges, and that the same was prejudicial to the administration of Justice or that it reflected badly on Cobb's fitness to practice Law. It never said how so, because it could not.

PROSECUTORIAL MISCONDUCT AND JUDICIAL BIAS

73) State prosecutor Rabe systematically engaged in highly prejudicial prosecutorial misconduct including:

A)      Refusing to withdraw from the case or the indictment the "theft" charge when she admitted under oath that she had never even seen such exculpatory order(s), while full well knowing that

15

in the structurally deficient system within which she prosecutes cases that she could not lose no matter the evidence or lack thereof;

B)        illegally combining with a licensed lawyer, one Blute, a hugely interested Party given his above conduct and symbiotic relationship with the State throughout, to have him falsely testify under oath to evidentiarily incompetent and impossible legal facts and conclusions so as to maintain the"theft" charge, including that he "believed" that there was a court "order" directing Cobb and not his client to pay the $3244.50 when both Rabe and Blute both knew that such testimony was manifestly false and irrelevant since actual Orders and not Blute's "belief" controlled;

C)        improperly persuaded Judge Gertner to voluntarily attempt to give character testimony against Cobb in specific violation of the Code of Conduct for United States Judges, Cannon 2(b);

D)        violated Cobb's right to privacy by telling Cobb's ex-client during an "investigation" (six months before the indictment) in the said Sosman matter that Cobb was "going to be suspended" because "we have a big case against him" (referring to the Gertner matter) when that information was highly coercive and confidential under the system's own rules;

E)        otherwise economically coerced the same ex-client(s) who were then economically strapped into giving false testimony by promising them that she would recover money for them with their participation as against Cobb;

F)        knowingly, intentionally, and systematically fabricating evidence in order to convict Cobb, including literally inventing a "court order" which did not even exist and a "hearing" which never occurred, all undisputed on the BBO record, in order to pursue a "theft" theory for which she knew both then and now that not one grain of legally competent evidence was ever even presented in support thereof;

G)        maliciously and repeatedly falsely misrepresented material and prejudicial facts without evidentiary basis therefore to the lawyer governance tribunal and court itself;

H)        Literally told the witness Husband as above who was involved in the sanction payment in the Sosman matter exactly how to testify at the discipline "hearing", including the absurdity that he did not know that Judge Sosman had ordered Cobb to personally pay the above $4,000.00 sanction, when both he and his wife were present and duly noted on the record at the very February 2, 1994 hearing with Cobb wherein the Judge herself repeatedly emphasized this fact, again, in an effort to somehow contort a record from which to argue theft, which "theft" still has no competent

evidence in support thereof;

I)    Obscuring the above fact by then arguing to the "tribunal" that it was at a later hearing in August 1994 not attended by the clients that the Judge first intimated that it was Cobb who was to pay the first ($4,000.00) sanction, when no such hearing ever occurred, and she did this despite a copy of the court docket itself (which was an Exhibit at the said disciplinary "hearing") showing this fact (i.e., no such August 1994 Court hearing), and besides the fact that there of course was no testimony that such a non-existent hearing ever occurred.
Alcorta v. State of Texas, 355 U.S. 28 (1957).

74)  As to prejudice, the tribunal adopted all these positions taken by the State prosecutor in toto and then recommended disbarment therefore.

75)  Whether or not Cobb was then correct in the judgment he made on behalf of his client's best interest in August 1994 as respects withholding from the Single Appeal Judge the (to this date still) undisputed ex parte switch in the Sosman matter, he was entitled to an opportunity under the due process clause later, at a disciplinary action affecting his fundamental rights, particularly under the First Amendment, to prove a fact material to his defense, namely, that there was hard evidence that this judge exhibited bias and/or appeared influenced.

76)  Yet this opportunity was unconstitutionally Denied outright through the governance system's quashing of the very subpoena calling Justice Sosman to there explain such conduct. Connecticut v. Doe, 538 U.S. 1,7 (2003).

