support it; and that it is not interposed for delay.'" "'Good ground'" requires that the pleadings be based on "reasonable inquiry and an absence of bad faith." *Bird v. Bird*, 24 Mass. App. Ct. 362, 368 (1987). *New England Albank for Savings v. Rouleau* 28 Mass. App. Ct. 135, 141 (1989). *Nemeroff v. Abelson*, 620 F.2d 339, 350 (2d Cir. 1980). See also Vairo, Rule 11: A Critical Analysis, 118 F.R.D. 189, 193 (1988).

We conclude that the motion judge did not abuse her discretion in awarding sanctions against plaintiffs' counsel to NMF.[7] See *Bird v. Bird*, 24 Mass. App. Ct. at 369 (abuse of discretion standard employed in determining whether rule 11 sanctions were warranted). See also *Cooper & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (award of sanctions under cognate Federal rule 11 reviewed under abuse of discretion standard). Before filing the subject complaint, plaintiffs' counsel had been furnished with case law from NMF and Rose's counsel which indicated that a violation of professional canons of ethics did not give rise to a cause of action and that the absolute privilege which attaches to statements made by an attorney preliminary and pertinent to anticipated litigation immunized NMF and Rose from civil liability. Compare *Robinson v. Dean Witter Reynolds, Inc.* 129 F.R.D. 15, 21 (D. Mass. 1989) (plaintiff's counsel sanctioned under Federal rule 11 [1983] for opposing arbitration in face of clearly contrary legal authority which had been brought to its attention by opposing counsel).

In addition, the judge could properly determine that plaintiffs' counsel acted out of spite in instituting this action against NMF and Rose in an effort to remove them as South Shore's counsel in view of evidence that in his G. L. c. 93A demand letter to Rose he referred to South Shore as their "(former?) client[]," and in other correspondence stated, "I do not really care whether its NMF, F. Lee Bailey, or a kid right out of law school, NOBODY is going to do to my clients what NMF attempted and get away with it." Presented with

---

[5] Rule 11 is modeled after Federal rule 11 as it existed prior to its amendment in 1983. Federal rule 11 was again amended in 1993.

[6] We note that the plaintiffs did not raise as an issue whether attorney's fees may be awarded to an attorney pro se litigant under rule 11. Accordingly, we make no determination on that issue. See *Committe v. Dennis Reimer Co., L.P.A.*, 150 F.R.D. 495, 501-502 (D. Vt. 1993), for a discussion of an award of attorney's fees to pro se litigants under Federal rule 11.

this evidence, the motion judge could properly determine that plaintiffs' counsel acted in bad faith in joining Rose and NMF as party defendants in plaintiffs' litigation against South Shore and the doctor.

3. *Single justice sanctions under Mass.R.A.P. 25.* The plaintiffs argue that the single justice erred in imposing sanctions under Mass.R.A.P. 25 against their counsel based on the insertion of material in the G. L. c. 231, § 118, first par,[8] petition which accused the motion judge of bias, unethical conduct, and inappropriate susceptibility to unspecified illegitimate influence by counsel for NMF and Rose. Their argument is limited to the contention that sanctions were not warranted based on the conduct of the motion judge and the impropriety of NMF and Rose being represented by an attorney from their firm.

Having reviewed the affidavit filed by plaintiffs' counsel in support of the petition for interlocutory review, we conclude that the single justice did not abuse his discretion in imposing sanctions. However, Mass.R.A.P. 25 provides that "[i]f the appellate court shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee." Rule 1 of the Rules of Appellate Procedure defines "Appellate Court" as "the full Supreme Judicial Court, the full Appeals Court, or a statutory quorum of either, as the case may be." The rule makes no reference to a single justice of either court. Therefore, a single justice does not have the power to make such an award under Mass.R.A.P. 25 — an issue which was not raised by the plaintiffs and is, consequently, considered waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). *Fifty-One Hispanic Residents of Chelsea v. School Comm. of Chelsea*, 421 Mass. 598, 604 (1996).

In any event, the single justice had the authority to make such an award under rule 11 of the Massachusetts Rules of

---

[8] Because the parties have not raised as an issue the timeliness of the petition filed with the single justice under G. L. c. 231, § 118, on September 29, 1994, and the state of the docket in the Superior Court is such that we are uncertain as to whether the orders were entered on August 12, 1994 (the date of entry shown on the docket), or on August 30, 1994 (the date shown on the docket as the date of notice to the parties), we assume that the single justice treated August 30, 1994, as the actual date of entry of orders and thus had jurisdiction to act in this matter. G. L. c. 231, § 118. Mass.R.Civ.P. 77(d), 365 Mass. 838 (1974).

Doe *v.* Nutter, McClennen & Fish.

Civil Procedure, which allows sanctions for the inclusion of "scandalous and impertinent" material in a pleading and which has been made applicable to single justice proceedings by Mass.R.Civ.P. 1, 365 Mass. 730 (1974). *Callahan* v. *Board of Bar Overseers*, 417 Mass. 516, 519 (1994).