77)  It was imperative to Cobb's defense of the disciplinary charges that evidence of Judge Sosman's several violations of her obligations under her Judicial Conduct Code be established, since his argument that she was biased for which

he was disbarred was not insubstantially grounded thereon.
This could have been conclusively shown by cross-examining her
under oath about the said rules and their application to the
facts presented which were undisputed on the transcript of the
said February 2, 1994 hearing.

78) And while it is true that the said Judge freely acknowledged
and encouraged at least one of these unethical acts itself on
the very court transcript which Cobb had then steadfastly
insisted upon from the February 2, 1994 hearing itself, which
transcript was an Exhibit at the disciplinary tribunal, Cobb
still should have been entitled to marshal evidence as to the
weight of these facts through what would have been undeniable
evidence that she not only knew of the violation(s), but that
her own Code required her to take action against the same, let
alone explaining the *ex parte* session switch.

79) It was also important to discuss with her how her opinion
grounding her sanctions as against Cobb was a judicial
aberration, particularly in light of the *Meltzer, supra,*
Opinion which said that the very argument she deemed summarily
frivolous under highly questionable circumstances was in fact
good law.

80) It was imperative to Cobb's defense that evidence of the said
Judge's having been influenced be established.

81) This could have been done with her on the stand by confronting
her with the fact that in fifty some odd pages of transcript
dialog between her and the attorneys that she not once
mentioned nor disclosed that she had taken the case out of
session, and why not.

82) As to the *ex parte* switch, she needed to explain how it was

that the judge who supposedly had recused himself weeks prior to the hearing in actuality did not so recuse himself until five days after the hearing by a writing clearly in the present tense (also part of the BBO record), and also explain how and why it was that she had accepted wholly duplicate court filings in her session when the original filings had gone to the proper session and then acted on these duplicate papers before the proper session judge ever recused himself in the present tense on the original papers.

83) Bias is inferred when a tribunal simply adopts argument of the prosecutor on essentially a capital charge for which no evidence exists, rather than basing its finding on the actual evidence.

84) This bias is now also held on the part of the Defendant herein, through summary adoption of the BBO / BC record.

85) The Single Justice prior to his Ruling of August 2, 2004, had an obligation to made an independent review of the BBO record, since the same implicated First Amendment rights. *See Bose Corp. v. Comsumers Union*, 466 U.S. 485, 499 (1984). No such independent review occurred.

86) Once it was known that Judge Gertner would voluntarily testify before the BBO, over Cobb's Objection that she so voluntarily testify, one of the three members of the BBO fact finding tribunal came forth – a day or so before the hearings were to commence – and disclosed that she had a prior professional affiliation with Judge Gertner, the judge having been on a Board of Trust in an entity in which the fact finder was a member. Cobb Objected to her inclusion in the tribunal, and the same was denied summarily.

87) The Law of the Case before the said grievance tribunal was that the factual basis in support of Cobb's speech as above "is to be determined from objective, concrete facts available to him at the time", subjective data as to Justice Sosman's knowledge there being "irrelevant". This was set forth in the governance system's ruling Allowing Justice Sosman's Motion to quash the subpoena for her to there testify, and was the purported basis for the ruling.

88) Cobb was thus prevented by the tribunal from establishing a fact material to his defense relative to Sosman because the standard was "objective", yet Judge Gertner and lawyer Cohen were allowed to testify to wholly subjective state of mind denials (irrelevant to whether the reports against them were *prima facie*).

89) This double standard simultaneously buttressed the State's case and prejudiced Cobb's defense.

90) Moreover, the Single Justice's Opinion of August 2, 2004 used this double standard to disbar Cobb, by citing to the Judge Sosman's state of mind, and to witness Blute's state of mind, in spite of the disallowance by the BBO of Cobb's attempt to so inquire into the same as above and in spite of the "law of the case" which had said that such knowledge as above was "irrelevant".

91) Judge Gertner's / lawyer Cohen's testimony was and had always been irrelevant, the only First Amendment and/or safe harbor issue being whether Cobb's original report that they had so spoken with the witness was *prima facie,* which as above it was according to: the Exhibits filed in the disciplinary matter for all purposes which contained Cobb's clients testimony in

this regard; the State Court judge's ruling as above, and, the Single Justice's Ruling that such statements were "discredited hearsay", which again admits their prima facie character.