Accordingly, we affirm the judgment dismissing the complaint and the orders of the motion judge and single justice assessing sanctions against plaintiffs' counsel. We also consider this appeal frivolous and award double costs against the plaintiffs' counsel.

*So ordered.*

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
CIVIL ACTION NO. 93-7134-F

JANE DOE,                                        )
       Plaintiff,                              )
v.                                               )
NUTTER, MCCLENNEN, & FISH,                       )
ALAN D. ROSE, SOUTH SHORE                        )
NEUROLOGY ASSOCIATES, INC.,                      )
MICHAEL HAYES, M.D.                              )
       Defendant                               )

<u>AFFIDAVIT IN SUPPORT OF</u>
<u>MOTION FOR MODIFICATION OF IMPOUNDMENT ORDER</u>

     Jane R. Rabe, being duly sworn, hereby deposes and says:

     1. Since July 1991, I have been employed as an Assistant Bar Counsel in the Office of Bar Counsel, Board of Bar Overseers of the Supreme Judicial Court. Pursuant to S.J.C. Rule 4:01, the Bar Counsel's office is charged with investigating the professional conduct of members of the Massachusetts bar.

     2. I am responsible for investigating allegations of serious professional misconduct by Attorney Mathew Cobb. I make the following averments on information and belief formed as a result of the investigation to date. The averments are limited to matters deemed necessary for a determination of Bar Counsel's motion.

     3. I am prosecuting Attorney Mathew Cobb for, among other things, his conduct in filing a complaint on behalf of the plaintiffs, Jane Doe and another, against Nutter, McClennen & Fish; Alan D. Rose, Esq. when he knew that there was no good ground to support it and that the claims asserted were barred by absolute privilege. Bar Counsel is informed that the captioned matter was instituted in or about December 1993; that the parties of record were listed as Jane Doe and another; Nutter, McClennen & Fish (NMF); Alan D. Rose, South Shore Neurology Associates Inc., Michael T. Hayes, MD., and that the listed counsel of record for the individual parties were Mathew Cobb, Esq., for Jane

Doe; Joseph G. Blute for NMF; William Daley for South Shore Neurology; and Frank Reardon for Dr. Hayes.

4. On February 2, 1994, this Court conducted a hearing on NMF and Rose's motion to dismiss and motions for sanctions. On August 12, 1994, this Court found that the respondent had violated Mass. R. Civ. P. 11 by filing the complaint and awarded NMF and Rose $4,000 in attorneys' fees, "said fees to be paid by plaintiff's counsel (and not directly or indirectly, passes on to plaintiff)." See the decision dated August 12, 1994 attached hereto as Exhibit "A".

5. The respondent filed a petition for interlocutory review and motion for stay on behalf of the plaintiffs. In the respondent's affidavit in support of review, the respondent alleged that NMF "must have had some particular power or influence with the trial judge" for the judge to overlook NMF's ethical breaches. On October 20, 1994, a single justice of the Appeals Court dismissed the petition filed by the respondent, affirmed the decision of this Court and imposed double costs and sanctions, $3,244.50, against the respondent for filing a frivolous petition that included "scandalous and impertinent" accusations against the Superior Court judge of bias, unethical conduct and inappropriate susceptibility to influence by NMF and Rose. See Order dated October 20, 1994 attached hereto as Exhibit "B".

6. Bar Counsel charges that after receiving Exhibit A, the order for sanctions, the respondent intentionally misrepresented to his clients, the plaintiffs, that they had been sanctioned in the amount of $4,000 and offered to split the sanctions with the clients. The respondent denies this allegation.

7. Bar Counsel has charged that the single justice sanctions of the attorneys' fees were to be paid by the respondent. See the Appeals Court decision *Doe v. Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 138, 140 (1996) attached hereto as Exhibit "C".

8. Among other things the respondent claims that the sanctions of attorneys' fees imposed by the single justice were against the plaintiffs. In support of this defense the respondent has provided a copy of impounded "Orders" dated April 28, 1995 from this court. See Orders dated April 28, 1995 attached hereto as Exhibit "D". Bar Counsel had

2

not previously seen these Orders and wishes to review the entire court file to further investigate.

9. Public disciplinary proceedings were instituted against Matthew Cobb, Esq. on February 12, 2001. A hearing is scheduled to begin on October 9, 2001. Bar Counsel will only use such records as are necessary to establish the charges or refute the respondent's defenses. In that event, pursuant to Rule 4:01, § 20(4), Bar Counsel will seek a protective order from the Board of Bar Overseers for the impoundment of any confidential records of this Court offered in evidence or referred to in the disciplinary proceedings.

SWORN TO under the pains and penalties of perjury at Boston, Massachusetts, this 26ᵗʰ day of September, 2001.