92) Mr. Rose, who was a key witness for the State at the hearings, sought hard to establish that neither he nor his equity partner at the time, Blute, had done anything unethical in the Sosman matter.

93) Later, while the tribunal was deliberating, the SJC itself - the same Judge Sosman now being a full member thereof - appointed Rose to the very Board of Overseers who would review the findings of the said Tribunal.

94) Not only did the court then so appoint, but it publically and openly disseminated the news of the appointment thereby insuring that the then deliberating tribunal members would be sure to know about it.

95) The said appointment in and of itself represented to the world at large that Rose's conduct both then and now was ethical.

96) This factual determination however was the exact and core issue of Rose's testimony, namely, whether he and his partner had acted unethically before Judge Sosman who had openly allowed the same, as that was precisely Cobb's safe harbor and First Amendment protected premise for the inference that Judge Sosman has exhibited bias.

97) So the appointment publically destroyed and/or discredited the factual basis for Cobb's assertion, all before the tribunal ruled.

98)


Safe Harbor

99) Cobb's report as to the Gertner / Cohen matter was made under the safe harbor of his lawyer oath which mandates that a lawyer cannot consent to the doing of any falsehood, and that he must act with fidelity at all times.

100) For Cobb to have acquiesced to having a witness that he was definitely going to call feign ignorance under oath of material facts without disclosing that the same witness had only "forgotten" the evidence as above after being urged to do so was in violation of the said Oath.

When Reasonably Minded Judges Disagree as to Whether a Particular Legal Position Taken Is Valid, the Lawyer Cannot Constitutionally Be Punished for Taking Such Legal Position.

101) The material and substantial disciplinary charge against Cobb in the Sosman matter that he prosecuted a "frivolous" case cannot stand since his exact argument was upheld by another judge and due process does not allow for punishment in such circumstances where reasonably minded judges disagree as to the viability of a legal position. *In re Ruffalo*, 390 U.S. 544, 553 (1968) (MR. JUSTICE WHITE AND MR. JUSTICE MARSHALL concurring).

Generalized and Specific Undue Pre-indictment Prejudicial Delays Designed for the State's Advantage

102) The combined indictment involving these reports, together with an unrelated ethical non-event in 1998 which was used to "stack" onto the indictment in order to intentionally confound the defense of the "proceeding" (a routine doing in this system, as seen below), came down in February, 2001.

22

103) Roughly seven years of intentional prejudicial pre-indictment delays designed to gain advantage by the government had gone by before this indictment was presented against Cobb.

104) Among the published rules and regulations promulgated by the SJC which control lawyer governance in Massachusetts, there is not presently nor has there ever been any Statute of Limitations of any kind.

105) Generally, the said system has for years capitalized upon such lack of limitations by running up pre-indictment delays to an average length in excess of five years so as to hedge its bet through intentionally prejudicing the defense of matters brought before it to advantage themselves. These facts are readily confirmed by the case statistics themselves.

106) Specifically, these unregulated delays were used as against Cobb to intentionally prejudice his chances of acquittal, and they stretched to a maximum of seven years.

107) The actual "hearing"involving the most critical witness in the entire case relative to "theft" occurred about eight years after the event. All he "remembered" were "facts" which never occurred which he had been told to say by the same prosecutor, Rabe, who had previously attempted to bribe him.

108) The routine pre-indictment and other inherently prejudicial systemwide delays which for decades have prevailed in the said system despite public cries from the Bar to the court to install some sort of limitations rule, constitute relevant evidence that the SJC through its well known structurally deficient lawyer governance system similarly intended to also intentionally and prejudicially delay Cobb's matter. F.R.E. 404(b).

109) Such historically longstanding, systemic, well known, and never overturned by the governance system's admitted supervisor (the SJC) on due process grounds, pre-indictment delays in such proceedings cannot plausibly be construed as unintentional, and the same reflect a manifest deliberate indifference to the clearly established federal constitutional right to not be deprived of property nor Liberty without procedural due process of law.