Jane R. Rabe
Assistant Bar Counsel
B.B.O. #542454

3

*MBD    04    10226*

UNITED STATES COURT
DISTRICT OF MASSACHUSETTS

Matthew Cobb,                              )
                                           )   CIVIL ACTION
        Plaintiff,                         )
                                           )   04   10390   MLW
vs.                                        )
                                           )
Honorable Margaret H. Marshall, et al.,    )
                                           )
        Defendants.                        )

*D*

PLAINTIFF'S BRIEF IN SUPPORT OF
RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER

**Procedural Update**

On the afternoon of May 5, 2004, this Court held a lengthy
hearing in this matter. The Court then issued a Ruling staying
this action until the Single Justice of the Massachusetts Supreme
Judicial Court (SJC) had Ruled in Cobb's bar discipline matter
pending before the SJC. A copy of this Court's Order of May 5,
2004 is attached hereto as Exhibit "A". The Single Justice ruled
on August 2, 2004, and disbarment, effective September 1, 2004,
is his order. See Exhibit "B".

Pursuant to this Court's Order of May 5, counsel herein must
(by August 16ᵗʰ) have conferred and filed a proposed schedule for
the resolution of the plaintiff's motion for preliminary
injunction and the defendants' motion to dismiss. Presently, this
conference has not yet occurred. Cobb is working on a draft
schedule, which he will have transmitted to counsel by Tuesday

Page 1 of  14

D

Morning, August 10.

**The May 5, 2004 Hearing in this matter.**

At this Court's above hearing, Cobb had argued for a TRO to then issue barring the Single Justice hearing then set for the following day. As respects the central issue of maintaining the *status quo*, the TRO had two independent grounds.

First was that it could hardly be contested that disbarment in itself constituted irreparable injury. The equity achieved therefore in preserving the *status quo* temporarily whist the parties prepared for a (most likely) consolidated trial on the merits / hearing on preliminary injunction weighed heavily in Plaintiff's favor. This much has not changed and, as this Court at least tangentially noted at the hearing, the state's claim that it needs to discipline a lawyer, now, must be viewed in the context of upwards of eight years of state sanctioned delays.

Secondly, was that if the Single Justice hearing were not enjoined, the state was then sure to argue - post Single Justice Order - that this Court would be violating the Rooker-Feldman Abstention Doctrine should it then interfere with Cobb's ongoing state court proceedings. Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). And while the plaintiff certainly does not take the position that any such argument would have had merit, it

Page 2 of 14

was enough that the state would assuredly make it.

Once this Court was adequately informed at the said May 5th hearing of this (second) reason for so preserving the *status quo*, discussions between the Court and counsel for the defendants then ensued relative to whether said defendants would in fact take such a legal position post Single Justice Ruling or not. Counsel for the defendants clearly represented to the Court that defendants would not so argue Rooker-Feldman as respects the Single Justice's Order.

As it turns out - and wholly independent of the above waiver by the state defendants - Rooker-Feldman on its substance has no application whatsoever to the recent Single Justice's Order anyway. Exhibit "B". This is because we do not in the least need to here review the same in order to "overrule" it nor decide legal /factual issues in a way different than did Justice Greaney. Rather, it is for what the Opinion in itself undisputedly informs as to the central issues regarding the First and Fourteenth Amendments to the U.S. Constitution in the case, which presently weigh heavily into preserving the status quo.

Namely: (1) that Cobb is being severely punished by the state **for the content** of what he said relative to the *prima facie* actions of two judges some ten years ago which actions threatened the fair administration of Justice; (2) that the factual basis for the state's sole justification for disbarment, theft -

Page 3 of   14

despite the State's second seemingly clear May 5th promise to the
Court that the Single Justice would address all of Cobb's
arguments made before the federal court - was only addressed
partially and in a wholly conclusory fashion which avoided any
discussion of the State's dearth of specific evidence on the
"actual deprivation" element of "conversion".

There a host of other issues to be dealt with relative
to the preliminary injunction, but these two are so grave, and it
is so obvious that the prosecution relied heavily on these two,
that in themselves they are enough to presently Vacate the said
Single Justice Order until this Court passes ultimate judgment at
the preliminary injunction.

**The government has again failed to explain except in conclusory
fashion how it was that Cobb could have possibly wrongfully
deprived his client of funds, even temporarily, when it is
undisputed that his client's obligation to pay money preceded in
time by eight months any actual receipt by Cobb from the said
client of monies which he was to pay over to another on client's
behalf.**

Unless and until the government establishes that Cobb
possessed client funds "wrongfully", namely, at a time that the
client was not already obligated to pay, we do not even get to
the rest of the "conversion" elements. ("One who intentionally or
wrongfully exercises acts of ownership, control or dominion over
personal property to which he has no right of possession at the
time is liable for the tort of conversion." See generally Nolan,
Tort Law § 35 (1979).