110) The protection of the public" is not rationally achieved in any plausible way through claiming years and years after the fact that an attorney who has manifestly served the public interests in the interim through prosecuting civil rights violations for years wholly fault free must be taken off the streets, now.

111) The said pre-indictment delays have severely prejudiced Cobb for many years, both emotionally and in his job, by having unresolved publically known ethical charges pending for so long without even a clarifying indictment which could theoretically at least be defended against.

112) As to prejudice due to intentional, undue delay, there was additionally a loss of a pivotal witness (Jaraki) on Cobb's behalf who could give the important testimony regarding judge Gertner's above reported act, and several witness for the state had substantial lapses in memory when describing events seven plus years prior.

113) The said governance system knew in Fall of 1996 that Jaraki was clearly available - though living out of state - because as then explained to them, he was then having to participate in the still ongoing  (pertaining to the above described 1995

report by Cobb) lawsuit that Cobb's second report occurred in, which lawsuit was not settled (again, quite successfully) until Spring, 1998, *more then three years* after the event for which the undersigned was prosecuted.

114) At the so called lawyer governance "hearing", Cobb was told that it his fault the witness got away, that he could have somehow combed this earth to find him and "deposed" him before formal proceedings even commenced, which was not his duty, was not plausible, and which the BBO rules pre-indictment did not allow, let alone out of State.

115) To date, the SJC has rejected all arguments made on federal due process grounds owing to the above said unconstitutional practice of routine and intentional delay of such proceedings, even rejecting such delay argument in a case where a lawyer was punished for an act *some sixteen years prior.*

116) The lack of Statutes of Limitations as above is unconstitutional generally, facially, and as applied to Cobb in violation of the due process clause of the 14th Amendment to the United States Constitution. *U.S. v. Marion*, 404 U.S. 307 (1971); *Barker v. Wingo*, 407 U.S. 514 (1972).

### Conviction for Un-indicted Charges

117) The indictment charging Cobb with theft on the premise that he disobeyed a court order directing the above said Nutile payment, which court order not only never existed, but in fact was exactly the opposite, was never amended.

118) Cobb sent repeated communications to the head administrator of the BBO in this specific regard which were systematically ignored.

119) It was pointed out by Cobb pre-hearing that the entire so called basis upon which the charge of "theft" rested as set forth in the indictment was non-existent.

120) Such "theft" charge depended in its entirety according to the fatally flawed indictment upon the false accusation that the Full Appeals Court had "Affirmed" a Single Judge Appeals Court order supposedly directing that Cobb, and not his client, pay the above mentioned approximate $3,244.50 sanction.

121) Such "order" for Cobb so to pay never existed, was never even remotely an issue on appeal therefore, and so it could not possibly have been "Affirmed".

122) As shown above and at the BBO, it was Cobb's client, and not Cobb, who was directed to so pay this amount by the Single Judge of the Appeals Court and later again by a judge of the trial court.

123) Cobb reasonably believed therefore that he could prove at the lawyer governance "hearings" that such "theft" accusation was without evidentiary basis, which he did.

124) So the said prosecutor on the fly after the close of the evidence simply argued that what had been alleged in the very indictment which she drafted before admittedly even bothering to check the actual court papers as an "Affirmance" of a non-existent Single Judge Appeal Court order was now somehow – though never explained how – a "modification" of the *actual* Single Judge Appeal Court order which had directed Cobb's client, and not Cobb, to pay, and that the "modification" now "ordered" Cobb   – without any such words whatsoever – to himself pay the sanction,  which payment years before had been fully and legally complied with to the letter in accordance

26

with both the said Single Judge Appeal Court Order and the later trial court order re-affirming the said payment as above.

125) The trial court's order itself as above directing Cobb and his clients to make the such payment was then ignored by the prosecution as if it never existed.

126) The prosecution and now the Defendant SJC thus has never explained how it is that this order, fully complied with, and never even an issue of Appeal could somehow now not count.

127) This sort of intentional prosecutorial sandbagging in an indictment is unconstitutional under the cases of *In Re Ruffalo*, 390 U.S. 544 (1968) and *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 654 (1985).