Page 4 of   14

It has never been contested that the theory of the
prosecution as specifically plead in the indictment was clearly
that the Massachusetts Appeals Court had "Affirmed" an Order of
a Single Justice which directed Cobb, and not his client, to pay
a roughly $3,200.00 sanction, and that he never did so. At the
hearings before the BBO, Cobb showed undisputedly that there was
no such "order" of the Single Justice directing him to pay, so it
could not be "Affirmed", and that there was yet still another
Order against saying to make the exact same payments. See Cobb's
Brief in support of preliminary injunction, pp. 27-34. So, after
the close of the evidence before the BBO, and after Cobb had
successfully completely debunked the indicted theory, both Bar
Counsel and the Board adopted a new, unindicted theory, namely,
that the Full Panel "Affirmance" as alleged was now somehow a
"modification" of - without even using such words or even
referencing  - a trial court order directing that his clients pay
the funds. This theory of course also was without factual basis.

Now, given the Single Justice's Opinion of August 2, 2004,
another, third, un-indicted theory of conversion is being
pursued. This new theory of conversion as best as can be   .
determined is apparently that Cobb can now be guilty of holding
client funds that he received some eight months after the
client's obligation to pay accrued "wrongfully" at a time wherein
it remains undisputed that Cobb then promptly paid over the said

Page 5 of   14

funds to the party owed as directed by Court Order.

Sooner or later this continued re-formulation of the prosecution's wholly un-indicted theory of the case must stop because no reasonable man could possibly defend such a moving target. See In Re Ruffalo, 390 U.S. 544 (1968). Cobb reasonably defended the indicted charge as having no basis in fact. He showed that the supposed order which such charge was based upon did not exist and in fact the Court ordered not once but twice exactly the opposite.

Now it appears that such never amended indicted charge has been wholly abandoned and a quite novel theory of conversion is now being pursued. No person could reasonably anticipate that after proving conclusively at a hearing that there was no point in time ever that he held even a penny of the client's money prior to the client's obligation to pay a court ordered sanction which was precisely what was indicted, that he would later be faced with a most novel unindicted "conversion" claim. Namely, that if a client undisputedly owes $3,200.00 on day one which his lawyer is to disburse, then, some eight months later finally sends over $2,000.00 of that amount towards payment and then the lawyer digs into his own pocket to cover the deficit still owed to make the timely disbursement pursuant to court order, that this is somehow "conversion". As best as can be understood from Exhibit "B" is that if six years after all payments were

Page 6 of   14

unequivocally made pursuant to court order the client thinks that
the money he sent to lawyer was for something else, then lawyer
has "converted" temporarily those funds. This theory cannot find
basis in the law of conversion, and it was certainly not even
close to what was alleged in the indictment. No man could
possibly defend such a moving target. Exhibit "B" pp. 6-7.

**The government has finally admitted the obvious, that it
seeks to punish the very content of Cobb's prima facie speech,
yet for the eleventh straight calender year it has not said how
such speech ever posed a clear and present danger to the
administration of justice.**

It is clear that Cobb is being punished for the content of
what he said about the judges. See Exhibit "B", pp. 22. As such,
the government must have evidence that his words presented a
"clear and present danger" to the administration of justice.
Bridges v. California, 314 U.S. 252 (1941). The BBO record
contains nothing of the sort. Rather, as was precisely criticized
by the U.S. Supreme Court in both Schaware and Gentile, *infra*,
the Board simply stated facts (i.e., the content of what was said
by the lawyer) then summarily concluded that the same posed a
threat to Justice without more. Thankfully, the Honorable Justice
Greaney's Opinion itself now finally confirms that which
seemed always clear, namely, that Cobb's words reflected
competently reported (evidence wise) acts of misconduct in the
courts.

With respect to Judge Sosman, the Opinion itself, Exhibit
"B" at p. 13, acknowledges what Cobb has said all along. This was

Page 7 of  14

that Attorney Blute was there violating (old) DR 5-103 by
representing his equity Law Firm Partner, Rose, a defendant, at
the hearing. What more is there?

It is undisputed that Cobb had simply argued to the Single
Justice (Lawrence) of the Appeals Court in August 1994 that Judge
Sosman's conduct - in throwing out the case as against Attorney
Rose and his firm, Nutter, and then sanctioning Cobb personally
for $4,000.00 after knowingly allowing and encouraging such
misconduct on the still preserved record in open court -
permitted a reasonable inference of bias and/or potential
influence. In the ten years following this act, Cobb never again
made such an accusation because, of the next several hundred or
so judges he was before, he never again observed a judge
knowingly allow and encourage such an undisputed disciplinary
rule in open court.

Justice Greaney's Opinion in fact draws upon the Judge's
clear knowledge of this violation. Exhibit "B", p. 13, FN 3. It
should be also noted that Cobb's reference to "I haven't made a
complaint about that" was responding to an inquiry by Judge
Sosman as to whether Cobb had made a *BBO complaint* about Mr.
Rose's conduct of unethically contacting his then client after he
knew Cobb represented her. Cobb was certainly then objecting to
Blute's unethical practice before the Judge, as he had raised and
there argued the issue as "a violation".