Intentionally Confounding the Defense
By "Stacking" Wholly Disparate in Time,
Parties, and Gravity, Charges Spanning Many Years, Then Using the
"Stacked" Charges to Circuitously "Support" Each Other Charge in
Order to Create, Post Closure of Evidence, a New Un-indicted
Substantive Charge out of Then Air Known as "Pattern"

128) The said system has systematically for years also engaged in a practice of unconstitutionally "stacking" completely different in parties, theories, and gravity charges in such an indictment, like Cobb's ("Counts") which "Counts" are remotely distant in time.

129) A defendant as did Cobb then attempts to defend piecemeal, because that it all that is charged in the indictment as against him, like Cobb.

130) However, at the close of the evidence, the prosecutor then argues that an (un-indicted) "pattern" of conduct has

occurred, or that some (un-indicted) "conduct as a whole" has occurred, neither of which terms can be found in the disciplinary rules, in the indictment, nor even in the body of evidence which treated the charges supposedly independently, although both of which are then argued as a new substantive charge post closure of the evidence, as was done against Cobb.

131) This process is intentionally done for unconscionable advantage, the State systematically then making the exact circuitous arguments barred by (fairness premised) F.R.E. 404(a).

132) One unproven charge is then used to buttress another unproven charge, as was done with Cobb.

133) A substantial percentage of cases prosecuted by this system have such multiple charges.

134) The said governance system for years has used this unconstitutional process of confounding the defense to insure conviction rates in the neighborhood of approximately 99 %.

135) In Cobb's case, as per the above M.O., the three "Counts" spanned many years, were stacked, the indictment for the first two (the above said reports) was intentionally delayed approximately six years post such reports as above to accumulate a  frivolous charge which could be so stacked, and the governance system's un-indicted post evidence argued "pattern" and "conduct as a whole" was used to shore up the "theft" disbarment charge.

136) The third charge involved an accusation against Cobb that he had settled a case without authority. The case was in federal court, Cobb first learning that his client was suffering buyer's remorse after she had authorized the deal and after

Cobb had closed it with such authorization.

137) In all his practice in thirteen years of routine settlements, no one had ever made any such accusation against Cobb that he had settled without authority, let alone that he ever deprived one client of even one cent for one second.

138) None of the three case here mentioned were brought by a client of Cobb.

139) Cobb had immediately after learning that his client was attempting to renege after the deal had been closed, then moved for the presiding federal judge to grant a hearing so that his client could be heard as to her position of late that she did not so authorize the deal, and in the moving papers he clearly stated his position that she had in fact given the authority, and that he had testimony and documents indicating as much.

140) The judge denied the hearing, and the case went to judgment.

141) The United States Court of Appeals for the First Circuit reversed, specifically because the judge had failed to grant the very hearing which Cobb had timely (pre-entry of judgment) requested for her.

142) On remand, another federal (Magistrate) judge then had an evidentiary hearing, and ruled that it was in her view a "misunderstanding" between lawyer and client, that Cobb did not disclose any privileged information (the BBO of course found exactly the opposite), and, under her view of the law, the case could still be maintained on remand.

143) This case lacking in any even arguable ethical lapse whatsoever, was then routinely twisted into some horrible unethical misdeed on the part of Cobb, and, during the said

disciplinary hearing, the prosecutor – as she did with the other cases as above – misrepresented time and again facts so as to build more argument not supported by the evidence, and the tribunal adopted it all.

144) Cobb had simply said that the testimony and documents he had "indicated" that his client had given authority. He tried to present this evidence at the said evidentiary hearing, but could not do so since he was not counsel, but there merely as a witness.

145) The prosecutor then repeatedly misrepresented this fact by arguing - again without evidentiary basis – that Cobb has represented that he had a writing from the client specifically granting the authority to settle, which Cobb never even remotely represented and which fact was uncontested before the BBO.

146) The discipline tribunal also adopted this argument sans evidence.

147) Such extended delays increase the probability that – as in the present case - some new, routine, wholly meritless, and unrelated charge will be stacked with the prior charge, thereby aiding its routine pattern arguments.