It is beyond purview - and has never been remotely contested
by the state in ten years - that Judge Sosman's own Judicial Code
of Conduct not only barred her from encouraging unethical conduct

Page 8 of   14

no matter the costs nor efforts supposedly saved thereby, but also required her to report or otherwise take action regarding such unethical misconduct which she became aware of. Neither the ethical violation of Blute, nor the Judge's own obligation to take action thereon, evaporated simply because the judge felt it expedient to ignore it as was clearly and unfortunately intimated in Justice Greaney's Opinion. Exhibit "B", at p. 13. When we teach the law of ethics, and make violations of the same disbarable, we should stick by it, otherwise lawyers who believe under clear safe harbor that they are doing the right - albeit difficult - thing will be disbarred for having insulted the integrity of a judge who was not following the rules.

Secondly as to Judge Sosman, Cobb was prevented by the BBO from calling her to the stand under a BBO ruling which stated that what mattered in so far as Cobb's argument that she was biased was what was objectively knowable at the time, Judge Sosman's knowledge being "irrelevant". Exhibit "C". Yet, the Court itself in disbarring now uses this exact knowledge of Judge Sosman to rationalize that it was somehow alright for her to ignore the disciplinary rules. Exhibit "B" p. 13. So, the knowledge was irrelevant and barred when Cobb needed to cross examine the Judge under oath as to why she did what she did, yet, the exact same "irrelevant" knowledge is now being used to disbar Cobb?

As respects the ex parte judge swap manifestly made without Judge Sosman having ever disclosed the same to Cobb, Cobb was also deprived of course of inquiring of her about the same. Yet,

Page 9 of   14

he is now penalized for not having evidence that an improper *ex
parte* communication occurred, which the Court emphasizes by
quoting the testimony of Mr. Blute in this regard. Exhibit "B" at
p. 11.

It is quite remarkable how it is that Mr. Blute "went up to
superior court" and, speaking in present terms stated that Judge
Barrett then "recused himself", when the BBO record evidenced
copies of documents obviously drafted at the Nutter offices with
Judge Sosman's name on them which were directed to Judge Sosman's
session clearly preceding him going "up to the superior court".
It is also of course quite curious how it is that Blute knew of
this switch (and he did not deny that he so informed Cobb
personally a second or two before the gavel dropped at the
hearing) unless he had not spoken with the court about it. So
Cobb could not cross examine Judge Sosman on this point either
which would be to simply have her tell how it was that she took
the case, and with whom did she so arrange to do so? Cobb was
moreover certainly entitled to cross examine Judge Sosman on
whether her application to the Bench roughly a year prior to that
time had been approved by a committee which Mr. Rose himself had
vice chaired. If this fact in and of itself was not required to
be disclosed by a Judge who was then and there throwing out the
case against Rose then rewarding him with sanctions with him
right there in the courtroom, then when that fact is combined
with the fact that no court officer apart from Mr. Blute (at the
very last second, well after Judge Sosman had the case) at any
time ever informed Cobb of the session switch, then such

Page 10 of   14

disclosure ought to have ben made. If there was a discussion with the Court as to Judge Barrett not taking the case, then Cobb should have been involved, as he would not likely Object to a Judge who had worked with a particular lawyer when "sanctions" were on deck since that Judge would certainly have gone out of his way to appear fair, something unfortunately which did not then occur with Judge Sosman.

Given the above, Cobb was prevented in establishing facts material to his defense relative to Judge Sosman, and the same is unconstitutional under Connecticut v. Doe, 538 U.S. 1, 7 (2003).

As to the second instance of reporting misconduct in the court, it is undisputed that the Judge (Gertner) in question was clearly not performing a *judicial act* when, as reported by a witness, she had privately spoken with that witness (who was a prior client of hers), which witness then told Cobb's client that he had agreed to "forget" his testimony based on that and another conversation should he be called to the stand as previously contemplated. What is and has always been at issue was whether making the report was protected conduct under either the First Amendment or under a Massachusetts Lawyer's (safe harbor) Oath [1].

What has never been an issue of course is whether almost seven years later the persons in question might deny having

---

[1]    I (repeat the name) solemnly swear that **I will do no falsehood, nor consent to the doing of any in court;** I will not wittingly or willingly promote or sue any false, groundless or unlawful suit, nor give aid or consent to the same; I will delay no man for lucre or malice; but I will conduct myself in the office of an attorney within the courts according to the best of my knowledge and discretion, **and with all good fidelity as well to the courts as my clients. So help me God.** (relevant bolding added by the Relator).

aided a witness in his plan to not testify truthfully under oath. Judge Gertner's testimony has never been relevant to this nor the BBO case since what was reported was *prima facie* and therefore reportable to the Court whether or not later denials were made.

The said witness had already detailed to both Cobb and client the material information which he now would "forget". The mere fact that Judge Gertner was a judge cannot be used to punish Cobb when she was not acting in any judicial capacity. Since the Court has alluded again to the fact that she was a judge, Exhibit "B", p. 22, and we all know that whatever her actions were reported to be that they were not judicial, then what is happening here is that the judge - simply because she is a judge and for no other conceivable reason - is being given unconstitutionally preferred reputational status under Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 838 (1978) for criticisms as against her so as to rationalize Cobb's punishment therefore, which violates the First Amendment. Please see discussion in pp. 41 - 50 of Plaintiff's previously filed Brief in support of TRO. The State cannot credibly deny that this specific charge of "accusing a sitting federal judge" was time and again emphasized throughout these proceedings as a grave wrong, it has been all over Boston publically for years, and its inclusion therefore as a reason to punish - not unlike the false claim of theft - forever poisoned the outcome of the matter.