148) Stacking as above is also unconstitutional as applied to Cobb in violation of the due process clause of the 14th Amendment to the United States Constitution via the inclusion of a fabricated disbarable offence against Cobb to support other non-disbarable stacked claims against Cobb, and the same prejudicially infected Cobb's proceedings and impossible confounded his defense. *Kotteakos v. U.S.*, 328 U.S. 750, 773 (1946); *McElroy v. U.S.*, 164 U.S. 76, 81 (1896).

149) All federal due process "stacking" arguments made before the SJC have been similarly rejected.

### A Structurally Deficient System Which to a Statistically Certainty Can Only Produce the Result of Guilt

150) Over the last thirty years, to a statistical certainty, lawyers against whom formal charges (indictment) are brought by the said system and also for which there was conducted a contested so called "hearing" before some fact finding entity designated by the governance system are always convicted. That the SJC reviews the findings does not alter these statistics.

151) Because conviction is thereby assured to a statistical certainty upon the mere bringing of the indictment, the entire governance system described herein is structurally deficient, and otherwise arbitrary and capricious. *Furman v. Georgia*, 408 U.S. 238 (1972).

152) The SJC has been aware of this statistical fact for decades, although it has not been disclosed publically by it since the early 1990's when such statistics were eliminated from "Bar Counsel's Annual Statistical Report".

153) Guilt cannot be statistically related by regression analysis or other acceptable scientific means to any  factor other than whether the indictment was brought, including whether the victim is represented by counsel.

154) Since the creation in 1974 of the present lawyer governance system in Massachusetts supervised admittedly by the SJC, a final determination of innocence therein respecting all instances in which formal contested disciplinary proceedings were instigated was and is so extremely rare (less than 1% of

31

the roughly 1750 some odd cases) as to constitute an arbitrary and capricious result. *Furman v. Georgia*, 408 U.S. 238 (1972).

155) The public interests are served only by allowing lawyers to uncover unethical practices done by lawyers or even the odd judge.

156) The public interests are not served by a system of only ostensible due process in which lawyers who expose misconduct by its esteemed members can be placed into then churned out as guilty as was Cobb under the pretense of protecting the public.

157) The system through its results alone is facially unconstitutional in violation of the 14th amendment since a fair, non-biased, non-predetermined hearing can never be reasonably inferred from a system which always convicts.

158) A fair trial is at the core of the due process clause of the 14th Amendment.

159) The lack of the same makes irrelevant the entire Bill of Rights, including a lawyer's 1st Amendment right to speak on matters of public concern, as Cobb did, and not to be retaliated against therefore, as Cobb was.

160) The above systemwide results (statistics) themselves portend an even larger problem which is the free allowance of bad faith and/or arbitrary and capricious prosecutions, since all charges brought by the system, however motivated, arbitrary, or evidence bereft will, through either undue delay, stacking, systematic rejection of constitutional arguments by the SJC, or through systemic bias, result in a guilt finding.

161) The prosecution against Cobb was made in bad faith, and was motivated by a desire to retaliate against Cobb for, and/or

otherwise punish Cobb for, his speech on matters of public concern.

## Count I

162) The Plaintiff adopts by reference all within allegations, and further alleges:

163) The above said conduct constitutes a deprivation of Cobb's constitutionally protected rights under the First and Fourteenth Amendments to the United States Constitution.

164) The actions of Defendants were fairly attributable to the State because the deprivation of Cobb's constitutionally protected rights were caused by the exercise of some right or privilege created by the state, by a rule of conduct imposed by the state, or by a person for whom the state is responsible; and because all Defendants acted together with or obtained significant aid from state officials, or because their conduct was otherwise chargeable to the state.

165) Additionally, the Defendants were otherwise acting under color of state law for the purposes of 42 U.S.C. § 1983.

WHEREFORE, the Plaintiff, Matthew Cobb, demands judgment against the Defendants as follows:

A) A prohibitory Temporary Restraining Order forestalling the effective disbarment date of September 1, 2004, as Ordered by the Single Justice, until trial on the merits;

B) A prohibitory Preliminary Injunction as above, including baring any full SJC action on any complaint now pending against Cobb; and