Secondly, as respects the instance regarding Judge Gertner, the very lawyer's Oath in Massachusetts as above - let alone the First Amendment - allows for such reporting. Cobb's Oath to do

Page 12 of   14

nor consent to the doing of any falsehood in the court and to otherwise require strict fidelity does not go on to say "unless a judge later shall determine that he in his discretion will not admit the reported evidence of such falsity because it is improbable". Please see Exhibit "B" at p. 5 wherein Justice Greaney explains that this statement was "discredited hearsay". For any evidence to have ever been discredited, it must first have been considered, and that was enough under the First Amendment, Landmark, and under the said Oath. The fact is that as unsavory as this all was, it was a reportable event because even the SJC now says that it was *prima facie*. Whether it is denied later is immaterial to the reporting requirement as the unqualified Oath so infers. The Oath as it must be is set forth in an unqualified way. Moreover, the report that the witness had so changed his testimony upon such urging was relevant to Cobb's state of mind in reporting the situation to the Court as an Officer of the Court acting under such dictate. Under the Oath itself, there could hardly be evidence more germane to whether a falsehood was being perpetrated upon the Court than what the lawyer clearly understood (his state of mind in so reporting) through the said report to be such a falsity. The report was therefore protected by safe harbor under Gentile v. State Bar of Nevada, 501 U.S. 1030, 1048-49 (1991)(Majority Opinion by Mr. Chief Justice Rehnquist).

**Conclusion**

There can be no doubt that the several protected through

Page 13 of 14

quite unpopular Judge reports by Cobb, together with the "theft" which never happened, weighed heavily on the decision to disbar Cobb. The State has admitted all along that the only disbarable offense was theft. It mixed a capital charge with non-capital charges, and completely changed the theory of that charge twice after the evidence closed.

This impending disbarment (effective September 1, 2004) is unjust and the exclusive basis for the same was arrived at without affording Cobb both substantive and procedural due process. The Single Justice's decision and that of the BBO were both hopelessly prejudiced by the inclusion of the above. Cobb can easily defend at a full hearing some of the other charges under the First Amendment, like disciplining him for an taking a legal position that one judge approves, and the other believes frivolous. <u>Schware v. Board of Bar</u> Examiners of New Mexico, 353 U.S. 232 (1957)(concurrence, unconstitutional to punish lawyer when reasonably minded judges disagree as to the merits of the legal position he took).

LoRo 7o1  /attorney K.H, esq.
I informed by leaving a message
w/ his office/his sec.
(MC)

Respectfully submitted,

Matthew Cobb
101 Tremont Street
Boston, Massachusetts  02108
(617) 357-7300

Served via US mail, fax
& email this Aug. 9 04     Page 14 of  14

By matt Cobb







COMMONWEALTH OF MASSACHUSETTS
COMMISSION ON JUDICIAL CONDUCT
14 BEACON STREET SUITE 102
BOSTON, MASSACHUSETTS 02108
Phone: (617) 725-8050

**COMPLAINT FORM**

CJC Complaint No. _____

This form is designed to provide the Commission with the information to screen your complaint and to begin an investigation of your allegations. Please read the accompanying materials on the Commission's function and procedures before filling out this form. ONLY ONE JUDGE MAY BE COMPLAINED OF ON EACH FORM.

**PLEASE TYPE OR PRINT CLEARLY ALL INFORMATION**

Your name: Matthew Cobb, Esquire
Address: Law Office of Matthew Cobb, 101 Tremont Street, Boston, MA 02108
Daytime telephone: (617) 357-7300

Name of judge:  **CHIEF JUSTICE MARGARET H. MARSHALL**

Court:  **Supreme Judicial Court**

Case name: In Re: Matthew Cobb
Docket number: BD 2004 023
Attorneys involved: NA
Date(s) of misconduct: December 31, 2002 and continuing.
Has an appeal been filed? NA

**A summary of the general nature of your complaint:**

This judge willingly participated in an improper, callous, and otherwise unethical extrajudicial public proclamation which ostensibly had, was designed to have, or which had in fact a direct substantial prejudicial impact upon a deliberating legal entity so as to prejudice the said entity's determination of one of the central issues before them, which improper act was designed to protect judge **MARTHA SOSMAN** from public exposure of her irrefutable uncontested material judicial misconduct which has been hidden via a sealed record in the Massachusetts Courts now for upwards of ten years.

**Specific Facts:**

1)    Alan Rose, Esquire, and his former partner at Nutter, McClennen & Fish, Joseph Blue, Esquire were both material witnesses before the Massachusetts BBO's so called "Hearing Committee (HC)" as against Cobb. **As a matter of law**, their character traits - including veracity and ethical mores - were then at issue.

2)    No insubstantial part of the above docket numbered prosecution as against Cobb was due to his publically reporting that then Judge Sosman of the Superior Court had knowingly and willingly



acted unethically in specific violation of the Code of Judicial Conduct by openly allowing and encouraging Blute to practice unethically before her in open court on February 2, 1994, and by then rewarding him for his misconduct later that year, all in spite of his manifestly obvious and acknowledged violations of then existing lawyer Disciplinary Rules (DR 5-102 and DR 5-103), and by not mandatorily reporting Rose's uncontested unethical misconduct (DR 7-104) which was then the actual subject matter of the said court proceeding.

3)   At the so called BBO "hearing" in 2001 regarding the above docket numbered matter against Cobb, it was central to Cobb's defense to show that Rose (and Blute) did in fact act unethically, and the fact that Sosman - given her knowledge of the same - did not report such misconduct was the basis in part for Cobb publically reporting that she was biased and/or influenced by the firm of Nutter, McClennen & Fish.

4)   As to Sosman being biased and influenced, Cobb had it right all along. Even though he did not then report the following fact, it remains uncontested through this date that Rose's equity Partner, Blute, who was then (2/2/94) violating ethical rules by there representing Rose (pecuniary interest and a sure witness in the case) with Sosman's clear knowledge,  had only weeks previously unethically arranged *ex parte* for Sosman to hear the subject case against his own firm and partner (Rose) out of session, he had communicated *ex parte* with the court in that regard, and Sosman - while clearly knowing that she had improperly *ex parte* snatched another session judge's case  - never bothered to disclose this switch and impropriety to Cobb nor Cobb's clients. It just so happened that Rose had only a year prior played a substantial role in approving Judge Sosman's application to the bench. None of these facts in this paragraph have ever been contested in the least.

5)   So, while the so called "hearing" committee was "deliberating" in Cobb's matter at year's end, 2002, the SJC appoints Rose to the BBO on December 31, 2002, it then makes it a point to promptly publicly announce the same via written and Internet publications, and news of the said announcement was otherwise intentionally circulated to the BBO's/ HC's/ OBC's quarters at 75 Federal Street, Boston.

6)   The HC did not rule on Cobb's matter until February 21, 2003, after it learned of the Rose ✕ appointment to the BBO. Moreover, the so called "Appeal Panel" (who Rose also oversees, like he oversaw the very HC who had to factually evaluate whether he acted unethically) as well as the BBO itself, now containing Rose, were also influenced by this High Court injection of ethical credibility to material witness Rose. The BBO was entitled to assume that the SJC would not appoint one to its ranks unless he was certified "ethical", something which was material to Cobb's defense.

   One really has to ask oneself here why on earth was it so necessary for the SJC to hurriedly appoint one Rose to the BBO on December 31, 2002, let alone then immediately disseminate notice thereof to the OBC / BBO, and to the public generally for good measure, while the so called "Hearing Committee" in Cobb's then pending BBO proceeding was still out. We can safely assume that the committee members were not sequestered and that they could read, including reading the regular internal announcements distributed within the BBO / OBC itself detailing Rose's appointment. The HC's ruling was two months post Rose announcement.

   Would America have been outraged had Congress hurriedly awarded Oliver North the Congressional Medal of Ethics and had appointed him to ride herd over (and be in a position to overturn) the very committee entrusted to factually determine whether he had truthfully testified before

✕ BBO did not rule until Feb., '04.   (MC)

them, by public proclamation no less, all before the said investigating committee fact finders (before whom North's ethics, read veracity, were therefore paramount) had made any determination?

The point here is that any direct evidence of bias of the appointing authority - which we can all guess will never be admitted - pales by comparison to the determinative issue of the rank appearance of impropriety. CJC Cannon 3 (C)(1). Surely the SJC understands the controlling notion of "appearance of impropriety", since it regularly disbars attorneys for the same.

It cannot be plausibly denied that the timing and publication of the Rose appointment *ipso facto* violated the Code of Judicial Conduct, Cannon 3 (C) (1) given that the same injected material "facts" as truth into the HC's deliberative process above. What objective person, given the above, would not seriously question the timing of the Rose appointment? What about the appearance that Rose was rewarded by the SJC itself soon after his all too obvious testimonial cooperation with the BBO in exterminating a man who ratted out a highly favored Justice of the SJC? Did not this appointment's timing send a strong public message that the appointing authority cared not about the appearance of impropriety and bias, and, hence, its own CJC? Did not the same allow a reasoned inference of actual bias of the SJC in forever polluting the proceedings as against Cobb? Did not the same send a plausible message to not only the HC members, but also to the full BBO membership, that Cobb's assertions of Rose's misconduct (which, not coincidentally, were part of the basis for his criticism of Sosman) were pure folly and should be ignored?

Any reasoned mind could furthermore accept the notion that an unmistakable signal was sent on December 31, 2002 by the SJC to 75 Federal Street, Fifth Floor. The SJC as an admitted "supervisor" of, and appointing authority no less for, 75 Federal obviously publicly stamped Rose unqualifiedly with ethical prowess at a time where his ethics (read: lack thereof) were a material issue in an, ostensibly at least, undecided proceeding conducted by SJC underlings, which, had Cobb won, would have cast substantial disrepute on Sosman, another of 75 Federal's "supervisors". This conduct makes the public comments which Judge Gertner made in the *Boston Children's* case - for which she was disqualified by the First Circuit due to their appearance alone - look trite indeed.

As a subtle reminder, to pass a valid "judgment", a court must go into the fray with no predisposition, let alone prior conflicting judgment on the same facts. Here, the SJC already publicly and unequivocally has passed judgment on Rose's ethical conduct *in toto*, the very judgment it must now pass upon to decide the Cobb matter.

There can never be any rational claim that Rose's rights to the appointment, let alone the public interests generally in the fair administration of justice, RIGHT THEN somehow dominated Cobb's rights under the United States Constitution to a fair trial.

Well, maybe the SJC simply did not know of what was going down at the BBO? Well, as seen below as a matter of law under *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982) a state high court cannot claim ignorance as a defense to the law when it comes to its own self administered bar division. As a matter of law it is "responsible", *id.*, for every act therein. It is irrelevant therefore whether the court continues to set up a defense of ignorance.

Moreover, to have appointed Rose to an "ethics" board is to *ipso facto* have scrutinized his ethical background beforehand including all claims of ethical misconduct and all lawsuits (both of which obviously existed at the 2/2/94 proceeding) against him, or, at least, the public would reasonably assume so. CJC Cannon 3(C) (1). As such, every member of the SJC who must now judge Rose's testimony in order to adjudicate Cobb's pending BBO matter now possesses the very material personal knowledge about Rose which is at issue in that exact matter, namely, that he - as also opined by Judge Lawrence of the Appeals court in August 1994 - violated ethical rules. The same requires

disqualification of the entire SJC per Cannon 3 (C)(1)(a).

Justice Sosman herself in fact knew that Rose was a material witness at Cobb's proceeding and that the said proceeding was then ongoing when the SJC Rose appointment was made since she had been subpoenaed to there testify, which subpoena see vigorously fought.

The said Rose appointment was a manifest character voucher by the SJC for him. And while the Code of Judicial Conduct (CJC) bars "sworn" voluntary vouchers as such, the fact remains that nothing is remotely gained by the SJC swearing to anything. The public is entitled to assume that it speaks the truth without such formalism. This voucher takes on special meaning when one considers that it was made at a time when Rose's own ethical misconduct was part of the factual underpinning for Cobb's First Amendment protected allegation against Judge Sosman that she was biased. See CJC Cannon 2 (A)(appearance of impropriety created by what clearly objectively appears to be a character plug for Rose at a most inopportune time for Cobb); see also CJC Cannon 2 (B), sentence 2 (a public announcement that someone is appointed to an "ethics" board is tantamount to a public proclamation that that someone was, is, and is assumed to forever be "ethical", a materially contested point in Cobb's proceedings underpinning, again, the inference of bias as against Sosman. See also Cannon 3 (B) (5).

Under the law set forth by the Supreme Court in *Middlesex, supra*, all actions of the OBC/BBO are those of the court itself and the court is "responsible", *id.*, as a matter of Law for each such action. We do not even reach the issue of "knowledge" by the SJC of what went down at the OBC / BBO, since knowledge is simply a way to impute liability from an agent to a principal, a situation we have not under *Middlesex* since the BBO/ OBC and the court are indistinguishable as a matter of law. The SJC membership cannot therefore continue to deny responsibility for its ostensible arms length doings from what went down at the BBO / OBC joint entity, namely, that Rose was a material witness for the state at the time the appointment was made, and, consequently, his credibility was then paramount.

It is neigh impossible to say what a far reaching signal such an appointment would be to the gentleman's (Mr. Rose) colleagues on the Board. He is given the Official State high court stamp of ethical approval, meaning his track record is devoid of ethical misconduct. Yet part of the issues addressed in the Cobb matter impinged greatly upon his and his law partner's undisputed unethical conduct which the then trial judge Sosman freely allowed and encouraged. The Board could therefore rest assured, as it did when recommending disbarment for Cobb, that everything said by Cobb about Rose, his partner, Blute, and the judge must be folly, since ITS ADMITTED SUPERVISOR, THE SJC, had said beyond purview that this man, and implicitly his then law firm and partners, has always been beyond ethical reproach (via the appointment).

The undersigned has seen some quite skillful ploys in litigation in his all too brief tenure in the law in this fine City, but this one deserves top Honors because it is truly in a class by itself. Should the SJC and Rose have waited until after these proceeding were concluded to make and accept this appointment? Yes, that is if either of them actually cared about the appearance of impropriety or the rank prejudice that this could have as against Cobb. I understand that this complaint and any other communication to or from the Commission on Judicial Conduct remain confidential to the extent required by MGL chapter 211C, section 6, and Commission Rule 5.

Signed _____

Date _____